# 25-2322-cr

## United States Court of Appeals

*for the*

## Second Circuit

UNITED STATES OF AMERICA,

*Appellee,*

– v. –

ROBERT MENENDEZ, WAEL HANA, JOSE URIBE, FRED DAIBES,

*Defendants,*

NADINE MENENDEZ,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

# BRIEF AND SPECIAL APPENDIX FOR DEFENDANT-APPELLANT

SARAH R. KRISSOFF
EMMA SCULLY
ANDREW VAZQUEZ
COZEN O'CONNOR
*Attorneys for Defendant-Appellant*
3 World Trade Center
175 Greenwich Street, 55th Floor
New York, New York 10007
(212) 509-9400

CP COUNSEL PRESS (800) 4-APPEAL • (388612)

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..... iv

INTRODUCTION ..... 1

JURISDICTIONAL STATEMENT ..... 5

STATEMENT OF THE ISSUES ..... 5

STATEMENT OF THE CASE ..... 6

A. Factual Background ..... 6

B. Investigation and Charges ..... 7

C. Mrs. Menendez's Loss of Counsel ..... 10

D. Trial ..... 13

1. Failure to Call Prior Counsel During Trial ..... 13

2. The Evidence Presented at Trial ..... 14

i. Bribery Schemes ..... 15

ii. Grand Jury Obstruction Charges ..... 17

3. The Use of Summary Chart Exhibits ..... 18

E. Conviction and Sentencing ..... 19

SUMMARY OF ARGUMENT ..... 20

ARGUMENT ..... 25

I. THE GOVERNMENT VIOLATED MRS. MENENDEZ'S SIXTH AMENDMENT RIGHT TO COUNSEL ..... 25

A. Standard of Review ..... 25

B. Mrs. Menendez's Conviction Must Be Vacated Based On the Deprivation of Her Right to Counsel ..... 26

1. The Government May Not Unnecessarily Interfere With the Right to Counsel ..... 26

2. The Government's Conduct Violated Mrs. Menendez's Right to Counsel of Her Choice ................29

3. The District Court's Decision Denying Mrs. Menendez's Motion for a New Trial Rested On a Flawed Theory of Waiver ............................................37

4. The District Court's Decision Was Erroneous to the Extent It Found Mrs. Menendez Forfeited Her Sixth Amendment Claim .......................................43

C. The District Court Abused Its Discretion by Refusing to Hold an Evidentiary Hearing Prior to Denying Her Motion for a New Trial ..........................................................45

II. THE GOVERNMENT'S USE OF SUMMARY EXHIBITS FACILITATED A SUMMATION IN EVIDENTIARY FORM ..............................................................................................49

III. THE EVIDENCE AT TRIAL CANNOT SUPPORT MRS. MENENDEZ'S CONVICTIONS ......................................................56

A. Standard of Review ...............................................................56

B. The Evidence Was Insufficient To Support the Federal Bribery Convictions ...............................................................56

1. The Government Failed to Prove a Single Official Act ..................................................................56

i. The Egypt Scheme ............................................57

ii. The New Jersey Scheme .....................................60

iii. The Daibes Scheme ...........................................63

2. The Government Failed to Prove a *Quid Pro Quo* ..........................................................................65

i. The Egypt Scheme ............................................65

ii. The New Jersey Scheme .....................................68

iii. The Daibes Scheme ............................................70

C. The Evidence Was Insufficient to Convict Mrs. Menendez on the Obstruction of Justice Counts ......................73

1. The Trial Evidence Did Not Support Mrs. Menendez's Convictions on Counts Seventeen and Eighteen .....73

2. The Evidence At Trial Was Insufficient to Support the Conviction on Count Four .....77

IV. VENUE DOES NOT PROPERLY LIE IN THE SOUTHERN DISTRICT OF NEW YORK .....79

A. The Egypt Scheme .....81

1. The Mr. Chow Dinner .....81

2. Meeting at Lotte Hotel .....82

3. Drive from JFK Airport .....82

4. The Sale of the Gold Bars .....83

B. The New Jersey Scheme .....83

C. The Daibes Scheme .....85

D. The Conspiracy Counts .....85

CONCLUSION .....87

## TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Bd. of License Comm'rs of Town of Tiverton v. Pastore*,
469 U.S. 238 (1985) .......... 32, 35

*Berger v. United States*,
295 U.S. 78 (1935) .......... 33

*Brady v. United States*,
397 U.S. 742 (1970) .......... 46

*Chang v. United States*,
250 F.3d 79 (2d Cir. 2001) .......... 40, 44

*Donnelly v. DeChristoforo*,
416 U.S. 637 (1974) .......... 46

*Evans v. United States*,
504 U.S. 255 (1992) .......... 83

*Faretta v. California*,
422 U.S. 806 (1975) .......... 38

*Johnson v. Zerbst*,
304 U.S. 458 (1938) .......... 37, 40

*Jones v. Murphy*,
694 F.3d 225 (2d Cir. 2012) .......... 42

*Krumme v. WestPoint Stevens Inc.*,
238 F.3d 133 (2d Cir. 2000) .......... 44

*Luis v. United States*,
578 U.S. 5 (2016) .......... 26, 27

*Maine v. Moulton*,
474 U.S. 159 (1985) .......... 26

*McDonnell v. United States*,
579 U.S. 550 (2016) .......... *passim*

*Napue v. People of State of Ill.*,
360 U.S. 264 (1959) .......... 48-49

*Oyague v. Artuz*,
393 F.3d 99 (2d Cir. 2004)....................................................................25

*Purcell v. United States*,
158 F.4th 441 (2d Cir. 2025)..................................................................79

*Quinones v. United States*,
637 F. App'x 42 (2d Cir. 2016)...............................................................49

*Red Tree Invs., LLC v. Petróleos de Venezuela, S.A.*,
82 F.4th 161 (2d Cir. 2023)....................................................................44

*Strouse v. Leonardo*,
928 F.2d 548 (2d Cir. 1991)...................................................................38

*Torres v. United States*,
140 F.3d 392 (2d Cir. 1998)...................................................................39

*United States v. Aguilar*,
515 U.S. 593 (1995) ........................................................... 74, 75, 77

*United States v. Aquart*,
912 F.3d 1 (2d Cir. 2018).......................................................................46

*United States v. Armedo-Sarmiento*,
524 F.2d 591 (2d Cir. 1975)...................................................................33

*United States v. Aulet*,
618 F.2d 182 (2d Cir. 1980)...................................................................45

*United States v. Awadallah*,
436 F.3d 125 (2d Cir. 2006)...................................................................45

*United States v. Beech-Nut Nutrition Corp.*,
871 F.2d 1181 (2d Cir. 1989).................................................................80

*United States v. Biaggi*,
853 F.2d 89 (2d Cir. 1988).....................................................................62

*United States v. Bongiovanni*,
19-CR-227, 2024 WL 3487914 (W.D.N.Y. July 19, 2024).......................... 67, 70

*United States v. Boruch*,
550 F. App'x 30 (2d Cir. 2013)........................................................ 83-84

*United States v. Bramer*,
956 F.3d 91 (2d Cir. 2020).....................................................................56

*United States v. Bray*,
139 F.3d 1104 (6th Cir. 1998)....................51

*United States v. Brennan*,
183 F.3d 139 (2d Cir. 1999)....................79

*United States v. Brumer*,
528 F.3d 157 (2d Cir. 2008)....................28

*United States v. Cain*,
671 F.3d 271 (2d Cir. 2012)....................33

*United States v. Carmenate*,
544 F.3d 105 (2d Cir. 2008).................... 25, 39

*United States v. Cassese*,
428 F.3d 92 (2d Cir. 2005)....................71

*United States v. Citron*,
783 F.2d 307 (2d Cir. 1986)....................50

*United States v. Conlin*,
551 F.2d 534 (2d Cir. 1977).................... 51, 55

*United States v. Cruz-Flores*,
56 F.3d 461 (2d Cir. 1995)....................25

*United States v. Cunningham*,
672 F.2d 1064 (2d Cir. 1982).................... 28, 31

*United States v. Curcio*,
680 F.2d 881 (2d Cir. 1982)....................10

*United States v. Davis*,
689 F.3d 179 (2d Cir. 2012).................... 79, 85

*United States v. Fell*,
531 F.3d 197 (2d Cir. 2008)....................25

*United States v. Fore*,
169 F.3d 104 (2d Cir. 1999)....................39

*United States v. Gonzalez*,
No. 23-10999, 2025 WL 48071 (5th Cir. Jan. 8, 2025)....................51

*United States v. Gonzalez–Lopez*,
548 U.S. 140 (2006) .................... 22, 26, 36, 37

*United States v. Ho*,
984 F.3d 191 (2d Cir. 2020)........................................................ 49, 52, 56

*United States v. Jacobson*,
15 F.3d 19 (2d Cir. 1994)...........................................................................49

*United States v. Jefferson*,
289 F. Supp. 3d 717 (E.D. Va. 2017)..........................................................58

*United States v. Jones*,
900 F.2d 512 (2d Cir. 1990).........................................................................29

*United States v. Kim*,
246 F.3d 186 (2d Cir. 2001).........................................................................84

*United States v. Kirk Tang Yuk*,
885 F.3d 57 (2d Cir. 2018)...........................................................................79

*United States v. Kliti*,
156 F.3d 150 (2d Cir. 1998).................................................................. 29, 35

*United States v. Lange*,
834 F.3d 58 (2d Cir. 2016)..................................................................... 79, 80, 85

*United States v. LaSpina*,
299 F.3d 165 (2d Cir. 2002).................................................................. 86, 87

*United States v. Leone*,
215 F.3d 253 (2d Cir. 2000).................................................................. 45, 49

*United States v. Levy*,
25 F.3d 146 (2d Cir. 1994)................................................................. 33-34, 38

*United States v. Locascio*,
6 F.3d 924 (2d Cir. 1993)...................................................................... 29, 35

*United States v. Mathurin*,
148 F.3d 68 (2d Cir. 1998)...........................................................................49

*United States v. Mazzariello*,
No. 13-CR-211, 2015 WL 11108936 (W.D.N.Y. Dec. 18, 2015).........................34

*United States v. McKeon*,
738 F.2d 26 (2d Cir. 1984)...........................................................................28

*United States v. Menendez*,
759 F. Supp. 3d 460, 477 (S.D.N.Y. 2024)...................................................65

*United States v. Morrison*,
449 U.S. 361 (1981) ....................................................................................36

*United States v. Pattee*,
820 F.3d 496 (2d Cir. 2016)..........................................................................39

*United States v. Perez*,
325 F.3d 115 (2d Cir. 2003)..........................................................................28

*United States v. Pouryan*,
628 F. App'x 18 (2d Cir. 2015).....................................................................39

*United States v. Purcell*,
967 F.3d 159 (2d Cir. 2020)................................................................... 82, 84

*United States v. Quattrone*,
441 F.3d 153 (2d Cir. 2006)..........................................................................74

*United States v. Rodriguez–Moreno*,
526 U.S. 275 (1999) ....................................................................................80

*United States v. Rommy*,
506 F.3d 108 (2d Cir. 2007)................................................................... 85, 86

*United States v. Rosemond*,
841 F.3d 95 (2d Cir. 2016)............................................................................44

*United States v. Rosemond*,
958 F.3d 111 (2d Cir. 2020) .........................................................................25

*United States v. Rossillo*,
853 F.2d 1062 (2d Cir. 1988)........................................................................46

*United States v. Rutigliano*,
790 F.3d 389 (2d Cir. 2015)..........................................................................80

*United States v. Silver*,
864 F.3d 102 (2d Cir. 2017)..........................................................................57

*United States v. Silver*,
948 F.3d 538 (2d Cir. 2020)........................................................ 61, 63, 65, 83

*United States v. Stein*,
541 F.3d 130 (2d Cir. 2008)........................................................ 26, 27, 36, 42

*United States v. Stephenson*,
895 F.2d 867 (2d Cir. 1990)..........................................................................80

*United States v. Taubman*,
297 F.3d 161 (2d Cir. 2002)....................................................................49

*United States v. Tillem*,
906 F.2d 814 (2d Cir. 1990)....................................................................80

*United States v. Tompkins*,
623 F.2d 824 (2d Cir. 1980)............................................................ 45, 49

*United States v. Triumph Cap. Grp., Inc.*,
487 F.3d 124 (2d Cir. 2007)....................................................................25

*United States v. Triumph Cap. Grp., Inc.*,
544 F.3d 149 (2d Cir. 2008)....................................................................77

*United States v. Tzolov*,
642 F.3d 314 (2d Cir. 2011)............................................... 80, 82, 84, 85

*United States v. Urciuoli*,
513 F.3d 290 (1st Cir. 2008) ........................................................... 61-62

*United States v. Valencia*,
826 F.2d 169 (2d Cir. 1987)....................................................................28

*United States v. Zichettello*,
208 F.3d 72 (2d Cir. 2000)......................................................................81

*UPS Store, Inc. v. Hagan*,
No. 14-CV-1210, 2017 WL 3309721 (S.D.N.Y. Aug. 2, 2017) ...........................51

*Wheat v. United States*,
486 U.S. 153 (1988) ...............................................................................38

*Zappia Middle E. Const. Co. v. Emirate of Abu Dhabi*,
215 F.3d 247 (2d Cir. 2000)....................................................................26

**Constitutional Provisions:**

U.S. Const., Amend. VI ........................................................................ *passim*

U.S. Const., Art. III § 2, cl. 3 ..................................................................79

**Statutes & Other Authorities:**

18 U.S.C. § 201 ......................................................................................80

18 U.S.C. § 201(a)(3) ..... 58, 59

18 U.S.C. § 1343 ..... 80

18 U.S.C. § 1503 ..... 74, 75

18 U.S.C. § 1951(b)(2) ..... 80

18 U.S.C. § 3231 ..... 5

18 U.S.C. § 3237(a) ..... 85

28 U.S.C. § 1291 ..... 5

Fed. R. App. P. 28(i) ..... 24

Fed. R. App. P. 4(b) ..... 5

Fed. R. Crim. P. 11 ..... 39

Fed. R. Crim. P. 11(b)(1) ..... 39

Fed. R. Crim. P. 23(a) ..... 39

Fed. R. Crim. P. 29 ..... 19

Fed. R. Crim. P. 33 ..... 19

Fed. R. Crim. P. 51(a) ..... 44

Fed. R. Evid. 1006 ..... 50, 51, 52, 56

Fed. R. Evid. 602 ..... 41

Fed. R. Evid. 901 ..... 41

N.Y. R.P.C. 3.3(a)(1) ..... 32, 36

N.Y. R.P.C. 3.8 ..... 33

N.Y. R.P.C. 3.7(a) ..... 28

Evan T. Barr, *Prosecuted for a Proffer*, N. Y. L. J. (May 1, 2024), https://www.reedsmith.com/en/perspectives/2024/05/prosecuted-for-a-proffer ..... 9

*How a Last-Ditch Effort to Save Menendez From Prosecution Backfired*, N.Y. Times (July 7, 2024), https://www.nytimes.com/2024/07/07/nyregion/robert-menendez-bribery-trial-abbe-lowell.html ..... 9

## INTRODUCTION

Nadine Menendez's conviction cannot stand. In a series of cumulative missteps, the Government trampled upon Mrs. Menendez's Sixth Amendment rights. After creating a conflict between Mrs. Menendez and her counsel, the Government then announced that it was calling Mrs. Menendez's attorney as a witness against her at trial. This, of course, forced counsel out of the case. Having brazenly interfered in the attorney-client relationship, the Government then, remarkably, *never called Mrs. Menendez's counsel as a witness at trial*. Compounding this violation, the Government never provided notice to Mrs. Menendez—or the District Court—that the fundamental nature of the conflict had changed once the Government altered course.

The relationship between a defendant and her counsel is sacrosanct, and both the Constitution and hundreds of years of case law protect that relationship. The Government, in its zeal to pile-on additional charges against the wife of a sitting Senator shortly before trial, ignored the guardrails of the Constitution. Through its carelessness and haste, the Government's entirely preventable actions deprived Mrs. Menendez of her right to proceed to trial with the counsel of her choice. This was a fundamental structural error that requires this Court to vacate the conviction.

The potential for abuse should the Government's misconduct go unchecked is enormous. The Government enjoys broad discretion when choosing the witnesses

it calls to prove its case. But if the Government is allowed to claim it will call a defendant's own counsel at trial, force that counsel out of the case, and then not call that counsel—without properly informing the defendant or the District Court along the way—our carefully balanced system of criminal justice is at grave risk.

The timeline of events here is critical. Mrs. Menendez retained David Schertler and the law firm of Schertler Onorato in June 2022, in connection with the Government's investigation into the matter underlying this appeal. In August 2023, prior to any charges being filed, Mr. Schertler and his colleagues participated in a standard attorney proffer with the Government (the "August 2023 Proffer"). Shortly thereafter, in September 2023, Mrs. Menendez was indicted, along with her co-defendants. In March 2024, approximately two months before the then-scheduled trial, the Government obtained a fourth superseding indictment (the "S4 Indictment"), which included new obstruction charges against Mrs. Menendez.

In an unprecedented prosecutorial move, those charges were based in part on statements made by Mr. Schertler during the August 2023 Proffer. Importantly, Mrs. Menendez's counsel and attorneys from the Government were the only attendees at this meeting. The obstruction charges also relied upon a handful of documents Mr. Schertler provided to the U.S. Attorney's Office, on Mrs. Menendez's behalf, in response to a Government subpoena.

The S4 Indictment, of course, rendered Mr. Schertler a potential fact witness and created a potential conflict between Mrs. Menendez and her counsel. The parties identified the issue for the District Court, and the District Court held a *Curcio* hearing, as it was required to do. At that hearing, the Government stated *unequivocally* that it intended to call Mr. Schertler as a witness, with one of the lead Assistant United States Attorneys on the matter stating, "we have made it clear that we would intend to call Mr. Schertler as a witness." A210.

Indeed, by seeking to introduce evidence regarding the August 2023 Proffer, the Government *necessarily* turned Mr. Schertler (or someone else at his firm) into a sworn witness. This was an unforced error: the Government failed to have any law enforcement agents or non-attorneys from the U.S. Attorney's Office present at the proffer who would have been able to testify. The Assistant United States Attorneys and supervisory lawyers present certainly were not willing to testify and risk conflicting *themselves* off the high-profile case against a sitting Senator and his wife.

Once the Government made clear that it would call Mr. Schertler as a sworn witness, there were only two paths forward: either the parties would reach an anonymized stipulation as to Mr. Schertler's testimony, allowing Mr. Schertler to continue as Mrs. Menendez's counsel, or the Government would call Mr. Schertler at trial and Mr. Schertler would withdraw or be disqualified. Ultimately, the parties

were unable to agree on an appropriate stipulation within that window. Thereafter, Mr. Schertler, an extremely well regarded and experienced trial lawyer whose team had been working on the matter for nearly two years, was forced to withdraw from the case due to the unnecessary conflict manufactured by the Government.

But the Government's misconduct does not end there. Despite forcing Mr. Schertler off of the case, subpoenaing Mr. Schertler himself, and marking trial exhibits for admission that necessarily required Mr. Schertler's testimony, the Government *never called Mr. Schertler* at trial. In fact, the Government offered no evidence *whatsoever* regarding the August 2023 Proffer. Separately, the subpoenaed documents at issue came into evidence via a paralegal from the Government, and they readily permitted redaction, which would have addressed any conflict issues had Schertler Onorato remained on the case. The Government also violated its fundamental duty of candor by failing to inform either Mrs. Menendez or the District Court that it was no longer calling, or considering not calling, Mr. Schertler as a witness.

As set forth herein, additional grounds require this Court to vacate Mrs. Menendez's conviction. The Government's use of so-called summary exhibits was improper and usurped the role of the jury. The evidence was insufficient to support the jury's verdicts on the bribery-related counts and the obstruction of justice counts.

This case was also brought in the wrong place—venue was improper in the Southern District of New York.

But even the strongest evidence could not support this conviction in light of the prosecution's gamesmanship and blatant interference with Mrs. Menendez's relationship with her counsel. The Government has apparently forgotten that there are checks on its power, and referees to call out foul play. The Government's misconduct violated Mrs. Menendez's fundamental Sixth Amendment rights. This structural error infected all counts, requiring the vacatur of the judgment of conviction.

## JURISDICTIONAL STATEMENT

Mrs. Menendez appeals from a final judgment of conviction entered by the U.S. District Court for the Southern District of New York (Stein, J.) on September 11, 2025. SPA53. Mrs. Menendez filed a timely notice of appeal under Fed. R. App. P. 4(b) on September 23, 2025. A3732. The District Court had subject matter jurisdiction over this federal criminal prosecution under 18 U.S.C. § 3231. This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1. Whether Mrs. Menendez's conviction must be vacated because the Government's conduct deprived her of her Sixth Amendment right to counsel of choice.

2. Whether Mrs. Menendez's conviction must be vacated based on the Government's unfairly prejudicial use of summary chart evidence at trial.

3. Whether the Government failed to prove the existence of any unlawful bribery scheme, entitling Mrs. Menendez to vacatur.

4. Whether Mrs. Menendez is entitled to vacatur of the obstruction convictions because the Government failed to prove that she or Senator Menendez acted with the requisite intent.

5. Whether Mrs. Menendez is entitled to a reversal of the conviction on and dismissal of all but two counts because the Government failed to prove venue was proper in the Southern District of New York.

## STATEMENT OF THE CASE

Mrs. Menendez appeals from a judgment of conviction entered by the U.S. District Court for the Southern District of New York (Stein, J.) after a jury trial.

### A. Factual Background

Mrs. Menendez, 58, is a New Jersey resident, born and originally raised during wartime in Lebanon. A2476, 2987–88. In 2017, she met Senator Robert Menendez, the senior United States Senator for New Jersey who served as the Chairman or Ranking Member of the Senate Foreign Relations Committee during periods relevant to this appeal. A789. The two married in October 2020. A2858. Prior to her relationship with the Senator, Mrs. Menendez had no exposure to life in the political sphere.

Mrs. Menendez was a long-time friend of Wael Hana, a New Jersey businessman originally from Egypt with ties to Egyptian officials. A775, 1862. Both Hana and Senator Menendez knew another New Jersey businessman, Fred Daibes, who was involved in real estate and a donor to Senator Menendez. A1433, 1435–36. A third New Jersey businessman, Jose Uribe, had worked in insurance and trucking. A1732–33, 1743.

The Government investigated and ultimately brought charges alleging that the Menendezes knowingly accepted various bribes related to these three New Jersey businessmen—Hana, Uribe, and Daibes—via three overlapping "schemes."

### B. Investigation and Charges

During the Government's investigation, Mrs. Menendez was represented by the firm Schertler Onorato Mead & Sears ("Schertler Onorato"). In August 2023, prior to any charges being filed, David Schertler, Danny Onorato, and other representatives from Schertler Onorato participated in an attorney proffer to address the investigation and the related allegations with the U.S. Attorney's Office for the Southern District of New York, the August 2023 Proffer.[1] A3670. Critically, the Government brought only prosecutors to the meeting. A total of eight attorneys from the Government attended, including the Deputy United States Attorney, the Chief of the Criminal Division, supervisory personnel, and line prosecutors: Daniel Gitner,

[1] Also in attendance on behalf of Mrs. Menendez were two others from Schertler Onorato: Paola Pinto (an associate) and Grace McMahon (a paralegal). A3670.

Andrea Griswold, Daniel Richenthal, Paul Monteleoni, Eli Mark, Maurene Comey, Rebecca Donaleski, and Lara Pomerantz. *Id.* No law enforcement agents or non-attorney representatives from the Government attended. *Id.* During that proffer, Mr. Schertler and Mr. Onorato used a PowerPoint presentation to guide the discussion.

About a month later, the Government initiated its prosecution of Senator Menendez, Hana, Daibes, Uribe, and Mrs. Menendez with a five-count indictment.[2] A20. On March 5, 2024, shortly before the then-scheduled trial, the Government obtained a so-called trial indictment, a fourth superseding indictment containing eighteen counts, the S4 Indictment. A127. Mrs. Menendez was charged in fifteen of the counts. *Id.* When the S4 Indictment was filed, trial was scheduled to begin only two months later, on May 6, 2024. A24. In an extraordinary move, the Government brought two new obstruction charges (Counts Seventeen and Eighteen) premised on the August 2023 Proffer, a similar attorney proffer involving Senator Menendez's counsel, and the provision of documents to the Government in response to grand jury subpoenas. *See* A186–89.

Specifically, Count Seventeen charged Mrs. Menendez with conspiracy to obstruct justice and alleged as a specific overt act that Mrs. Menendez "caused her counsel to make false statements and misleading statements to the United States Attorney's Office for the Southern District of New York" related to the August 2023

---

[2] Uribe was also indicted but became a cooperating witness.

Proffer. A188. The S4 Indictment contained similar allegations regarding attorney proffers made by Senator's Menendez's counsel. A187–88. Additional overt acts related to a series of checks written by the Menendezes that were produced to the U.S. Attorney's Office by counsel in response to a subpoena; the Government alleged that the checks were written to cover up the bribery schemes. A167–70, 187–88. Count Eighteen, the substantive obstruction charge, contained similar allegations. *See* A188–89.

The Government's unprecedented and aggressive theory that an attorney proffer could constitute obstruction of justice raised eyebrows in the legal community. Commentators noted the chilling effect such tactics could have on a defendant's communications with his attorney, as well as on a defense attorney's ability to offer critical evidence and counter-narratives during pre-indictment negotiations.[3] One commentator noted that the charges "significantly undermined the attorney-client relationship and the defendants' Sixth Amendment right to counsel." *See* Evan T. Barr, *Prosecuted for a Proffer*, N. Y. L. J. (May 1, 2024), https://www.reedsmith.com/en/perspectives/2024/05/prosecuted-for-a-proffer.

---

[3] *See How a Last-Ditch Effort to Save Menendez From Prosecution Backfired*, N.Y. TIMES (July 7, 2024), https://www.nytimes.com/2024/07/07/nyregion/robert-menendez-bribery-trial-abbe-lowell.html (quoting former chief of the Southern District's public corruption unit, Tatiana R. Martins, characterizing the obstruction charges as "unusual and aggressive").

### C. Mrs. Menendez's Loss of Counsel

On March 17, 2024, the Government requested that the District Court conduct a hearing pursuant to *United States v. Curcio*, 680 F.2d 881 (2d Cir. 1982), exploring the conflict between Mrs. Menendez and her counsel created by the obstruction allegations in the S4 Indictment.[4] *See* A193. In its request for a hearing, the Government specifically noted that it "may seek to call Mr. Schertler and/or enter into evidence materials or elicit testimony from other witnesses regarding events with which Mr. Schertler was involved." *Id.* The Government raised the secondary concern that "Mr. Schertler (and his co-counsel) may be limited in their ability to make certain arguments to the Court or the jury at trial" because of their personal knowledge of certain relevant facts. *Id.* As to the first issue, the Government insisted that the District Court "need not resolve the question [at that time]" but that it may present an "unsworn witness" issue. *Id.* The Government noted that the second issue was likely waivable. *Id.* The letter included a proposed colloquy for the *Curcio* hearing. *See* A195–99. Mrs. Menendez submitted a response. *See* A200.

On March 21, 2024—forty-six days before Mrs. Menendez's then-scheduled trial date—the Court held a *Curcio* hearing. At that hearing, the Government stated unequivocally that it intended to call Mr. Schertler as a witness. A210 (clearly

[4] Senator Menendez changed counsel in November 2023, and the lawyers who had represented him in connection with his attorney proffers were no longer representing him. A31, 33. Accordingly, Senator Menendez did not require a *Curcio* hearing.

stating that it "would intend to call Mr. Schertler as a witness absent the ability to reach an anonymized stipulation"). Mr. Schertler could not both be called as a witness by the Government at trial and represent Mrs. Menendez at the same trial. Accordingly, the Court continued the *Curcio* hearing on the basis that only two paths forward existed: either the parties would reach an anonymized stipulation as to Mr. Schertler's testimony, permitting Mr. Schertler's continued retention; or the Government would call Mr. Schertler as a witness at trial, and Mr. Schertler would no longer be able to serve as Mrs. Menendez's counsel. The parties failed to agree on a stipulation, and Schertler Onorato was forced to withdraw as counsel for Mrs. Menendez on April 5, 2024, roughly one month before her trial was scheduled to begin. *See* A240.[5] Mrs. Menendez submitted a declaration dated April 8, 2024, in which she stated she had discussed the withdrawal decision with independent counsel and consented to Mr. Schertler's withdrawal. *See* A3713.

In December 2023, the District Court had denied an adjournment request by all defendants. *See* A34. On March 6, 2024, Mrs. Menendez and her co-defendants again requested an adjournment in light of the new allegations in the S4 Indictment, but the District Court denied that motion. *See* A44–45. Further, at the *Curcio* hearing on March 21, 2024, the District Court reiterated its disinclination to adjourn

---

[5] For clarity, Schertler Onorato withdrew without a formal disqualification inquiry or order by the District Court due to the Government's unequivocal statement that they would be utilizing Mr. Schertler's testimony at trial. *See* A210; A240; CA3–4.

the trial date *even if* Schertler Onorato were formally disqualified at that late date. *See* A218 ("THE COURT: I certainly am going to try to stick to that May 6 date or as close to it as possible even if your counsel is disqualified.").

Mrs. Menendez sought to sever her case before and after the *Curcio* hearing, which the Government opposed. *See* A35–36, 39, 48, 49, 52.[6] Only when Mrs. Menendez informed the District Court of her breast cancer diagnosis on April 9, 2024, and sought an adjournment on that basis, did the Court sever her from the scheduled May 6, 2024 trial, and adjourn the date for her trial.[7] *See* A242, 248. The Court thereafter granted Mrs. Menendez time to retain new counsel. *See* A60. Mrs. Menendez retained new counsel on May 29, 2024, *see* A66, and prior counsel was permitted to withdraw on June 4, 2024. *See* A66, 68. The parties then appeared for a pretrial conference on June 12, 2024. A70. After a series of trial adjournments, primarily related to her medical condition, Mrs. Menendez's trial started on March 18, 2025. *See* A110.

---

[6] Senator Menendez also unsuccessfully sought severance. *See* A36, 48, 52.

[7] Robert Menendez, Hana, and Daibes proceeded to trial on May 13, 2024, were convicted on all counts, and sentenced in January 2025 to imprisonment ranging from seven to eleven years. All three co-defendants have consolidated appeals pending before this Court and have begun serving their sentences. Case Nos. 25-296 (L), 25-302 (CON), and 25-333 (CON) (2d Cir.).

## D. Trial

### 1. Failure to Call Prior Counsel During Trial

At the trial of Mrs. Menendez's co-defendants in 2024 (the "2024 Trial"), the Government offered evidence regarding an attorney proffer made by Senator Menendez's counsel, similar to the August 2023 Proffer on behalf of Mrs. Menendez. Specifically, excerpts of a slide deck that Senator Menendez's former counsel provided to prosecutors during a pre-indictment proffer on September 11, 2023 were admitted into evidence over objection. *See* A250 (letter from Senator Menendez objecting to Government exhibit 4A-3, the redacted slide deck); *see* A263. A non-lawyer witness from the U.S. Attorney's Office, the Special Assistant to the United States Attorney who had been present during the meeting, testified about the meeting and facilitated admission of the slide deck into evidence. A262–64.[8]

In the months before Mrs. Menendez's trial, the Government repeatedly manifested its plan to offer evidence related to Schertler Onorato's August 2023 Proffer. The Government marked as trial exhibits: (1) an excerpt of the PowerPoint presentation used by Mr. Schertler during the proffer (GX 4B-1); (2) an e-mail communication between Mrs. Menendez and Mr. Schertler regarding the proffer (GX 4B-2); and (3) a copy of the engagement letter between Mrs. Menendez and

---

[8] According to the Special Assistant, he had been asked to "sit in on the meeting and help set up some tech." A262.

Schertler Onorato (GX 4B-3). *See* EA68, 75, 77; A3600; SPA 42–43. Unlike its handling of Senator Menendez's attorney proffer, the Government staffed the August 2023 Proffer with only prosecutors, neglecting to include any law enforcement agents or non-attorneys from the U.S. Attorney's Office. Therefore, the Government had to use Mr. Schertler or one of his colleagues to admit the facts regarding the August 2023 Proffer, absent testimony from the prosecutors themselves. *See* A3670–71.

Moreover, during the process of choosing a jury, the Government disclosed both Mr. Schertler and Mr. Onorato on its list of "people and places" that the jury may hear about during trial. A323–24. In January 2025, the Government issued a subpoena to Mr. Schertler for testimony at Mrs. Menendez's trial, which was then scheduled for February 5, 2025. *See* A3671. When Mrs. Menendez's trial was adjourned one final time, the Government confirmed with Mr. Schertler that he would agree to apply the previous subpoena to the new trial date. *Id.*

The Government never called Mr. Schertler as a witness at Mrs. Mendendez's trial, and it offered no evidence whatsoever regarding the August 2023 Proffer.

2. <u>The Evidence Presented at Trial</u>

Mrs. Menendez's trial began in March 2025. Like the trial of her co-defendants, the Government built its case upon three bribery schemes: Egypt (Counts Five, Seven, and Eight), New Jersey (Counts Nine and Ten), and Daibes

(Counts Eleven, Thirteen, and Fourteen). A127. The Government further alleged that the Menendezes had obstructed the grand jury investigation related to their conduct. A167–69. At closing, the Government characterized Mrs. Menendez as the Senator's "go-between, demanding payment, collecting payment, and promising official action by the senator, but always, always, keeping him informed." A3096.

*i. Bribery Schemes*

**Egypt.** Per the Government, Senator Menendez moderated his prior policy positions regarding Egypt shortly after he began dating Mrs. Menendez and was introduced to Hana. A2172–77. The Government contended that the Senator undertook various actions regarding Egypt in exchange for benefits to Senator and Mrs. Menendez.

First, in April 2019, the Egyptian Government gave IS EG Halal Certifiers Inc.—a company owned by Hana—exclusive rights to certify U.S. beef exports to Egypt as halal compliant in April 2019. A576, 718; EA175–76 (rows 563–74). The U.S. Department of Agriculture ("USDA") opposed this decision. A583, 646–48; EA175–79 (rows 563–640). Hana sent Mrs. Menendez an article outlining USDA efforts to end IS EG's monopoly. EA179 (row 624). Mrs. Menendez forwarded the article to Senator Menendez, who subsequently called the Undersecretary for foreign agricultural affairs at the USDA, Ted McKinney. EA180 (row 645, 647). McKinney testified that the Senator told him calmly to "stop interfering with my

constituent [Hana and his business, both residing in New Jersey]." A1408, 1357–58, 1406, 3120. There was no evidence that Senator Menendez exerted pressure on Undersecretary McKinney. In fact, Undersecretary McKinney testified that the call did not alter his position on the topic. A1390; A1408 ("We don't like monopolies. So that was clearly my position, and that was what I reflected in letters and communications[.]"). Undersecretary McKinney further testified that the Senator was not angry during the call. A1357–58, 1406.

The Government also alleged that Senator Menendez acted on behalf of Egypt, including meeting with Egyptian officials, signing off on military aid to Egypt, relaying certain nonpublic embassy information to Mrs. Menendez, who shared it with Hana, and reviewing and editing a draft letter purportedly from an unidentified Egyptian official in response to concerns raised by a senator and others. *See, e.g.*, A914–17, 929–34, 955–56, 2145–47, 2154. The Government argued at trial that payments made by Hana and his associate on Mrs. Menendez's mortgage and payments from Hana to Mrs. Menendez for consulting work were bribery payments in furtherance of Senator Menendez's actions regarding Egypt. A710, 734–37, 1049–52, 1060–64; EA52, 79, 85, 87, 89.

**New Jersey.** The Government contended that Senator Menendez agreed to intervene in two New Jersey state criminal matters involving Uribe's associates. A1766, 1771–73. The Government presented evidence regarding several

conversations, including an in-person meeting, Senator Menendez had with New Jersey Attorney General Gurbir Grewal connected to the prosecutions. A1677–84, 1687–92. The Government further connected Uribe's payments toward a Mercedez-Benz for Mrs. Menendez to this scheme, relying on Uribe's testimony that he agreed to buy a car for Mrs. Menendez in exchange for her help. A1726, 1728, 1811–14.

**Daibes.** A federal grand jury indicted Fred Daibes in October 2018 in New Jersey. EA271 (row 1). Beginning in or about 2020, the Government contended the Senator and Daibes agreed to a *quid pro quo* in which the Senator would nominate an individual sympathetic to Daibes to serve as the U.S. Attorney for the District of New Jersey in order to obtain a favorable resolution for Daibes. A2499, 2488, 2575–76, 2639–40. Ultimately, Phillip Sellinger became the U.S. Attorney for the District of New Jersey. A2546–48. The Government asserted that the Senator was exerting influence and pressure, or at a minimum had agreed to exert influence or pressure, upon the relevant prosecutors for a favorable outcome for Daibes. In exchange, Daibes allegedly provided the Menendezes with cash and gold bars, among other things. *See, e.g.*, A478–80, 1446–51, 2281–83.

*ii. Grand Jury Obstruction Charges*

Counts Seventeen and Eighteen constituted the grand jury obstruction charges: conspiracy to commit obstruction of justice and a substantive obstruction charge. A186–88; A1709–20; EA93. The Government presented evidence at trial

that Senator Menendez wrote two checks to Mrs. Menendez with funds to cover (1) Uribe's car payments toward Mrs. Menendez's Mercedes, and (2) Hana's payments toward Mrs. Menendez's mortgage. Mrs. Menendez then wrote checks to Uribe and Hana with notations in the relevant memo lines that the funds pertained to loans. EA1, 13. Mrs. Menendez produced the checks promptly pursuant to a subpoena issued in June 2023. EA286. The Government did not present any evidence at trial regarding the August 2023 Proffer.

3. The Use of Summary Chart Exhibits

In their case-in-chief, prosecutors offered days of testimony through three primary summary exhibits. Each of the key summary exhibits aligned to one of the bribery schemes—GX 1352 (Egypt scheme, presented through witness Coughlin), GX 1353 (New Jersey scheme, presented through witness Graves), and GX 1354 (Daibes scheme, presented through witness Van Wie).[9] EA137, 220, 271. These three summary exhibits were charts containing hundreds of line entries in chronological order, combining information from various sources: texts, emails, WhatsApp and Signal communications, call log details, transcriptions of recorded voicemails, Google map screenshots, restaurant attendance logs, and photos of

[9] Other summary charts were admitted through the testimony of Coughlin and Van Wie. For example, GX 1311, GX 1313, and GX 1314 are charts of select text messages between Mrs. Menendez and Uribe, and GX 1337 is a chart of Mr. Menendez's search history. Unlike the "scheme" summary charts, these exhibits were limited to information from single sources.

checks, letters, internet search history results, and other documents. Mrs. Menendez's trial transcript spans 2,744 pages before the parties rested. Of those 2,744 pages, the testimony by Coughlin, Graves, and Van Wie, who read and described the key summary exhibits corresponding to the three alleged schemes—totaled approximately 462 pages, roughly seventeen percent of the transcript prior to summations. *See* A851–86, 899–1095 (Coughlin); A1484–1592, 1639–48, 2307–51 (Graves); A2678–2740 (Van Wie).

Each summary exhibit was drafted by prosecutors, not the testifying witness. The three Government witnesses who read and interpreted the summary exhibits had no knowledge of the underlying facts presented in the charts. A851, 890, 1481, 2677. They principally read aloud particular line entries picked by the Government, confirmed the accuracy of the line entries in relation to the underlying exhibits cited in the summary charts, and stated the timing between certain line entries. *See, e.g.*, A938–40 (connecting text from Hana to Egyptian official and separate text from Mrs. Menendez to Hana about a dinner).

### E. <u>Conviction and Sentencing</u>

The jury found Mrs. Menendez guilty of Counts One through Five, Seven through Eleven, Thirteen, Fourteen, Fifteen, Seventeen, and Eighteen on April 21, 2025, after a five-week trial. Following her conviction, Mrs. Menendez filed post-trial motions pursuant to Federal Rules of Criminal Procedure 29 and 33. Mrs.

Menendez raised the Sixth Amendment violations that are central to this appeal. *See* A3457. In connection with those motions, Mrs. Menendez requested that the District Court hold an evidentiary hearing to complete the record regarding the Sixth Amendment violations and address key factual questions regarding the Government's conduct and decision-making in forcing out Schertler Onorato. *See* A3479 n.8.

The Government filed an opposition brief rife with unsworn statements regarding the attorney conflict and their decision-making regarding the presentation of evidence surrounding Counts Seventeen and Eighteen, including evidence related to the August 2023 Proffer. A3596, 3600–01. The District Court failed to hold an evidentiary hearing and denied Mrs. Menendez's motion for post-trial relief. SPA2. The District Court dismissed Count Fifteen as multiplicitous and did not impose judgment on that count. SPA51–52; SPA53. The District Court ultimately sentenced Mrs. Menendez principally to 54 months imprisonment and three years of supervised release. SPA53. The Court also imposed a forfeiture order. A123; SPA60. Mrs. Menendez is scheduled to report to serve her sentence in July 2026. SPA55.

## SUMMARY OF ARGUMENT

**I.** This Court has repeatedly condemned unnecessary government interference with the Sixth Amendment rights of the accused. But here, the

Government did just that. Shortly before trial, the Government obtained the S4 Indictment charging obstruction of justice based in part on statements made during the August 2023 Proffer, at which only Government attorneys and Mrs. Menendez's counsel were present. Thus, the Government created the initial conflict between Mrs. Menendez and her long-time counsel. In its efforts to address the potential conflict before the District Court, the Government then unequivocally insisted that it would call Mr. Schertler as a witness absent the parties' ability to reach an anonymized stipulation as to Mr. Schertler's testimony. In other words, the Government's actions transformed a potential conflict into a severe, unwaivable conflict. When a stipulation proved unattainable, Mr. Schertler was forced to withdraw. Then, without any subsequent disclosure, discussion, or continuation of the *Curcio* proceedings, the Government decided not to call Mr. Schertler as a witness. The Government failed in its duties to Mrs. Menendez and the District Court and deprived Mrs. Menendez of her chosen counsel without justification.

Government interference with the rights of the accused cannot go unchecked. But the District Court refused to address this egregious overreach and dismissed Mrs. Menendez's Sixth Amendment claim. The District Court's decision rested on several untenable conclusions. First, the District Court's decision relied on the erroneous premise that Mrs. Menendez waived her right to counsel through inaction. This reasoning directly contravenes Second Circuit law requiring that waivers of

rights be knowing, intelligent, and voluntary pursuant to oversight by the trial court. Likewise, to the extent the District Court concluded Mrs. Menendez forfeited her Sixth Amendment claim, this erroneous decision neglects the fact that Mrs. Menendez raised the argument immediately when the conflict was first created, and that she was not required to raise the objection again. Finally, the District Court abused its discretion by failing to hold an evidentiary hearing after finding out about the constitutional violation and, remarkably, crediting unsworn factual assertions by the Government regarding the motives and timing of its decisions pertaining to Mr. Schertler.

Mrs. Menendez's conviction is tainted by the Sixth Amendment violation and must be vacated. No showing of prejudice is required to warrant vacatur, because deprivation of the right to counsel is a structural error "bear[ing] directly on the framework within which the trial proceed[ed]." *United States v. Gonzalez–Lopez*, 548 U.S. 140, 150 (2006) (Scalia, J.).

**II.** The Government's reliance on summary chart evidence rendered Mrs. Menendez's trial unfair and warrants vacatur of the conviction. In an abuse of its discretion, the District Court admitted highly prejudicial summary chart evidence, which the Government used to prove the heart of its case. By facilitating inferential leaps between disparate communications and events over multiple years, the

summary charts operated as premature summations, which the Government exploited to unfairly imply a *quid pro quo*.

**III.** Mrs. Menendez's bribery and obstruction convictions were unsupported by the evidence. Principally, the Government failed to meet the standard required by *McDonnell* and show that the Senator engaged in any "official act" in connection with any alleged bribery scheme. With respect to the Egypt scheme, Senator Menendez's phone call to Undersecretary McKinney cannot constitute an official act where no matter was pending before that official, and no evidence indicated that the Senator pressured McKinney. Likewise, messages sent from the Senator to Hana conveying arms sale information are insufficient to constitute an official act.

The Government's evidence was likewise infirm with respect to the alleged New Jersey scheme. Grewal testified to his "polite" communications with Senator Menendez, during which the Senator raised concerns about the unfair treatment of Hispanics by the Insurance Fraud Prosecutor's office. Such support for a broad policy position does not constitute a specific request for action by a public official. Finally, the Senator's recommendation that Philip Sellinger serve as the incoming United States Attorney for New Jersey did not suffice to establish an official act, particularly where the Senator did not request that Sellinger take any action.

The Government not only failed to prove any "official acts," but the only acts it did offer as evidence were not sufficiently tied to any *quid pro quo*—in other words, no acts were made *in exchange for* a thing of value. The timing of events undercuts the argument that any items were received in connection with Senator Menendez's efforts with respect to any of the alleged schemes. And, critically, Mrs. Menendez had no role in facilitating any of the acts in connection with the Daibes federal prosecution.

The Government's obstruction counts fare no better. Its case in support of the alleged obstruction of the grand jury proceeding in the Southern District of New York lacked sufficient evidence of any corrupt intent. And the Government relied on the same deficient evidence of *quid pro quo* to support its obstruction count related to the Daibes case. The Government's failure to offer sufficient evidence of its bribery and obstruction counts necessitates vacatur of the conviction on all counts with instructions to the District Court to enter a judgment of acquittal.

**IV.** Finally, this case was tried in the wrong district. The Government failed to adduce sufficient evidence that any relevant conduct occurred in the Southern District of New York, requiring vacatur on all but two counts.[10]

---

[10] Senator Menendez, Hana, and Daibes have filed their own briefs to challenge their convictions. Pursuant to Federal Rule of Appellate Procedure 28(i), Mrs. Menendez adopts by reference all arguments in their briefs that are consistent with the arguments raised herein, including, but not limited to, those addressing the Speech

# ARGUMENT

## I. THE GOVERNMENT VIOLATED MRS. MENENDEZ'S SIXTH AMENDMENT RIGHT TO COUNSEL

### A. Standard of Review

This Court reviews conclusions of law involving constitutional questions *de novo*. *United States v. Fell*, 531 F.3d 197, 209 (2d Cir. 2008); *United States v. Cruz-Flores*, 56 F.3d 461, 463 (2d Cir. 1995). Claims implicating the Sixth Amendment—including the right to counsel of choice—are no exception. *See, e.g.*, *United States v. Rosemond*, 958 F.3d 111, 119 (2d Cir. 2020) (claims of ineffective assistance of counsel and violations of the defendant's Sixth Amendment "right to autonomy" reviewed *de novo*); *United States v. Triumph Cap. Grp., Inc.*, 487 F.3d 124, 131 (2d Cir. 2007) (claim that right to counsel was infringed when the court restricted communication with counsel reviewed *de novo*). "'Whether a defendant has effectively waived his federal constitutional rights in a proceeding' is 'ultimately a legal question,' and so we review the District Court's ruling *de novo*." *United States v. Carmenate*, 544 F.3d 105, 107 (2d Cir. 2008) (quoting *Oyague v. Artuz*, 393 F.3d 99, 104 (2d Cir. 2004)).

---

or Debate Clause, the FARA conviction, venue, and the Government's use of summary charts.

Separately, "[t]he district court's denial of an evidentiary hearing is subject to an abuse of discretion standard of review." *Zappia Middle E. Const. Co. v. Emirate of Abu Dhabi*, 215 F.3d 247, 253 (2d Cir. 2000).

**B. <u>Mrs. Menendez's Conviction Must Be Vacated Based On the Deprivation of Her Right to Counsel</u>**

1. <u>The Government May Not Unnecessarily Interfere With the Right to Counsel</u>

The Sixth Amendment ensures that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. CONST. amend. VI. A component of this guarantee "is the right of a defendant who does not require appointed counsel to choose who will represent him." *Gonzalez–Lopez*, 548 U.S. at 144; *see also Luis v. United States*, 578 U.S. 5, 11 (2016) (noting the "necessarily close working relationship between lawyer and client, the need for confidence, and the critical importance of trust"). The right to "select counsel of one's choice" is considered the "root meaning" of the Sixth Amendment. *Gonzalez–Lopez*, 548 U.S. at 147–48.

Accordingly, the Government may not unnecessarily obstruct a defendant's right to counsel. Indeed, the Government is required to "honor" it. *United States v. Stein*, 541 F.3d 130, 154 (2d Cir. 2008) (quoting *Maine v. Moulton*, 474 U.S. 159, 170–71 (1985)). The Government has, "at the very least," an "affirmative obligation not to act in a manner that circumvents and thereby dilutes the protection afforded by the right to counsel." *Moulton*, 474 U.S. at 171 (holding that the Government

violated defendant's Sixth Amendment rights when it arranged to record conversations between defendant and undercover informant, interfering with the defendant's ability to consult counsel).

This Court has specifically condemned government interference with a defendant's right to counsel of choice. In *United States v. Stein*, this Court held that the government violated the defendants' Sixth Amendment rights when it pressured their employer to change its policy regarding advancement of legal fees, precluding multiple defendants from retaining counsel of their choosing. 541 F.3d at 144–47, 156–58. The Court recognized that "the right to counsel in an adversarial legal system would mean little if defense counsel could be controlled by the government or vetoed without good reason." *Id.* at 154; *accord Luis*, 578 U.S. at 12 (holding that Sixth Amendment precludes pretrial restraint of a criminal defendant's legitimate, untainted assets needed to retain counsel of choice).

Further, in addressing the admissibility of attorney statements at trial, this Court has expressly warned that the introduction of such evidence risks encroaching on a defendant's Sixth Amendment rights. The Court has observed that the introduction of attorney statements "raises a number of difficulties since it touches upon numerous sensitive areas including: communications between criminal defendants and their attorneys, . . . the work product, legal theories and trial tactics of the attorney, the freedom of the attorney to engage in uninhibited and robust

advocacy, [and] the right to counsel of one's choice." *United States v. McKeon*, 738 F.2d 26, 30 (2d Cir. 1984). Recognizing that "[t]hese Hobson's choices may thus seriously impair the defense," *id.* at 32, the Court has carefully circumscribed the use of such statements, *see id*. at 33; *see also United States v. Valencia*, 826 F.2d 169, 173–74 (2d Cir. 1987) (affirming exclusion of statements made during informal discussions between prosecutor and defense counsel, which may have led to counsel's disqualification, because government's need for the statements was inadequate to outweigh "the defendant's interests in retaining the services of his counsel").

To be sure, the right to counsel of choice is not absolute, *see United States v. Brumer*, 528 F.3d 157, 160 (2d Cir. 2008), and it may be overridden where the defendant's attorney is likely to act as a sworn witness at trial, *see United States v. Cunningham*, 672 F.2d 1064, 1074 (2d Cir. 1982); *see also* N.Y. Rules of Pro. Conduct r. 3.7(a) ("A lawyer shall not act as advocate before a tribunal in a matter in which the lawyer is likely to be a witness on a significant issue of fact."). But absent grounds for disqualification or mandatory withdrawal, "[w]here the right to counsel of choice conflicts with the right to an attorney of undivided loyalty, the choice as to which right is to take precedence must generally be left *to the defendant* and *not be dictated by the government*." *United States v. Perez*, 325 F.3d 115, 125 (2d Cir. 2003) (emphasis added).

In contrast to a sworn witness problem, the risk of an attorney becoming an *unsworn* witness presents entirely different concerns from a conflict-of-interest perspective. "An attorney acts as an unsworn witness when his relationship to his client results in his having first-hand knowledge of the events presented at trial." *United States v. Locascio*, 6 F.3d 924, 933 (2d Cir. 1993). While a sworn witness problem is "to the detriment of the accused," when an attorney acts as an unsworn witness, "the detriment is to the government." *Id.* at 933–34.

Accordingly, trial courts respond differently to the risk that counsel may be an unsworn witness. While disqualification is virtually mandatory when an attorney acts as a sworn witness, "disqualification is a drastic remedy to [an] unsworn witness problem." *Id.* at 934. As a result, the parties may agree "to limit inquiry to avoid the problem of counsel as an unsworn witness." *United States v. Kliti*, 156 F.3d 150, 156 n.7 (2d Cir. 1998); *see also United States v. Jones*, 900 F.2d 512, 520 (2d Cir. 1990) (finding no conflict existed where evidence, of which counsel had knowledge, was admitted in redacted form, and thus jury was unaware of counsel's involvement and would not place undue weight on evidence).

2. <u>The Government's Conduct Violated Mrs. Menendez's Right to Counsel of Her Choice</u>

The Government employed an aggressive and extraordinary charging strategy, knowingly creating a conflict of interest between Mrs. Menendez and her attorneys shortly before trial. It then unequivocally represented that the conflict was

unwaivable because the Government was calling Mrs. Menenedez's own counsel to testify, and neglected to correct the record when the fundamental nature of the conflict had changed. This conduct, in the aggregate, interfered with Mrs. Menendez's fundamental right to counsel of her choice without sufficient justification, and the results were severe and profound. Mr. Schertler was never called as a witness, yet Mrs. Menendez was forced to proceed to trial without her counsel of two years under the mistaken impression that he was incapable of representing her.

Through its unilateral, foreseeable, and entirely avoidable actions, the Government manufactured the need for Mr. Schertler to become a sworn witness and created an unwaivable conflict between Mrs. Menendez and her longstanding counsel. The Government *chose* to have at least *eight* prosecutors attend the August 2023 Proffer and *no* law enforcement agents or non-attorneys from the U.S. Attorney's Office. A3670–71.[11] It was a critical error for the Government to take the unprecedented step of seeking obstruction charges based in part on statements made during the August 2023 Proffer when it *knew that the only witness it would*

[11] While not the focus of this appeal, this begs the question of what evidence the Government presented to the grand jury to support the very specific allegations in the S4 Indictment regarding what was said by Mrs. Menendez's counsel at the August 2023 Proffer. A169–70. Were the trial AUSAs themselves, improperly, the hearsay source for the information presented to the grand jury related to the August 2023 Proffer?

*call at trial regarding those statements was Mrs. Menendez's own counsel* because of the Government's *failure* to have appropriate witnesses at the meeting.

After the charges were brought, the District Court held a *Curcio* hearing following the Government's representation that a potential conflict had arisen between Mrs. Menendez and Schertler Onorato. *See* A193, 206. That potential conflict ripened into a sworn witness problem when the Government stated, unequivocally, that it would call Mr. Schertler to testify. *See* A210. With stunning disregard for the implications to Mrs. Menendez's Sixth Amendment rights, the Government *insisted* on the existence of an unwaivable conflict. The inquiry conducted by the District Court during the only hearing on this fundamental issue was thus premised on the assumptions that (1) Mr. Schertler was going to be a sworn witness, and (2) the parties would reach an anonymized stipulation regarding Mr. Schertler's testimony. *See* A213–15. That did not happen.

Accordingly, Menendez did not lose her chosen counsel pursuant to a formal disqualification motion adjudicated by the District Court, as is generally the process when a defendant's counsel becomes a sworn witness. *See Cunningham*, 672 F.2d at 1073–74 (reviewing trial court's disqualification decisions). Rather, Mr. Schertler was forced to withdraw due to the Government's mismanagement of the conflict it had created. Once it became clear the parties would not reach a stipulation, the District Court acceded to Mr. Schertler's forced withdrawal as counsel without any

further *Curcio* proceedings—only one month before Mrs. Menendez's then-scheduled trial date. *See* A51, 66, 68; A240; A286.

Having prompted this drastic outcome, the Government then unilaterally and secretly decided that it would no longer call Mr. Schertler as a witness at Mrs. Menendez's trial.[12] But the *Curcio* proceeding and Mr. Schertler's subsequent withdrawal turned entirely on the Government's representation to Judge Stein that it "would intend to call Mr. Schertler as a witness absent the ability to reach an anonymized stipulation." A210. The representation, which profoundly impacted Mrs. Menendez's trial, turned out to be false.

The moment the Government knew that Mr. Schertler was no longer a *sworn* witness, or even that he was *unlikely* to be called, it had an affirmative duty to correct its prior representations from the *Curcio* hearing. The ethical duty of candor requires lawyers to correct false statements of material fact or law previously made to the tribunal. N.Y. R.P.C. 3.3(a)(1); *see also Bd. of License Comm'rs of Town of Tiverton v. Pastore*, 469 U.S. 238, 240 (1985) ("It is appropriate to remind counsel that they

[12] Although the precise moment is unclear, the Government itself has suggested that it knew it would no longer call Mr. Schertler—or, at least, that it was unlikely—as early as June 2024, during the 2024 Trial. *See* A3596 (stating that the Government "reconsider[ed] its likelihood of calling Schertler as a substantive witness" when it elected not to call the Senator's attorney in its case-in-chief either to testify about the attorney proffer, and the District Court ruled that an attorney proffer could not be in and of itself an act of obstruction). This unsubstantiated representation bears on just one of lines of inquiry that the District Court declined to take up in an evidentiary hearing. *See infra* Section I(C).

have a continuing duty to inform the Court of any development which may conceivably affect the outcome of the litigation." (internal quotations omitted)). This duty applies with even more force to prosecutors, who have heightened responsibilities due to their role as ministers of justice. *See* N.Y. R.P.C. 3.8; *see also Berger v. United States*, 295 U.S. 78, 88 (1935) (the United States Attorney is a representative of a "sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all, and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done.").

This duty to update the record flows not just from the ethical rules; the Government was required to give Mrs. Menendez a fair opportunity to weigh any *waivable* conflict against her right to counsel of her choice. *United States v. Cain*, 671 F.3d 271, 293 (2d Cir. 2012) ("[T]he determination of which right is to take precedence must generally be left to the defendant, who may make a knowing and intelligent waiver of his right to a conflict-free lawyer if he desires to continue the representation."); *see also, e.g.*, *United States v. Armedo-Sarmiento*, 524 F.2d 591, 592 (2d Cir. 1975) (reversing disqualification of attorney where "the district court did not even give [defendants] the opportunity to elect to retain . . . their attorneys").

Furthermore, a trial court relies on the Government's disclosures when fulfilling its duty to inquire, which is the first step a court must take when presented with a possible conflict of interest. *See United States v. Levy*, 25 F.3d 146, 153 (2d

Cir. 1994) (court has an "inquiry" obligation to determine whether an "attorney in fact suffers from an actual conflict, a potential conflict, or no genuine conflict at all."). By insisting that Mr. Schertler would be a sworn witness and failing to correct the record, the Government impeded the District Court's exercise of this duty. *See United States v. Mazzariello*, No. 13-CR-211, 2015 WL 11108936, at *11 (W.D.N.Y. Dec. 18, 2015) (change in circumstances arising from co-defendant's plea agreement was "precisely why the Court conducted its own initial inquiry hearing and must make an independent determination as to whether an actual conflict exists").

Had the District Court been apprised of the fact that Mr. Schertler would not (or was unlikely to) testify, it could have determined the conflict was waivable. At the very least, if the appropriate disclosures had been made by the Government, the District Court could have and should have held an additional *Curcio* proceeding to address any remaining conflict issues. But for the Government's reticence, Mrs. Menendez would have had a fair opportunity to waive her right to conflict-free counsel, thereby asserting her right to chosen counsel, and re-engage Schertler Onorato.

Even if Mr. Schertler had remained a potential *unsworn* witness at trial, the analysis is the same. The Government nonetheless had a duty to update the District Court as to this transformation of the conflict, allowing the parties to resolve the

unsworn witness issue or inviting the District Court to make the "drastic" decision to enter a formal disqualification order. *Locascio*, 6 F.3d at 934. Indeed, the record demonstrates that the unsworn witness issue could have been easily resolved by sanitizing the evidence. The Government ultimately presented its obstruction case using documents transmitted by Schertler Onorato to the U.S. Attorney's Office pursuant to subpoena, *see* EA15, which were admitted through the testimony of a paralegal at the U.S. Attorney's Office, *see* A2102–24. This evidence easily permitted redaction and could have been authenticated by a number of witnesses, or it could have otherwise been offered through stipulation. *See Kliti*, 156 F.3d at 156 n.7. *Only* the Government's insistence on introducing evidence regarding the August 2023 Proffer created an unwaivable "sworn witness" problem that necessitated Mr. Schertler's withdrawal. *See id.* at 155.

The Government violated its affirmative duty to update Mrs. Menendez and the Court once the fundamental nature of the conflict between Mrs. Menendez and her counsel changed— namely, when the Government either contemplated, or had already decided, not to call Mr. Schertler as a witness. The Government cannot talk its way out of this fundamental error, which prevented the District Court from further inquiring about the conflict issue, which it would have been required to do. The Government's lack of candor not only violated Mrs. Menendez's fundamental rights but obstructed the proceedings of the District Court. *See Pastore*, 469 U.S. at 240;

N.Y. R.P.C. 3.3(a)(1). Because the Government stayed silent, Mrs. Menendez was wrongfully deprived of the opportunity to retain her chosen counsel once the conflict had fundamentally changed.

The proper remedy in this case is vacatur of the conviction. "Cases involving Sixth Amendment deprivations are subject to the general rule that remedies should be tailored to the injury suffered from the constitutional violation and should not unnecessarily infringe on competing interests." *United States v. Morrison*, 449 U.S. 361, 364 (1981). Relief must be tailored to ensure that a defendant receives "a fair trial." *Id.* at 365; *see also Stein*, 541 F.3d at 157–58 (affirming dismissal of indictment against defendants where government interference with right to counsel tainted pre-indictment investigation and prosecution).

As the Supreme Court has already determined, a court need not find prejudice or ineffective assistance before vacating a conviction on grounds of deprivation of the right to chosen counsel. *Gonzalez-Lopez*, 548 U.S. at 147–48. Rather, the "erroneous deprivation of the right to counsel of choice, with consequences that are necessarily unquantifiable and indeterminate, unquestionably qualifies as 'structural error.'" *Id.* at 150; *see also id.* ("Different attorneys will pursue different strategies with regard to investigation and discovery, development of the theory of defense, selection of the jury, presentation of the witnesses, and style of witness examination and jury argument. And the choice of attorney will affect whether and on what terms

the defendant cooperates with the prosecution, plea bargains, or decides instead to go to trial."). This structural error, which "bears directly on the framework within which the trial proceeds," entitles Mrs. Menendez to vacatur of the conviction. *Id.*

3. The District Court's Decision Denying Mrs. Menendez's Motion for a New Trial Rested On a Flawed Theory of Waiver

Rather than remedying the blatant constitutional concerns raised by the Government's conduct, the District Court turned a blind eye. In its decision denying Mrs. Menendez's post-trial motion, the District Court concluded Mrs. Menendez waived her right to counsel because she did not affirmatively inquire into Mr. Schertler's status as a witness. *See* A3716. The District Court's decision invokes a theory of waiver that is incompatible with the Sixth Amendment right to counsel. Waivers of constitutional rights must be knowing and intelligent, and they cannot be presumed to occur through a defendant's inaction. Indeed, courts specifically employ a presumption *against* waiver of fundamental constitutional rights. *See Johnson v. Zerbst*, 304 U.S. 458, 464 (1938). Accordingly, the trial court generally must take steps to ensure the defendant is making an informed decision.

The District Court's holding improperly shifted the burden to the *defendant* to remedy the conduct that the *Government* created, controlled, and exclusively knew about. In every other context, the *trial court* has an affirmative duty to ensure comportment with the Sixth Amendment, often aided by the government's disclosures. Indeed, Mrs. Menendez was entitled to an affirmative disclosure from

the Government and a revised colloquy regarding her right to counsel. Such obligations are consistent with the court's "independent duty to ensure that criminal defendants receive a trial that is fair and does not contravene the Sixth Amendment." *Wheat v. United States*, 486 U.S. 153, 161 (1988).

For example, the procedure created by this Court to address conflicts of interest requires that the trial court conduct a formal inquiry any time "the specter of conflicts of interest arises." *Levy*, 25 F.3d at 153. Once a court becomes aware of a potential conflict, it "must investigate the facts and details of the attorney's interests to determine whether the attorney in fact suffers from an actual conflict, a potential conflict, or no genuine conflict at all." *Id.* (citing *Strouse v. Leonardo*, 928 F.2d 548, 555 (2d Cir. 1991)). If the trial court determines that disqualification is not required, it has an additional obligation to address the defendant in an on-the-record colloquy pursuant to *Curcio* and obtain the defendant's knowing and intelligent waiver of her right to conflict-free counsel. *See id.*

Similarly, where a defendant chooses to proceed *pro se* and entirely waive her right to counsel, the district court must follow specific procedures to obtain the defendant's knowing and intelligent waiver. *See Faretta v. California*, 422 U.S. 806, 835 (1975). In securing this waiver, the court must apprise the defendant "of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.'" *Id.* "The

district judge and defendant should engage in a colloquy on the record." *United States v. Fore*, 169 F.3d 104, 108 (2d Cir. 1999) (citing *Torres v. United States*, 140 F.3d 392, 401 (2d Cir. 1998)).

The list goes on. The Federal Rules of Criminal Procedure require that a defendant may not waive the right to a jury trial unless such waiver is written, consented to by the government, and approved by the court. *See* Fed. R. Crim. P. 23(a). To ensure the waiver is knowing, voluntary, and intelligent, this Court has "recommended a colloquy on the record, specifically 'inform[ing] each defendant that a jury is composed of twelve members of the community, that the defendant may participate in the selection of the jurors, that the jury's verdict must be unanimous, and that a judge alone will decide guilt or innocence if the defendant waives the right to a jury trial.'" *United States v. Pouryan*, 628 F. App'x 18, 20 (2d Cir. 2015) (quoting *Carmenate*, 544 F.3d at 107–08). Similarly, before accepting a plea of guilty or *nolo contendere*, a trial court must follow the procedures outlined in Rule 11 of the Federal Rules of Criminal Procedure, which includes a colloquy in open court specifically informing a defendant of the constitutional rights she will forgo. *See* Fed. R. Crim. P. 11(b)(1); *see also United States v. Pattee*, 820 F.3d 496, 504 (2d Cir. 2016) (Rule 11 "constitutes a required minimum in assuring that a defendant understands the nature of the charges, the penalties he faces, and the rights that he is giving up by entering a plea.").

And even where an on-the-record colloquy is not required, reviewing courts nonetheless cannot rely on mere silence to find that a defendant made a knowing and intelligent waiver of critical constitutional rights. *See Zerbst*, 304 U.S. at 464. "[A]bsent something in the record suggesting a knowing waiver, silence alone cannot support an inference of such a waiver." *Chang v. United States*, 250 F.3d 79, 84 (2d Cir. 2001) (reviewing whether defendant waived right to a jury trial and "refus[ing] to find a waiver or forfeiture solely from a defendant's silence at trial").

These guardrails permeate criminal trial procedure and illustrate the central flaw in the District Court's ruling. Waiver of constitutional rights requires court oversight, precision, and sensitivity. Instead, the District Court grasped at every straw the Government placed before it to find that Mrs. Menendez waived her right to chosen counsel. Precedent makes clear that "courts indulge every reasonable presumption against waiver of fundamental constitutional rights and . . . do not presume acquiescence in the loss of fundamental rights." *Zerbst*, 304 U.S. at 464 (internal quotations omitted). The District Court's holding that Mrs. Menendez *implicitly* waived her right to counsel of her choice rests only on this forbidden presumption.

The District Court certainly was not permitted to infer such a waiver because Mrs. Menendez did not expressly seek to re-engage Schertler Onorato. Nor was such an inference even supported by the record, since the Government's actions in

advance of trial consistently reinforced the belief that Mr. Schertler would testify. The Government's exhibit list included excerpts from the PowerPoint presentation from the attorney proffer, which would have, as discussed *supra* Section I(B)(2), necessarily required the testimony of Mr. Schertler to be admitted. *See* A3601; EA68. Because only attorneys from Schertler Onorato and prosecution attorneys had attended the August 2023 Proffer, *see* A3670–71, that authenticating testimony necessarily needed to come from Mr. Schertler or one of his colleagues. *See* Fed. R. Evid. 602, 901. In fact, in January 2025, the Government issued a subpoena to Mr. Schertler for testimony at Mrs. Menendez's trial, which was then scheduled for February 5, 2025. *See* A3671. When Mrs. Menendez's trial was adjourned one final time, the Government confirmed with Mr. Schertler that he would apply the previous subpoena to the new trial date. *Id*.

Then, during jury selection, the Government disclosed both Mr. Schertler and Mr. Onorato on its list of "people and places" the jury would hear about during trial. A323–24.[13] The 2024 Trial reinforced the reasonableness of Mrs. Menendez's

[13] While neither Mr. Schertler's nor Mr. Onorato's names specifically appeared on the lists of potential witnesses the Government produced to Mrs. Menendez's counsel prior to trial, those lists contained catchall categories for "persons as to whom stipulations of testimony or fact have been proposed to you," and "document/records custodians as necessary, in the event that no satisfactory stipulation is reached." A3624. These categories patently encompass testimony from Mr. Schertler or his partners, particularly given the exhibits that had been marked for trial.

expectation that Schertler would be called. The District Court *admitted*—and the Government *relied upon*—evidence from Senator Menendez's attorney proffer at his trial based on the testimony of an attendee at the proffer. *See* A262–64 (admitting PowerPoint presentation used at Senator's attorney proffer); A286 (referencing PowerPoint in Government's summation). Mrs. Menendez therefore had no reason to suspect that the Government had reconsidered introducing evidence from *her* attorney proffer, which, as discussed above, would have necessitated Mr. Schertler's testimony. Each of these pretrial communications bolstered Mrs. Menendez's reasonable expectation that Mr. Schertler would be a testifying witness and undermines any finding that Mrs. Menendez had the information necessary to make an intelligent and knowing decision not to invoke her Sixth Amendment rights.

Where the *Government* had already stated unequivocally that it would be calling Mr. Schertler as a witness, and Mr. Schertler's withdrawal was expressly premised on that representation, it certainly was not incumbent on *Mrs. Menendez* to repeatedly inquire as to the truthfulness of the Government's representation. By holding otherwise, the District Court erred in impermissibly shifting the burden to Mrs. Menendez. The law does not permit that. *See Stein*, 541 F.3d at 156 (finding Sixth Amendment violation where *government* "failed to establish a legitimate justification for interfering with" defense funding); *see also Jones v. Murphy*, 694 F.3d 225, 236–37 (2d Cir. 2012) ("A criminal defendant, who is not an expert in

criminal procedure or constitutional law, must generally be *advised* of the consequences of waiving his rights." (emphasis added)).

#### 4. The District Court's Decision Was Erroneous to the Extent It Found Mrs. Menendez Forfeited Her Sixth Amendment Claim

Mrs. Menendez properly preserved her claim that she was deprived of her Sixth Amendment rights. The District Court wrongly suggested otherwise. *See* A3716.[14] Mrs. Menendez properly preserved her claim at trial when she objected to the Government's creation of the potential conflict with the introduction of the S4 Indictment. Specifically, on March 18, 2024, Mrs. Menendez filed a letter in response to the Government's request for a *Curcio* hearing in which she objected to the Government's lack of disclosure regarding its trial strategy, arguing that it interfered with her ability to make informed decisions regarding her right to counsel. *See* A202 ("At this stage in the proceedings, with a quickly approaching trial date, *the Government has an obligation to make its intentions known so that Ms. Menendez can intelligently evaluate whether to waive any potential conflict of interest* with awareness of the conflict's significant strategic consequences." (emphasis added and internal quotations omitted)). Mrs. Menendez's claim in her post-trial motions raises the very same concerns.

---

[14] The District Court's opinion is unclear as to whether it bases its decision on waiver, forfeiture, or both. For the avoidance of doubt, Mrs. Menendez addresses both doctrines.

"Claims properly presented to and considered by the district court . . . have not been forfeited." *Red Tree Invs., LLC v. Petróleos de Venezuela, S.A.*, 82 F.4th 161, 174 (2d Cir. 2023). As a practical matter, Mrs. Menendez used all tools available at trial to vigilantly guard her Sixth Amendment rights and allow the District Court an opportunity to manage any encroachment on those rights. But the Government's lack of candor regarding the changing nature of the conflict made it impracticable and unnecessary for Mrs. Menendez to raise the same objection at a later date. *See United States v. Rosemond*, 841 F.3d 95, 106 (2d Cir. 2016) ("Where a defendant has made his position clear, further objections to 'rulings or orders of the court are unnecessary' to preserve a claim of error for appellate review." (quoting Fed. R. Crim. P. 51(a)); *see also Krumme v. WestPoint Stevens Inc.*, 238 F.3d 133, 144 (2d Cir. 2000) (disagreeing with district court's forfeiture determination because defendant would have had to "anticipate" that trial court would "issue an internally inconsistent decision" in order to raise the issue claim again at trial).

More fundamentally, because Mrs. Menendez was entitled to updated disclosures regarding the conflict and an allocution in the District Court, she cannot be deemed to have forfeited a claim absent those protections. *See Chang*, 250 F.3d at 84 ("A defendant who is ignorant of the right to testify has no reason to seek to interrupt the proceedings to assert that right, and we see no reason to impose what would in effect be a penalty on such a defendant.").

### C. The District Court Abused Its Discretion by Refusing to Hold an Evidentiary Hearing Prior to Denying Her Motion for a New Trial

The District Court could have found that a Sixth Amendment deprivation occurred based on the trial record and evidence submitted in post-trial briefing alone. But to the extent the District Court opted to resolve the Sixth Amendment issue based on disputed facts, including extensive and central unsworn factual assertions made by the Government in its post-trial brief, it was required to hold an evidentiary hearing. A hearing into the circumstances of an alleged constitutional deprivation is required when controlling facts are disputed and cannot be resolved on the trial record. *See United States v. Tompkins*, 623 F.2d 824, 829 (2d Cir. 1980) (remand "to the trial court for additional fact-finding" is only option where "record is silent on so crucial a question of fact as the intent to waive counsel").[15]

Indeed, "a district judge is not a spectator." *United States v. Awadallah*, 436 F.3d 125, 136 (2d Cir. 2006). Rather, "[w]hen a trial judge observes occurrences that potentially call into question the fairness of the proceedings or the thoroughness of a defense, it is incumbent on the judge to inquire." *Id.* "When specific guarantees

---

[15] This Court has repeatedly expressed the "desirability of permitting a district judge to hold an evidentiary hearing to develop a full factual record on remand rather than on collateral review." *Tompkins*, 623 F.2d at 829 n.5 (citing *United States v. Aulet*, 618 F.2d 182, 186 (2d Cir. 1980)); *United States v. Leone*, 215 F.3d 253, 257 (2d Cir. 2000) (in light of the limitations of AEDPA, exercising discretion to remand for a hearing "rather than to dismiss the appeal and force the appellant to use up his only habeas petition").

of the Bill of Rights are involved," courts must "take[ ] special care to assure that prosecutorial conduct in no way impermissibly infringes them." *United States v. Aquart*, 912 F.3d 1, 42 (2d Cir. 2018) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). The duty to inquire is especially critical where the validity of a waiver of rights is in doubt, because the district court must assure itself that such waivers are not just "voluntary" but also "knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences." *Brady v. United States*, 397 U.S. 742, 748 (1970); *see also United States v. Rossillo*, 853 F.2d 1062, 1064 (2d Cir. 1988) (vacating guilty plea where district court failed to sufficiently inquire into defendant's guilty plea offer).

But the District Court failed to engage in a reasonable inquiry to resolve the Sixth Amendment claim. Notably, the Government did not submit a *single* affidavit in support of its opposition—but this absence did not stop the Government from lodging a succession of unsubstantiated factual and contradictory assertions in support of its argument. *See* A3596 (stating that "the Government's reconsideration of its likelihood of calling Schertler as a substantive witness in its case-in-chief . . . was based on [its] continued attempts to streamline and focus trial presentation . . . in light of, among other things, the Court's rulings, at the first trial . . . that an attorney proffer could not be in and of itself an act of obstruction"); A3600 ("The Government was considering introducing a portion of . . . certain slides Schertler

used at the attorney proffer . . . until the Saturday before the Government rested its case-in-chief."); A3585–86 ("The Government was considering introducing documents pertaining to . . . the attorney proffer at which he unknowingly passed on false statements from the defendant to the U.S. Attorney's Office, up until shortly before the Government rested its case-in-chief."). Meanwhile, Mrs. Menendez submitted the affidavit of Mr. Schertler, which directly contradicted several of the Government's assertions but was wholly ignored in the District Court's opinion. *See* A3670.

The District Court declined to create a record and purported to resolve the constitutional issue by relying on the Government's unsworn and internally contradictory assertions in its Opposition Brief—assertions based on nothing other than its self-serving say-so. The Government posited that Mrs. Menendez's conflict with her attorney never truly resolved because Mr. Schertler remained a potential witness until the end of trial, but also that, somehow, Mrs. Menendez should have gleaned that Mr. Schertler was unlikely to be called as a trial witness (and therefore waived her right to re-engage him). Without any inquiry into the timing of the Government's decision making regarding calling Mr. Schertler as a witness, the Court simply accepted the Government's argument that Mrs. Menendez should have known that Mr. Schertler would not likely be called as a witness. *See* A3717. In the same breath, the Court accepted without scrutiny the Government's contradictory

assertion that the conflict never truly ended because the Government *might* have called Mr. Schertler as a rebuttal witness. *See id*.

Moreover, the Government openly confessed that it "reconsider[ed] its likelihood of calling Mr. Schertler as a witness in its case-in-chief" *during the Co-Defendants' trial*—*i.e.*, June 2024, nearly a year before Mrs. Menendez's trial. *See* A3596. Yet the District Court did not inquire into why, assuming the truth of this statement, the Government made no effort to disclose its change in strategy to the trial court or Mrs. Menendez, or whether it even considered doing so. Nor did the District Court inquire further into the Government's purported motivations for changing course or even seek to unearth a single internal discussion on the matter.

Further, the District Court relied heavily on the Government's argument that Mr. Schertler remained a potential unsworn witness based on exhibits it considered introducing up until April 12, 2025. *See* A3600–01; A3717. This argument has little to no impact to the analysis of whether Mrs. Menendez was deprived of her rights, as described *supra* Section I(B)(2). But to the extent the District Court relied on this assertion, it should have been tested in a hearing and led to further inquiry into how the unsworn witness issue may have been resolved through agreement or stipulation.

In cases involving "a claim of denial of rights under the Federal Constitution," this Court "is not bound by the conclusions of lower courts, but will reexamine the evidentiary basis on which those conclusions are founded." *Napue v. People of State*

*of Ill.*, 360 U.S. 264, 272 (1959) (internal quotations omitted). However, should this Court determine that additional factfinding is needed to determine whether Mrs. Menendez was deprived her right to counsel, it may pursue a remand to the District Court to hold an evidentiary hearing. *See Leone*, 215 F.3d at 256; *United States v. Jacobson*, 15 F.3d 19, 21–22 (2d Cir. 1994); *see also Tompkins*, 623 F.2d at 829 (ordering district court to hold evidentiary hearing because record was silent as to appellant's intent to waive counsel prior to trial); *United States v. Mathurin*, 148 F.3d 68, 70 (2d Cir. 1998) (remanding to district court to hold evidentiary hearing because defendant's statement that he was "never given *Miranda* warnings" was "sufficiently factual and specific to require an evidentiary hearing"); *see also, e.g.*, *Quinones v. United States*, 637 F. App'x 42, 45 (2d Cir. 2016) (vacating district court decision declining to hold evidentiary hearing into defendant's Section 2255 claim because court credited unsworn factual assertions from the government and the materials before the court did not conclusively establish that defendant is entitled to no relief).

## II. THE GOVERNMENT'S USE OF SUMMARY EXHIBITS FACILITATED A SUMMATION IN EVIDENTIARY FORM

This Court reviews evidentiary rulings, including the admission of summary exhibits, for abuse of discretion. *See United States v. Taubman*, 297 F.3d 161, 164 (2d Cir. 2002); *United States v. Ho*, 984 F.3d 191, 207 (2d Cir. 2020).

The District Court abused its discretion by admitting summary exhibits that functioned as early summations. The Government's key summary charts—GX 1352 (Egypt scheme), GX 1353 (New Jersey scheme), GX 1354 (Daibes scheme)—cherry-picked incriminating snippets, stripped context, and suggested *quid pro quo* narrative arcs through timelines that connected various sources—texts, emails, calendar entries, internet searches, and calls—just as a summation does. Their impact was substantial: three FBI agents narrated these exhibits for roughly 462 pages—approximately seventeen percent of the trial transcript before summation (A851–86, 899–1095 (Coughlin); A1484–592, 1639–48, 2307–51 (Graves); A2678–740 (Van Wie)).[16] The prejudicial use of summary charts here amounts to more than harmless error and warrants vacatur. *See United States v. Citron*, 783 F.2d 307, 315–18 (2d Cir. 1986) (vacating conviction for admission of summary chart).

Federal Rule of Evidence 1006 allows the admission of evidence to prove the content of voluminous admissible records that cannot be conveniently examined in court. Fed. R. Evid. 1006. The guidance to Rule 1006 is explicit that "[i]f a summary exhibit . . . is argumentative, its probative value may be substantially

---

[16] Defense counsel objected to the use of summary exhibits in this manner, which the District Court overruled. A886–92.

outweighed by the risk of unfair prejudice or confusion." *See* Adv. Comm. Note to the 2024 Amend. to R. 1006.

The District Court did not merely misapply Rule 1006, it disregarded its core limitation on argumentativeness. "[G]reat care must be taken to ensure that the proposed summary contains no annotation or suggestion, even inferential, that may be considered argumentative." *UPS Store, Inc. v. Hagan*, No. 14-CV-1210, 2017 WL 3309721, at *5 (S.D.N.Y. Aug. 2, 2017) (internal citations and quotations omitted). A summary "chart which for any reason presents an unfair picture [of the evidence] can be a potent weapon for harm, and permitting the jury to consider it is error." *United States v. Conlin*, 551 F.2d 534, 538–39 (2d Cir. 1977). "[S]ummary witnesses cannot organize the case for the jury, substitute for closing argument, . . . or introduce evidence the jury has not previously heard." *See United States v. Gonzalez*, No. 23-10999, 2025 WL 48071, at *3 (5th Cir. Jan. 8, 2025) (internal citations omitted); *see also United States v. Bray*, 139 F.3d 1104, 1110 (6th Cir. 1998) ("[A] summary containing elements of argumentation could very well be the functional equivalent of a mini-summation by the chart's proponent every time the jurors look at it during their deliberations."). In permitting the Government's unfettered use of the summary charts, the District Court abdicated its role in preventing undue prejudice.

The District Court's reliance on *United States v. Ho*, 984 F.3d 191 (2d Cir. 2020) to support admission of the summary charts was misplaced. First, in *Ho*, this Court upheld the use of summary charts in connection with a significantly smaller universe of documents—seventy-one documents for one scheme and sixty-two for another scheme. Thus, the potential prejudice from narrative distortion was more limited. *Id.* at 209. Second, at the time of the *Ho* decision, Rule 1006 had not yet been amended, and the district court in that case gave a limiting instruction that the charts were *not* evidence. *Id.* at 210.[17] Here, the opposite instruction was given, *see* A3351, and the jury was permitted to give more weight to the charts.

The improperly argumentative nature of the summary charts is evident on the face of the documents. First, several entries reflect the *absence* of a record, which is impermissible commentary in a chart that purports to summarize *exhibits*. For example, GX 1353 contains commentary that a meeting between Senator Menendez and Grewal "does not appear on Menendez's Senate calendar." A2332–33; EA266 (row 931). The same tactic is repeated in GX 1352 where the Government notes a lack of meetings involving Ahmed Helmy. EA178 (row 605). Second, the Government selectively included images the underlying evidence in certain rows—

[17] Rule 1006 was amended in 2024 to clarify that courts that give this limiting instruction are mistaken about the operation of the rule, because summary charts admitted under this rule are an alternative way to admit voluminous evidence and are not a demonstrative aid. *See* Adv. Comm. Note to the 2024 Amend. to Rule 1006.

inevitably drawing juror attention to rows that the Government wanted to highlight. Through the images, the Government impermissibly emphasized certain meetings and things of value found in possession of the Menendezes, just as they would in a closing argument. *See* EA215 (row 1085); EA211 (row 1042); EA253 (row 637); EA283 (row 192).

The Government's use of summary charts exceeded the typical role of minimizing voluminous pages of irrelevant information that can belabor a jury's evaluation of the evidence. Here, the summary charts merged various sources related to select events into one document—even though the "events" cited therein were otherwise admitted into evidence. Admission of these summary charts gave the Government a premature opportunity to organize the evidence into narrative form prior to summation, conflating evidence with argument.

The Government's use of GX 1354 to present the Daibes scheme was particularly prejudicial, pairing vague statements and acts to imply a *quid pro quo*. For example, via elicited testimony from Van Wie, the Government flagged a record of a call from Mrs. Menendez to Daibes' driver (A2717; EA280 (row 153)), after which it highlighted a text from Mrs. Menendez to Daibes two hours later, "Thank you. Christmas in January." A2718; EA280 (row 154). The next line entry (row 155) reflects a call from Senator Menendez to the First Assistant for the U.S. Attorney's Office for the District of New Jersey, that occurred within hours of Mrs.

Menendez's text. The next line entry (row 156)—and next topic of elicited testimony—was the Senator's Google search for the price of a kilo of gold five days after the text. A2718–19. Then rows 157 and 158 reflect calls by Senator Menendez (to the First Assistant and Daibes) two days after the Google search. A2719. Through five lines of the summary chart, the Government made multiple inferential leaps by connecting different types of events occurring to argue the receipt of a bribe and actions taken in furtherance of that bribe, though the described events were based upon different sources (phone records, text, internet search) and involved different participants. This is precisely what summation is for.

The Government also improperly cherry-picked entries in its Egypt chart, GX 1352. For example, the Government emphasized a text from Mrs. Menendez, stating "a year of broken promises by Will to me." A972; EA169 (row 461). Then the Government highlighted a record of a meeting from approximately a year prior, row 73. A972. By doing so, the Government argued a connection between a particular meeting in March 2018 that involved the Menendezes, Hana, and an Egyptian official, and Mrs. Menendez's statement about Hana. Given the ongoing nature of Mrs. Menendez's relationship with Hana, such an inference is wildly speculative and only proper in summation, yet it was unfairly and prematurely advanced during the Government's presentation of the summary chart. GX 1352 also jumped between disparate conversations when it paired up Mrs. Menendez's texts with Hana about

meeting for dinner (EA144 (rows 90–97)) with a conversation between Dana Stroul and Tiernen Miller where Senator Menendez asked how many Americans work at the U.S. Embassy in Cairo (EA144 (rows 98–100)) to imply that these interactions were somehow related.[18]

The Government manipulated the charts' expansive time frames to its advantage to paint a *quid pro quo*. For example, in the Daibes scheme, GX 1354 skipped days between entries to link together Senator Menendez's search for "1 kilo gold bar" on November 20, 2021 to Daibes's rejection of a plea offer on November 26—stating "we reserve our right to approach the new U.S. Attorney"—to Sellinger's confirmation on December 7. A2702–04; EA277–78 (rows 102–103, 104–108). At another point, Agent Van Wie pivoted from Mrs. Menendez's messages about selling gold bars in May 2022 backwards in time one month to highlight Daibes's plea deal. A2732–38; EA283 (rows 192, 196–198, 204), 284 (rows 278–210, 212–219, 207). The Government then explicitly connected the entries about Daibes's plea deal to Senator Menendez's search for the price of gold one month earlier to argue a *quid pro quo*. A2739; EA285 (row 230), 284 (row 207).

By allowing these charts into evidence, the District Court abused its discretion. These charts were "a potent weapon for harm" which painted "an unfair picture" of the evidence against Mrs. Menendez. *Conlin*, 551 F.2d at 538–39. While

[18] Two people who could have easily been subpoenaed to testify to this exchange.

Rule 1006 permits the use of summaries for convenience and efficiency, there is a point where convenience crosses a line. This error was not harmless; it struck at the heart of the factfinding process and warrants vacatur.

## III. THE EVIDENCE AT TRIAL CANNOT SUPPORT MRS. MENENDEZ'S CONVICTIONS

### A. Standard of Review

This Court reviews challenges to the sufficiency of evidence *de novo*. *See Ho*, 984 F.3d at 199. Where the record lacks sufficient evidence on which any rational trier of fact could have found a defendant guilty of the crime charged, this Court must vacate the judgment of the conviction and remand to the District Court with instruction to enter a judgment of acquittal. *See United States v. Bramer*, 956 F.3d 91, 96, 99 (2d Cir. 2020).

### B. The Evidence Was Insufficient To Support the Federal Bribery Convictions

#### 1. The Government Failed to Prove a Single Official Act

Under applicable Supreme Court and Second Circuit precedent, an official act must be more than a mere use of an official's influence or favor. Bedrock law requires the public official use *his office* in order to trigger *McDonnell* criminal liability. Indeed, an official act involves a "formal exercise of governmental power" of a "focused and concrete" nature that is pending either before the public official who is performing the official act or before another public official. *See McDonnell v. United States*, 579 U.S. 550, 571–74 (2016). The Supreme Court cautioned

against lowering the standard, admonishing that certain minor conduct can never rise to the level of an official act, alone, including organizing an event, talking to another official, or coordinating a meeting. *Id.* at 574; *United States v. Silver ("Silver I")*, 864 F.3d 102, 117 (2d Cir. 2017). Despite these limitations, the Government, endorsed by the District Court over the course of this case, stretched the definition of a *McDonnell* official act far past its legal limitations and failed to offer sufficient evidence of official acts with respect to the relevant schemes, requiring the reversal of Mrs. Menendez's convictions on the bribery counts.

*i. The Egypt Scheme*

The Government relied principally on two purported official acts to wrongfully secure a conviction against Mrs. Menendez for the so-called Egypt-related bribery counts. First, a May 2019 minutes-long call from Senator Menendez to Undersecretary McKinney, in which the Senator stated: "stop interfering with my constituent." A1354. Second, a July 2018 text from Senator Menendez to Mrs. Menendez, the contents of which Mrs. Menendez then sent to Hana, stating: "Tell Will I am going to sign off this sale to Egypt today. Egypt: 46,000 12MM Target Practice Rounds and 10,000 Rounds Tank Ammunition: $99 million." EA161 (row 306). Neither constitute official acts.

Glaringly, despite the Government's heavy reliance on the McKinney call in pursuit of Mrs. Menendez's conviction, no matter was pending at the time of the call

before any American official, including the Senator or McKinney. *See* A3120 ("But this one incident, the McKinney call and the bribes that surround it, is all you need to convict the defendant on the Egypt-related bribery counts."). Rather, it was exclusively Egypt's decision to whom it would offer the certification grant. The applicable law requires that a matter be pending before a *U.S.* official to constitute an official act under *McDonnell*. *See* 18 U.S.C. § 201(a)(3); *see id.* ("public official" is a "Member of Congress… or an officer or employee or person acting for or on behalf of the United States."); *United States v. Jefferson*, 289 F. Supp. 3d 717, 738 (E.D. Va. 2017) ("pressur[ing] foreign officials cannot be official acts because questions or matters before [foreign] officials are not questions or matters pending before a 'public official' within the meaning of the bribery statute."). Even Undersecretary McKinney testified that the decision around the certification grant rested solely within the power of the Egyptian government. *See also* A1390 (testifying that no one at the USDA could overrule Egypt's decision). This alone should end the inquiry on the McKinney call. But there is more.

The Government also framed the Senator's call to McKinney as an attempt to pressure McKinney into halting the USDA's efforts to reverse Egypt's grant of the certification monopoly. *See* A3127. This too fails to constitute official action. McKinney testified that the U.S Government's position on the certification was based on a broad disapproval of monopolies. *See* A1408. But that is too amorphous

of a policy position to constitute a specific question or matter under *McDonnell*. Indeed, *McDonnell* already foreclosed that theory as a basis for a federal conviction. *See McDonnell*, 579 U.S. at 570 ("Economic development is not naturally described as a matter 'pending' before a public official—or something that may be brought 'by law' before him[.] Under § 201(a)(3), the pertinent 'question, matter, cause, suit, proceeding or controversy' must be more focused and concrete.").

Nor did the evidence show any pressure from Senator Menendez. *C.f. McDonnell*, 579 U.S. at 572. Undersecretary McKinney himself testified that Senator Menendez never threatened him. A1406. Nor did the single call alter McKinney's position, or his thinking, on the certification issue. A1408. Senator Menendez never attempted to escalate the matter after his call with McKinney. A1406–07.

The July 2018 arms-sale text was not an official act either. A text message communicating a decision, itself, cannot constitute an official act, even if the underlying decision was one. *McDonnell*, 579 U.S. at 571. Moreover, the Government framed the text message, not as an official act itself, but the promise of one. The Government was wrong. The message communicated, as a matter of common sense and plain language, a decision that already had been made. *See* EA161 (row 306) ("Tell Will I am going to sign off this sale to Egypt today."). For

all of these reasons, the District Court's uncritical acceptance of the above theories of official acts was erroneous.

*ii. The New Jersey Scheme*

The Government's evidence of an official act was similarly insufficient with respect to the alleged scheme related to New Jersey's investigation and prosecution of Uribe's associates: Elvis Parra and Ana Peguero. At trial, the Government failed to offer adequate proof that two short discussions with the former New Jersey Attorney General constituted official acts. The Government specifically contended the discussions constituted evidence of both: (1) promises to "disrupt the New Jersey Attorney General's prosecution and investigation" of Uribe's associates, and (2), in the alternative, an attempt to pressure Grewal. A3097; A3162. But they were never that.

Former New Jersey Attorney General Grewal's own testimony refuted the Government's theory that the Senator's meetings were more than just meetings. *McDonnell*, 579 U.S. at 574 (clarifying that calls or meetings, themselves, do not constitute official acts). Notably, the Senator never asked Grewal to do anything. A1702. The Senator never even provided Grewal with the details of the criminal matters: no names of any targets of investigation, no indicted defendants, and no case name. Grewal did not know if the matters were criminally charged. A1690; A1699–1700. The Senator also never made any threats. Grewal testified that the

Senator's tone was "always cordial," "polite," and the Senator never seemed upset, A1692—facts inconsistent with an attempt to pressure interfere with the state criminal case.

Moreover, there was no formal exercise of governmental power that the Senator attempted or promised to influence. In both discussions with Grewal, the Senator raised concerns about the unfair treatment of Hispanics by the Insurance Fraud Prosecutor's office. But seeking "justice" or even equity, generally, is not a specific question that is pending before an official. *McDonnell*, 579 U.S. at 570; *United States v. Silver ("Silver II")*, 948 F.3d 538, 557 (2d Cir. 2020) ("More pointedly, such a promise is so lacking in definition or specificity that it amounts to no promise at all. And, absent a promise, there is no *quid pro quo.*"). By extension, neither is a phone call or meeting that merely communicates support for a broad policy position, like the fair treatment of Hispanics by the state Attorney General. *McDonnell*, 579 U.S. at 573 ("Simply expressing support . . . at a meeting, event, or call . . . similarly does not qualify as a decision or action[,] as long as the public official does not intend to exert pressure on another official or provide advice, knowing or intending such advice to form the basis for an 'official act.'"). Nor could the Senator's conduct have influenced the Attorney General's investigative or prosecutorial determinations; the Senator possessed no power over such matters within the purview of the state Attorney General's Office. *See* A1703; *United States*

*v. Urciuoli*, 513 F.3d 290, 296 (1st Cir. 2008) (finding no criminal liability where state legislator never "invoked any purported oversight authority or threatened to use official powers in support of his advocacy.").

Thus, the District Court incorrectly endorsed the Government's theories of official acts. For instance, the District Court reasoned that the Second Circuit has held a U.S. Congressman's official acts could reach local officials, especially "those demonstrating Congressional interest[,]" citing *United States v. Biaggi*, 853 F.2d 89, 99 (2d Cir. 1988). SPA16. Its reliance on *Biaggi* is misplaced. First, Mrs. Menendez does not contend that federal officials can never perform official acts reaching the conduct of local officials. Rather, she contests that the call from the Senator to Grewal was an attempt to do just that—namely, change the course of the Parra or Peguero criminal matters.

Second, *Biaggi* is inapposite. There, the former congressman sat on the House Committee on maritime issues. In that capacity, he communicated with members of the NYC Mayor's office and other federal officers, specifically naming the maritime company for which the congressman was advocating. The congressman even planned to introduce a federal bill that would directly mitigate the company's financial challenges. Here, no facts demonstrate that the Senator wanted to impact the outcome of the Parra and Peguero matters. To affirm the Government's unsubstantiated theory would render the requirements of an "official act" entirely

meaningless, and condemn even routine, lawful conduct by public figures as potential criminal activity. *Silver II*, 948 F.3d at 558 ("Otherwise, we risk 'subject[ing] [public officials] to prosecution, without fair notice, for the most prosaic interactions.'") (citing *McDonnell*, 579 U.S. at 576).

*iii. The Daibes Scheme*

The Government also failed to prove official acts related to the federal prosecution against Daibes. The first purported official act involved the Senator's recommendation that Philip Sellinger serve as the incoming United States Attorney for New Jersey, and his related attempts (or promises) to influence Sellinger in intervention of a prosecution brought by that office against Daibes. The second involved phone calls from Senator Menendez to the First U.S. Attorney for New Jersey, Vikas Khanna, on Daibes's case. Neither are official acts.

The recommendation and purported attempts to influence Sellinger to intervene in the Daibes case failed to constitute official acts because the Government failed to prove that the Senator actually sought to intervene in the case. In no meetings with Sellinger or Soliman, a consultant for the Senator, did Senator Menendez ask Sellinger to take specific action in favor of Daibes. *See* A2532. Sellinger even testified that he had no understanding of which specific case the Senator was discussing during their first meeting. A2500 ("I really didn't know at the time."). Sellinger also testified: "Senator Menendez hoped that if I became

United States Attorney," Sellinger would look into whether Daibes was being treated fairly. A2499. Moreover, Sellinger told the Senator he would do that for every case before him. A2500.

The Senator knew Sellinger had been involved in the Daibes civil case before he even recommended Sellinger for United States Attorney. A2508–09; A2547. Then, after Sellinger was confirmed and recused from the case in December 2021, in March 2022, the Senator requested that Soliman remind Sellinger to "give the Daibes case… all due process." A2640. As with the meetings with Grewal, a request for fair treatment is too broad to constitute a specific matter that is pending before a public official. *McDonnell*, 579 U.S. at 570.

Second, the Government the Senator's calls to First U.S. Attorney Khanna were not official acts. The Government proffered no evidence whatsoever of the contents of the call. It did not even call Khanna as a trial witness. That was intentional. At the Senator's trial, Khanna testified that the Senator never asked him to take specific action and did not even speak about a particular case. A281; A282. Rather, the calls with Khanna were congratulatory. A281. And *McDonnell* foreclosed the Khanna calls as a viable theory of an official act. 579 U.S. at 573–74 (official action does not involve talking, alone, to another official).

For the foregoing reasons, the Government failed to prove its various theories of official acts in support of the three schemes, necessitating vacatur.

2. The Government Failed to Prove a *Quid Pro Quo*

*i. The Egypt Scheme*

The Government likewise failed to prove any *quid pro quo*. "In addition to an official act, the government must prove a quid pro quo, or an 'understanding that the payments were made in return for official action.'" *United States v. Menendez*, 759 F. Supp. 3d 460, 477 (S.D.N.Y. 2024) (quoting *Silver II*, 948 F.3d at 551). Timing is key. The public official must have "agreed[d] to perform an 'official act' *at the time* of the alleged quid pro quo." *Id.* at 478 (citing *McDonnell*, 579 U.S. at 572–73) (emphasis added). Moreover, "the quid pro quo must be clear and unambiguous." *Menendez*, 759 F. Supp. 3d at 477. "The inducement from the official is criminal if it is express or if it is implied from his words or actions, so long as he intends it to be so and the payor so interprets it." *Id.*

The central problem with the alleged Egypt scheme is timing. Both the Government and the District Court embraced a theory that a corrupt agreement was struck to provide aid to Hana's business and the country of Egypt. *See* SPA9. The Government advanced two theories of the purported *quid* received for the sale of arms to Egypt and the support for Hana's business: first, the fact that Mrs. Menendez received consultancy payments from Hana's certification business for "essentially no work for IS EG," *id.*; and second, that Hana offered Mrs. Menendez loans to assist with her mortgage payments. But, fatally, these "things of value" were given to Senator Menendez *after* he engaged in so-called official acts.

The Senator sent Mrs. Menendez the arms-sale text in July 2018. The call to McKinney occurred in May 2019. *But the Senator could not have known about Mrs. Menendez's mortgage delinquency until at least July 2019, well after these two acts occurred*. *See* EA195 (row 865) (On June 28, 2019, Mrs. Menendez stating in voicemail to Daibes that she would tell Senator Menendez about her unpaid mortgage on July 5, 2019). Moreover, the evidence at trial only supported that Mrs. Menendez stated she would inform the Senator about her mortgage issues on July 5th, not that she actually did so (on that day or ever). Hana also did not help pay Mrs. Menendez's mortgage until July 19, 2019. *See* EA197 (lines 891–894). Thus, neither official act could be tied to the mortgage assistance as a form of payment for those official acts.

The timing of the alleged consultancy payments also vitiates the inference of any connection. The Government identified the spring of 2018 as the inception of the purported bribery scheme to aid Hana's company and Egypt. A3101 ("As far back as April [6,] 2018, [Mrs. Menendez allegedly] told Hana that she was going to ask Menendez about the two deals."). But Mrs. Menendez considered working as a consultant to IS EG Halal as early as March 2019. EA169 (row 461) (referencing her weekly pay). Her first wages were paid starting in August 2019. EA200 (row 919). Under the Government's theory, Mrs. Menendez (and the Senator) would have had to agree that she wait over a year for payment in exchange for the Senator's

advocacy. But, under applicable law, the remoteness of the timing undermines the *quid pro quo*. *See, e.g., United States v. Bongiovanni*, 19-CR-227, 2024 WL 3487914 at *8 (W.D.N.Y. July 19, 2024) (years between purported official acts and receipt of things of value did not constitute *quid pro quo*).

In a weak attempt to circumvent this timing defect, the District Court erred when determining that the bribes were payments "'agreed to before an official act in order to influence the official with respect to a future act.'" SPA9. As with the Government, the District Court mistakenly looked to several meetings beginning in February 2018. The District Court also cited texts from Mrs. Menendez to suggest that she was involved in a bribery scheme merely because they were sent at some point after February 2018. SPA9–12; *see, e.g.*, EA144 (row 85); EA166 (row 402); EA169 (row 461). But the District Court's rationale does not move the needle. The Government offered no proof at trial of the contents of these meetings. Moreover, the Government offered no testimony from the text participants regarding the meaning of the texts. Rather, it strung together evidence of the mere fact of meetings, including perfectly lawful diplomatic meetings, and vague texts, to contend that they, together, somehow demonstrated a bribery scheme. The result: a

Government case supported only by suspicion, which fails to support Mrs. Menendez's federal conviction on this alleged bribery scheme.[19]

*ii. The New Jersey Scheme*

The evidence at trial also failed to support a corrupt agreement involving Mercedez-Benz payments in exchange for the Senator's intervention in state criminal matters involving Uribe's associates. Most notably, there was zero evidence that Senator Menendez knew that payments were made for the vehicle in exchange for his alleged intervention. *See, e.g.*, A1906 (Uribe testified that he never discussed any Mercedez-Benz payments with the Senator). The law requires this knowledge. Thus, even assuming Mrs. Menendez made some bribery agreement with Uribe, which she did not, the Government failed to prove an official act (by the Senator) was bargained in exchanged for a thing of value. That ends the inquiry on this scheme.

The Government errantly relied on certain meetings Uribe had with the Menendezes to allege that they struck a corrupt bargain with him. For example, Uribe, Mrs. Menendez and the Senator met on August 7, 2019 at Il Villagio's, which Uribe described to be the first time he mentioned the criminal investigations at all to

---

[19] The District Court also erred when it held that that Mrs. Menendez knew the mortgage support payments were not loans. *See* A776 (John Maldovan testimony on Mrs. Menendez's receipt of his text that he was authorized to send her a personal loan with zero interest); A738-39 (Maldovan drafted a loan agreement). Similarly, Mrs. Menendez always intended to act as a consultant for IS EG Halal; she was not involved in a sham job offered pretextually as a bribe.

the Senator directly. A1900. But Uribe never discussed the payments he was making for the Mercedez Benz. A1905. He also did not discuss the payments when he met the Senator at his home. A1929. Thus, the only reasonable inference that could be gleaned from these discussions was Uribe's request for the Senator to intervene in Peguero's case, but removed from any suggestion that the Senator would intervene in exchange for a thing of value, the request fell short of a *quid pro quo*.

The evidence at trial only ever plausibly supported an agreement was struck between Hana and Uribe, not with the Menendezes. Uribe initially testified that, in early 2018, Hana offered that for $200,000 to $250,000 he could make the investigations "go away." A1766. Uribe further explained that, in that conversation, Hana stated that "[Senator Menendez] will be the person that could help him make this investigation[] stop." *Id.* This testimony was far from support that the Menendezes participated in some bribery scheme. Rather, the testimony only suggested that Hana attempted to flaunt his purported connections with the Menendezes to Uribe—not that he actually *agreed with* the Menendezes that the Senator would influence the state Attorney General criminal matters in exchange for bribes. Uribe even testified to other meetings and discussions between him, Hana, and others, including Elvis Parra and Bien Hernandez, evidencing that only these individuals (and not the Menendezes) agreed to some intervention in the Parra and

Peguero cases. A1771 (Uribe testimony that Hana stated, again, that he knew the Menendezes and he could produce better outcomes in the criminal matters); A1777 (Uribe text to Bien Hernandez that they have to put on fundraisers for the Senator "because [they] were looking for a good outcome[.]")

The timing of the Mercedez payments also undermined the *quid pro quo* theory here. Discussions between Uribe and Mrs. Menendez regarding the luxury vehicle first occurred in 2019. The actual payments began later that spring. A1834. Yet, Uribe testified that he initially requested Hana discuss the pending state criminal matters with the Senator back in 2018. *See, e.g.*, EA108 (row 8) (October 2018 communications between Uribe and Hana, including Uribe's request that Hana "[p]lease be sure that [his] friend knows about this."). "[T]he remoteness of the events loosens the connection between the payments and [defendant's] future intervention on behalf of Gerace." *Bongiovanni*, 2024 WL 3487914, at *7. Consequently, the Government failed to offer sufficient evidence of a corrupt bribery scheme involving Uribe and his associates.

*iii. The Daibes Scheme*

The Government also failed to prove that the Senator agreed to perform an official act on behalf of Daibes in exchange for things of value. The Daibes scheme suffers from a failure to adequately connect the purported official act and the gold and cash Daibes allegedly offered the Senator and Mrs. Menendez in exchange. The

Senator began the process of considering Sellinger as a nominee for U.S. Attorney of New Jersey in August 2020. *See* EA271 (rows 2, 3). Sellinger's discussions with the Senator occurred in December 2020. A2498–99; A2508. The Senator then recommended Sellinger for office in the Spring of 2021. A2517.

The Government offered only speculative evidence of the receipt of gold, including on October 18, 2021, contending that the two must have received gold from Daibes that day because the Senator (but not Mrs. Menendez) googled the price of gold the same day that Daibes visited Mrs. Menendez at her home. EA276 (rows 91–93). Moreover, the Senator would have had to agree, from the time he first considered Sellinger for the official role, to wait more than a year for payment in exchange for his efforts to recommend Sellinger—which involved back-and-forth consideration of different nominees and numerous discussions and research related to them by the Senator and his staff. Much like its other theories, the Government's contention here defies common sense.

The Government's evidence at trial was also ambiguous as to when the Menendezes received cash, evidence which cannot support affirming a conviction. *See United States v. Cassese*, 428 F.3d 92, 103 (2d Cir. 2005) (verdict raises doubt when it rests on thin, equivocal, or attenuated evidence). The Government equivocated to the jury that Daibes offered cash "at some point during 2020, 2021, or 2022," and then later said the cash was given sometime between October 2021

and June 2022. A3186; A3203; EA135. The theories are inconsistent because the Government did not know when (or if) the cash was offered. Without the cash and gold, the Government's other theories were consistent with ordinary gifts offered by a long-time friend of the Senator. *See* EA275 (row 83); SPA22 (ride from JFK to the Menendez residence in October 2021).

Moreover, the Government could not connect Mrs. Menendez to this scheme at all. At bottom, the Government contended only that the Menendezes received gold and cash from Daibes, and Mrs. Menendez and Daibes engaged in one-off texts. But the proof fell far short of meeting the Government's evidentiary burden tying Mrs. Menendez to this federal bribery scheme. First, the fact that the Government seized envelopes of cash from the Menendez home with Daibes's fingerprints on them hardly moves the needle on Mrs. Menendez's role in any scheme. At most, the cash supported an inference that the Senator received the cash from Daibes, not Mrs. Menendez, as his fingerprints were also found on some of those envelopes. A1231. Moreover, Mrs. Menendez's sale of two bars of gold that the Government alleged matched gold once in Daibes's inventory cannot prove her role in this scheme. Indeed, only impermissible speculation supported the inference that Mrs. Menendez was lying when she told Khorozian that the gold she was selling to him was family gold.

As to the texts the Government offered between Mrs. Menendez and Daibes, they too required farfetched inferences to suggest that Mrs. Menendez had some incriminating role to play here. For instance, Mrs. Menendez and Daibes texted after the Senator underwent shoulder surgery. In that exchange, Mrs. Menendez informed Daibes that the Senator was "FIXATED" on his case, as if that communication inferred anything other than that the Senator was concerned about his friend. EA279 (row 133). The Government also took issue with a text Mrs. Menendez sent to John Pilot stating: "Thank you. Christmas in January[,]" solely because the text came on the same day (and before) the Senator's first attempt to call Khanna. EA300. But the text was ambiguous at best, much more so because no call or attempt to call Khanna was in fact an official act.

Consequently, the Government failed to prove beyond a reasonable doubt a single federal bribery scheme, let alone that Mrs. Menendez aided and abetted or participated in one. The Government failed to submit sufficient evidence on which a rational trier of fact could have reached a guilty verdict, and the Court must vacate Mrs. Menendez's convictions on the bribery counts.

### C. <u>The Evidence Was Insufficient to Convict Mrs. Menendez on the Obstruction of Justice Counts</u>

#### 1. <u>The Trial Evidence Did Not Support Mrs. Menendez's Convictions on Counts Seventeen and Eighteen</u>

Much like its federal bribery case, the Government failed to prove beyond a reasonable doubt the obstruction counts. In fact, the evidence on Counts Seventeen

and Eighteen was remarkably flimsy, consisting of self-serving testimony from the Government's cooperating witness, two checks provided by Senator Menendez to Mrs. Menendez, and two subsequent checks Mrs. Menendez wrote to Uribe and Hana. EA15. But nothing about these checks, or the circumstances around their creation and production, support criminal liability. Specifically, the Government failed to offer sufficient evidence that Mrs. Menendez acted with the necessary corrupt intent to obstruct the grand jury proceeding. The evidence at trial showed Mrs. Menendez simply complied with a subpoena when she received it by producing responsive documents.

To substantiate a conviction for obstruction of justice under the omnibus clause of 18 U.S.C. § 1503, "the government must establish" the existence and the defendant's awareness of a pending judicial or grand jury proceeding. The defendant must have also possessed the requisite "wrongful intent or improper purpose to influence [the] proceeding, whether or not the defendant [wa]s successful in doing so—that is, that the defendant corruptly intended to impede the administration of that judicial proceeding." *United States v. Quattrone*, 441 F.3d 153, 170 (2d Cir. 2006) (internal quotations omitted). Moreover, the Government must prove that the defendant's conduct had the "natural and probable effect of interfering" with a judicial or grand jury proceeding. *United States v. Aguilar*, 515 U.S. 593, 599 (1995) (internal quotations omitted). The Government must show that

a defendant knew that her actions were likely to affect the judicial proceeding to prove that the defendant acted with the necessary wrongful intent required under Section 1503. *Id.* A defendant "lacks the requisite intent to obstruct" absent the defendant's knowledge that her actions were likely to affect the judicial proceeding. *Id.* To substantiate the conspiracy to obstruct justice charge, the Government must further prove that Mrs. Menendez agreed with the Senator and Uribe to obstruct the grand jury proceeding. A3233–34 (Government arguing this conspiracy theory at trial).

Mrs. Menendez never demonstrated corrupt intent or an agreement to obstruct justice because the checks at the core of the Government's case were never made "to create a fake paper trail," as the Government alleged at trial. A3231. The checks themselves were always authentic; even Uribe testified that he deposited the check he received from Mrs. Menendez. A1963. Moreover, the record evidence showed that the funds Mrs. Menendez received from Hana and Uribe were always considered loans from her viewpoint. *See, e.g.*, A776 (John Moldovan testimony: Q: "On July 19, 2019, you texted Ms. Menendez that you were authorized to send roughly $23,000 as a personal loan with no interest. That's correct?" A: "Correct."); EA305; A754 (memo line of cashier's check reads, "loan auth W.Hana/IS EG TO N.A."); A1959 (Jose Uribe explaining to Mrs. Menendez that he would tell the FBI

that the car payments were an effort to help a friend that was in financial distress, and that the friend was going to pay him back).

The District Court incorrectly determined that Uribe's testimony somehow proved corrupt intent, pointing specifically to the conversation that Uribe had with Mrs. Menendez roughly a month after they were served with their initial grand jury subpoenas. SPA28. But Uribe testified only that Mrs. Menendez became scared when she saw the subpoenas, a hardly novel (or criminal) reaction for a lay person facing a federal subpoena. A1959 ("Q: What, if anything, did she say to you in response? A: Something to the extent that she get scared when she look at these documents. She gets sick when she look at these documents, actually."). Moreover, the District Court cited Uribe's self-serving testimony, reasoning that he had "devised" a story that the car payments were loans. SPA28. Uribe's motive and belief that he thought the payments were something other than loans says nothing about what Mrs. Menendez believed the checks to be—and required jumping through hoops to view the conversation as an agreement to hide the payments. A1959 ("Nadine asked me what was I going to say if the FBI asked me why I was making payment on her car . . . I said I will say . . . I was helping a friend that was in financial problem.").

Thus, the District Court erred when determining that Mrs. Menendez created the checks in December 2022 knowing that the documents "would be funneled into

the response to a grand jury subpoena." SPA29. *United States v. Aguilar*, 515 U.S. 593 (1995) undermines its position. In *Aguilar*, the Supreme Court held that the Government failed to prove that Aguilar knew his statements to an FBI agent would be provided to the grand jury, despite Aguilar knowing that there was an ongoing grand jury proceeding, because the evidence went no further than to show that Aguilar had merely testified falsely to an agent. The Supreme Court reasoned: "what use will be made of false testimony given to an investigating agent who has not been subpoenaed or otherwise directed to appear before the grand jury is far more speculative." *Id.* at 601–02. Likewise, the Government offered no proof that Mrs. Menendez in fact believed the checks would be offered to the grand jury when she first wrote them. Similarly, the District Court's reliance on *United States v. Triumph Cap. Grp., Inc.*, 544 F.3d 149 (2d Cir. 2008) is misplaced. In that case, the Government offered clear evidence of the defendant's awareness that the grand jury would likely inspect his laptop for records that he deleted.

2. The Evidence At Trial Was Insufficient to Support the Conviction on Count Four

The Government likewise failed to prove its case on Count Four. There was no evidence that the Senator obstructed or sought to obstruct Fred Daibes's federal case. By extension, Mrs. Menendez could not have conspired to obstruct the prosecution, requiring reversal of the conviction on this count as well.

At trial, the Government incorrectly argued that the evidence to support Count Four was demonstrated by the same evidence used to support the bribery offenses related to the Daibes scheme. A2816; A3234. The District Court also errantly held that Mrs. Menendez agreed to obstruct Daibes's prosecution, relying on evidence used in support of the Government's federal bribery counts related to the Daibes case. For the reasons already stated at length in Section III(B), there was no corrupt endeavor to intervene in Daibes's case. The Government failed to prove that the Senator's recommendation of Sellinger, or his request to Soliman to ask Sellinger to give Daibes fair treatment, was done in exchange for things of value. A2640.

Nor did Mrs. Menendez agree to obstruct justice. The District Court relied on a text with Daibes that the Senator was concerned about his long-time friend's case, and Mrs. Menendez's alleged receipt of things of value. SPA31. Again, this reasoning is flawed because it relies on speculative leaps that Mrs. Menendez actually received these things of value in connection with any bribery scheme. She did not. *See supra* Section III(B). Moreover, the text conversation she had with Daibes requires impermissible inferences to conclude that a communication reflecting the Senator's concern demonstrated a criminal motive. EA279 (rows 133–134).[20]

---

[20] Moreover, recommending a candidate for office does not constitute obstruction. The recommendation is only one of many steps in the process, and, ultimately, only the President of the United States nominates the candidate for confirmation by the

Because no reasonable trier of fact could have found Mrs. Menendez guilty of the obstruction charges based on the evidence presented at trial, her conviction on the obstruction counts must be vacated.

## IV. VENUE DOES NOT PROPERLY LIE IN THE SOUTHERN DISTRICT OF NEW YORK

Article III and the Sixth Amendment to the Constitution guarantee a criminal trial "in the State where the crime shall have been committed." U.S. CONST., art. III § 2, cl. 3; amend. VI. The Government's blatant attempt to ramrod this prosecution through the Southern District of New York ("SDNY" or "the District") disregarded this fundamental constitutional protection. This Court reviews venue determinations *de novo*. *United States v. Kirk Tang Yuk*, 885 F.3d 57, 70 (2d Cir. 2018). Where venue is not properly laid and defendants timely objected, reversal of the conviction and dismissal of the count is required. *See United States v. Brennan*, 183 F.3d 139, 149 (2d Cir. 1999); *Purcell v. United States*, 158 F.4th 441, 451 (2d Cir. 2025).

Venue must be established by a preponderance of the evidence and be found through a particularized inquiry as to each count for each defendant. *See United States v. Davis*, 689 F.3d 179, 185 (2d Cir. 2012); *United States v. Lange*, 834 F.3d 58, 71 (2d Cir. 2016). When analyzing venue, courts begin by determining the *locus*

---

Senate. Assuming the Senator was interested in how the person he recommended for office may view equitable treatment of Latino defendants and Daibes's case, he was permitted to do so.

*delicti* of the particular crime at issue, by "identify[ing] the conduct constituting the offense"—otherwise known as the crime's "essential conduct"—and "discern[ing] the location of the commission of the criminal acts." *United States v. Rodriguez–Moreno*, 526 U.S. 275, 279–80 (1999). Mere preparatory acts or incidental contacts with a district do not suffice. *See United States v. Tzolov*, 642 F.3d 314, 318 (2d Cir. 2011); *United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181, 1190 (2d Cir. 1989). For charges based on aiding and abetting, "[v]enue is proper where the defendant's accessorial acts were committed or where the underlying crime occurred." *Lange*, 834 F.3d at 69 (cleaned up).

The "essential conduct" of bribery occurs where a defendant "corruptly demands, seeks, receives, accepts, or agrees to" a bribe. *United States v. Stephenson*, 895 F.2d 867, 874 (2d Cir. 1990) (quoting 18 U.S.C. § 201). In this context, extortion is "the obtaining of property from another, with his consent, . . . under color of official right." 18 U.S.C. § 1951(b)(2). More plainly, the essential conduct occurs where a defendant "use[d] the authority of his office to obtain unearned money." *United States v. Tillem*, 906 F.2d 814, 821 (2d Cir. 1990).

For wire fraud, "venue lies where a wire in furtherance of a scheme begins its course, continues or ends." *United States v. Rutigliano*, 790 F.3d 389, 397 (2d Cir. 2015). The wire must be transmitted by or caused to be transmitted by the defendant. *See* 18 U.S.C. § 1343. A defendant causes transmission of a wire where he acts

"with knowledge that the use of the wires would follow in the ordinary course of business, or if such use could reasonably have been foreseen." *United States v. Zichettello*, 208 F.3d 72, 106 (2d Cir. 2000) (cleaned up).

### A. The Egypt Scheme

No essential conduct related to the Egypt Scheme took place in SDNY. Mrs. Menendez was charged with three substantive counts related to the Egypt Scheme—bribery, honest services wire fraud, and extortion. A193. To prove that venue was proper in SDNY, the Government relied upon (and the District Court errantly adopted) events that cannot establish venue in SDNY.

#### 1. The Mr. Chow Dinner

The Mr. Chow dinner in Manhattan did not support venue. SPA34; A943–47. The record contains no evidence that any "essential conduct" occurred at the Mr. Chow dinner. First, the Government offered no evidence of the contents of this meeting. SPA34. Second, Hana's payment for the dinner is not a bribe without evidence of a *quid pro quo* agreement, and there was none. Third, Hana's message to General Shawky from the restaurant during the dinner simply confirmed a future meeting; it did not corroborate a corrupt agreement. Additionally, the record shows only that Hana sent the message to General Shawky; there is no evidence that Mrs. Menendez directed its transmission or could have foreseen it. *See Zichettello*, 208 F.3d at 106. Fourth, the District Court's reliance on "the ensuing timeline" as evidence of essential conduct is purely an assumption based on the Government's

improperly argumentative summary charts. SPA34; *see supra* Section II. The Mr. Chow dinner was preparatory at most. *See Tzolov*, 642 F.3d at 318–19.

2. Meeting at Lotte Hotel

The simple fact of the meeting between Senator Menendez, Daibes, and General Helmy is insufficient to prove venue as to Mrs. Menendez because there is no evidence that any essential conduct took place at the meeting. SPA34; EA202 (rows 956–65); A1055. The messages between Mrs. Menendez and General Helmy regarding the meeting in New York bear no relevance to whether venue is proper in SDNY, as the messages do not show essential conduct taking place at the meeting, occurred months later, and did not pass through the District. SPA34; EA207 (rows 998–99); A1071.

3. Drive from JFK Airport

The record shows only that Daibes' driver, John Pilot, drove the Menendezes home from JFK airport, not that any essential conduct for the three counts took place during the ride or that the ride itself was part of a bribe. A1092; EA216 (rows 1104), 217 (rows 1113–18). Mere passage through SDNY without evidence of essential conduct is insufficient to establish venue. *See United States v. Purcell*, 967 F.3d 159, 189–90 (2d Cir. 2020) (explaining that defendant "attempted to recruit [victim] by meeting with her, not by traveling to his meeting with her" and "any passage by [the defendant] through the Southern District of New York on his way to Charlotte was merely a 'preparatory act[ ]' for the offense conduct"). The Government's

reliance on circumstantial evidence—such as Daibes' visit to the Menendez home the next morning or Pilot's fingerprints on an envelope of cash found in the Menendez home—does not show that any essential conduct for bribery, extortion, or wire fraud occurred *during* the JFK car ride.

4. The Sale of the Gold Bars

Lastly, the sale of gold bars through Vasken Khorozian in Manhattan is not essential conduct for any of the counts because it is purely post-offense conduct. *See* A2402–01, 2437–38, 2440–42; EA282 (rows 188–89). For bribery and extortion, once the payment is obtained in a *quid pro quo*, the alleged schemes are complete. *See Evans v. United States*, 504 U.S. 255, 268 (1992); *Silver II*, 948 F.3d at 548–49 (citing *Evans* to show that the completion of "a *quid pro quo* bribery scheme is the *moment at which the public official accepts the payment*.").

**B. The New Jersey Scheme**

The Government's venue theory for Counts nine and ten (wire fraud and extortion) also fails. First, the fact that Uribe's associate, while in the Bronx, made payments on Mrs. Menendez's Mercedes convertible cannot be the basis of venue. Mrs. Menendez could not have foreseen the actions of an *unknown third party* merely because the Bronx is near New Jersey. A1837. The District Court's case law supporting this conclusion relied on the foreseeability that a *co-conspirator* may perform essential conduct in another, proximate district—not a third party that is unknown to the defendant. *See, e.g.*, *United States v. Boruch*, 550 F. App'x 30, 33

(2d Cir. 2013) (relying on the foreseeability of overt acts by co-conspirators in a proximate district to find venue). Additionally, the wire by Uribe's associate was not directly caused by Mrs. Menendez, as Uribe was the one who directed it. *See United States v. Kim*, 246 F.3d 186, 190–91 (2d Cir. 2001).

Second, the Government relied upon Mrs. Menendez's travel through SDNY to deposit alleged bribery proceeds in Long Island. The District Court assumed that Mrs. Menendez traveled through SDNY to avoid detection with the alleged proceeds, but no evidence supports this. A1580–83. The Government did not even argue this in summation or in its post-trial brief; it simply argued that moving through the District with the proceeds of a bribe is sufficient for venue. A3183; A3580. If this is true, then any district in the country that a person travels through with bribery proceeds is sufficient for venue—a proposition that this Court has decisively rejected. *See Purcell*, 967 F.3d at 189–90 (traveling on the way to commit essential conduct does not establish venue in the district travelled through); *Tzolov*, 642 F.3d at 318–19 (boarding airplane in district to travel to meeting where defendant made fraudulent statements was preparatory).

Third, the District Court's finding that Mrs. Menendez used cell towers in SDNY to give instructions to Uribe sufficed for venue, SPA37 n.9, belies trial testimony which shows that Mrs. Menendez was most likely *in New Jersey* when she connected to the cell towers. A2781–84 ("Q. Where does it appear that Nadine

Menendez was most likely at around the time this message was sent? A. New Jersey.").

### C. The Daibes Scheme

The District Court's perfunctory analysis of venue for the counts related to the Daibes Scheme is flawed. Venue must be proper with respect to each count; therefore, the District Court was required to make a ruling regarding *each count*. *See Tzolov*, 642 F.3d at 318; *Lange*, 834 F.3d at 71. The District Court did not make specific findings and stated only that the evidence supporting the Egypt scheme also supports venue for the counts under the Daibes scheme. SPA36. Furthermore, the only examples used by the District Court—the JFK car ride and the sale of the gold bars—do not establish venue for the same reasons stated above. There is no evidence that any essential conduct took place during the JFK ride and the sale of gold bars is purely post-offense conduct.

### D. The Conspiracy Counts

Venue for the conspiracy counts fail for the same reasons as the substantive counts—no essential conduct occurred in SDNY. Venue for conspiracy lies in "any district in which such offense was begun, continued, or completed" or where an "a conspirator committed an overt act in furtherance of the criminal scheme." 18 U.S.C. § 3237(a); *see Davis*, 689 F.3d at 185–86; *United States v. Rommy*, 506 F.3d 108, 119 (2d Cir. 2007). "Where the object of a conspiracy is economic, the conspiracy generally continues until the conspirators receive their anticipated

economic benefits." *United States v. LaSpina*, 299 F.3d 165, 175 (2d Cir. 2002) (internal quotations omitted). For acts of co-conspirators to supply venue, it must be reasonably foreseeable to the defendant that the overt acts of co-conspirators may be committed in the district. *Rommy*, 506 F.3d at 123.

First, the record shows that the alleged agreements on the three schemes (Egypt, New Jersey, and Daibes schemes) were formed in New Jersey and Washington, D.C. Therefore, the formation of the conspiracies as alleged cannot be the basis of venue in SDNY. *See id.* at 119.

Second, the Government offered no evidence that the conduct in SDNY continued the alleged conspiracies or that Mrs. Menendez could reasonably foresee that any alleged overt acts would take place in the District. As stated above, there is no evidence of what was discussed at the Mr. Chow dinner or the meeting at the Lotte Hotel, and as such, they cannot be presumed to have continued the Egypt conspiracy. Additionally, Mrs. Menendez could not have foreseen that Uribe would direct an associate to make payments on her Mercedes-Benz from the Bronx when the associate is not a co-conspirator or known to Mrs. Menendez. A1837. Without reasonable foreseeability, it cannot establish venue as to *Mrs. Menendez.* Furthermore, the car ride home from JFK airport, which the District Court relied on for venue for Count Four, is inadequate. There is no evidence that the car ride was part of the alleged conspiracy (as a bribe or otherwise) or that anything related to the

conspiracy occurred during the car ride. Thus, venue cannot lie based upon the sole fact that the ride happened.

Lastly, the alleged sale of gold bars to Khorozian and depositing of alleged bribery cash occurred after the completion of the conspiracy. The object of the alleged conspiracies was to pay for acts by Senator Menendez, for which the gold bars and cash were the alleged "anticipated economic benefits." *LaSpina*, 299 F.3d at 175. Thus, the sale or depositing of these alleged proceeds occurred after the conspiracy's end, and the Government failed to prove that venue in SDNY on the conspiracy counts was proper.

## CONCLUSION

For the foregoing reasons, this Court should grant the relief requested and vacate or reverse all counts of conviction.

Dated: January 20, 2026

Respectfully submitted,

By: *<u>/s/ Sarah R. Krissoff</u>*
Sarah R. Krissoff
*Counsel of Record*
Emma Scully
Andrew Vazquez
COZEN O'CONNOR
3 WTC
175 Greenwich St.
New York, N.Y. 10007
(212) 908-1388

*Attorneys for Defendant Nadine Menendez*

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B), the word limit of Local Rule 32.1(a)(4) (A) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f): this document contains 20,941 words, as permitted by the Court.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because: this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point font Times New Roman.

Dated: New York, New York
January 20, 2026

# SPECIAL APPENDIX

**TABLE OF CONTENTS**

| | Page |
|---|---|
| Court Order on Mrs. Menendez's Posttrial Motions, dated July 29, 2025 [ECF Doc. No. 892] .............. | SPA-1 |
| Court Order and Opinion on Posttrial Motions, dated July 31, 2025 [ECF Doc. No. 894] .............. | SPA-2 |
| Judgment as to Nadine Menendez, dated September 11, 2025 [ECF Doc. No. 903]................................ | SPA-53 |

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

NADINE MENENDEZ,

Defendant.

23-Cr-490 (SHS)

ORDER

SIDNEY H. STEIN, U.S. District Judge.

The Court has today transmitted to counsel for the defendant and the government its Opinion & Order determining defendant's post-trial motions. In that Opinion & Order, the Court refers to certain material in Section III.A that has been filed under seal. The parties are directed to (i) promptly discuss the necessity and scope of any redactions to the Opinion & Order and (ii) submit their proposed redactions, if any, along with the bases for any proposed redactions, to the Court on or before noon on Thursday, August 1, 2025. (*See* ECF No. 169.)

Dated: New York, New York
July 29, 2025

SO ORDERED:

Sidney H. Stein, U.S.D.J.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

NADINE MENENDEZ,

Defendant.

(S4) 23-Cr-490 (SHS)

OPINION & ORDER

TABLE OF CONTENTS

I. Applicable Law ... 3
A. Rule 29 Motion for a Judgment of Acquittal ... 3
B. Rule 33 Motion for a New Trial ... 5
II. The Evidence Supports the Convictions. ... 6
A. The Evidence Was Sufficient to Prove a Corrupt *Quid Pro Quo* as well as Official Acts Related to the Egypt Scheme; the New Jersey State Criminal Matters; and the Daibes Federal Prosecution Scheme. ... 6
1. The Egypt Scheme ... 6
a. Official Acts ... 6
b. *Quid Pro Quo* ... 8
2. The New Jersey State Criminal Matters ... 13
a. Official Acts ... 13
b. *Quid Pro Quo* ... 15
3. The Daibes Federal Prosecution Scheme ... 19
a. Official Act ... 20
b. *Quid Pro Quo* ... 20
B. The Evidence Was Sufficient to Prove That Defendant Conspired for Menendez to Act as an Agent of a Foreign Principal. ... 23
C. The Evidence Was Sufficient to Prove the Obstruction of Justice Charges (Counts 4, 17 & 18) ... 27

D. The Evidence Was Sufficient to Prove That Venue for Each Count Was Proper in the Southern District of New York. .... 30
1. Substantive Counts Related to Egypt (Counts 5, 7 & 8) .... 31
2. Substantive Counts Related to the Daibes Federal Prosecution Scheme (Counts 11, 13 & 14) .... 35
3. Substantive Counts Related to the New Jersey State Criminal Matters (Counts 9 & 10) .... 35
4. The Conspiracy Charges (Counts 1, 2, 3, 4 & 15) .... 37
a. The Bribery Conspiracy Charges (Counts 1, 2 & 3) .... 37
b. The Conspiracy to Obstruct the Prosecution of Daibes in New Jersey Charge (Count 4) .... 37
c. The FARA Conspiracy Charge (Count 15) .... 38
III. There Was No Manifest Injustice Warranting a New Trial Pursuant to Rule 33. .... 38
A. The Sixth Amendment Does Not Entitle Defendant to a New Trial .... 39
1. Relevant Background .... 39
2. The Sixth Amendment Right to Counsel .... 42
3. Defendant's Sixth Amendment Rights Were Not Violated. .... 44
B. The Use of Summary Charts and Summary Witnesses by the Government Was Proper. .... 46
IV. Counts 1 and 15 Are Multiplicitous and Judgment Shall Enter on Only One of Those Counts. .... 50
V. Conclusion .... 51

SIDNEY H. STEIN, U.S. District Judge.

On September 21, 2023, a federal grand jury in the Southern District of New York indicted defendant Nadine Menendez, along with then-Senator Robert Menendez, as well as Wael Hana, Jose Uribe, and Fred Daibes for their participation in a years-long scheme to bribe Menendez in exchange for things of value, including numerous gold bars, hundreds of thousands of dollars in cash, and a Mercedes-Benz convertible for

defendant and her then-boyfriend and now-husband, Robert Menendez.[1] The trial of this action as to all defendants was originally scheduled to begin in May of 2024.[2] But due to a medical condition, the Court adjourned defendant's trial date and severed her trial from the trial of co-defendants Menendez, Hana, and Daibes. After an approximately nine-week trial in the summer of 2024, Menendez, Hana, and Daibes were each found guilty on all counts with which they had been charged.

Ten months after her original trial date, defendant proceeded to trial in March of 2025. The evidence presented was substantially similar to the evidence presented at her co-defendants' trial. Following a five-week trial, defendant was found guilty on all counts with which she had been charged. Defendant has now moved for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29, contending that the government failed to introduce evidence sufficient to support a conviction on all counts. (ECF No. 868.) Defendant seeks in the alternative a new trial pursuant to Federal Rule of Criminal Procedure 33, contending that her Sixth Amendment right to counsel was violated and that the government's use of summary charts and summary witnesses was improper. (*Id.*) Many of these issues have been unpacked and analyzed in this Court's December 13, 2024 Opinion following the trial of Menendez, Hana, and Daibes, *United States v. Menendez*, 759 F. Supp. 3d 460 (S.D.N.Y. 2024). The reader is directed to that Opinion for necessary background and relevant analysis.

As set forth below, defendant's motion pursuant to Rule 29 and Rule 33 is denied in its entirety. Just as this Court observed in connection with the evidence presented in the trial last year of Menendez, Hana, and Daibes, so too the jury's verdict in this trial of Nadine Menendez was fully supported by the extensive witness testimony and documentary evidence here. In addition, defendant has not identified any injustice—let alone a manifest injustice—requiring a new trial. The Court does, however, find that Counts 1 and 15 are multiplicitous and thus will impose judgment on only one of the two multiplicitous counts.

## I. Applicable Law

### A. Rule 29 Motion for a Judgment of Acquittal

Pursuant to Federal Rule of Criminal Procedure 29, after the jury has rendered its verdict, "the Court may set aside the verdict and enter an acquittal" of "any offense for

---

[1] For clarity, the Court will refer to Nadine Menendez as "defendant" and Robert Menendez as "Menendez."

[2] Jose Uribe pled guilty on March 1, 2024. (ECF No. 248.)

which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a), (c)(2). "[A] defendant challenging the sufficiency of the evidence 'bears a heavy burden.'" *United States v. Landesman*, 17 F.4th 298, 319 (2d Cir. 2021) (quoting *United States v. Martoma*, 894 F.3d 64, 72 (2d Cir. 2017)). In determining whether the evidence is sufficient such that "a reasonable mind might fairly conclude guilt beyond a reasonable doubt," *id.* (quoting *United States v. Autuori*, 212 F.3d 105, 114 (2d Cir. 2000)), courts are to "view the evidence presented in the light most favorable to the government" and draw "all permissible inferences . . . in the government's favor." *Id.* (quoting *United States v. Guadagna*, 183 F.3d 122, 129 (2d Cir. 1999)). Additionally, "it is well settled that 'Rule 29(c) does not provide the trial court with an opportunity to substitute its own determination of . . . the weight of the evidence and the reasonable inferences to be drawn for that of the jury.'" *United States v. Cote*, 544 F.3d 88, 99 (2d Cir. 2008) (quoting *Guadagna*, 183 F.3d at 129).

"When a defendant challenges the sufficiency of the evidence in a conspiracy case, 'deference to the jury's findings is especially important . . . because a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel.'" *United States v. Santos*, 541 F.3d 63, 70 (2d Cir. 2008) (quoting *United States v. Morgan*, 385 F.3d 196, 204 (2d Cir. 2004)). The agreement to join the conspiracy may "be inferred from the facts and circumstances of the case" and "[b]oth the existence of the conspiracy and the defendant's participation in it with the requisite criminal intent may be established through circumstantial evidence." *Landesman*, 17 F.4th at 320 (quoting *United States v. Wexler*, 522 F.3d 194, 207-08 (2d Cir. 2008)). Moreover, "the 'agreement or understanding' element of bribery 'is indistinguishable from a conspiratorial agreement,' and accordingly 'may be proven by circumstantial evidence.'" *United States v. Friedman*, 854 F.2d 535, 553 (2d Cir. 1988) (quoting *United States v. Covino*, 837 F.2d 65, 70 (2d Cir. 1988)).

While courts "must defer to a jury's reasonable inferences," they are to "give no deference to impermissible speculation." *United States v. Pauling*, 924 F.3d 649, 656 (2d Cir. 2019). "An inference is not a suspicion or a guess. It is a reasoned, logical decision to conclude that a disputed fact exists on the basis of another fact that is known to exist." *Id.* (quoting *Siewe v. Gonzales*, 480 F.3d 160, 168 (2d Cir. 2007)). "Impermissible speculation, on the other hand, is 'a complete absence of probative facts to support the conclusion reached.'" *Id.* (quoting *Lavender v. Kurn*, 327 U.S. 645, 653 (1946)).

Additionally, "[w]here a fact to be proved is also an element of the offense . . . it is not enough that the inferences in the government's favor are permissible." *Landesman*, 17 F.4th at 320 (quoting *Pauling*, 924 F.3d at 657). Rather, the court "must also be satisfied that the inferences are sufficiently supported to permit a rational juror to find

that the element, like all elements, is established beyond a reasonable doubt." *Id.* (quoting *Pauling*, 924 F.3d at 657). "[I]f the evidence viewed in the light most favorable to the prosecution gives 'equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence,' then 'a reasonable jury must necessarily entertain a reasonable doubt.'" *United States v. Triumph Cap. Grp., Inc.*, 544 F.3d 149, 159 (2d Cir. 2008) (quoting *United States v. Glenn*, 312 F.3d 58, 70 (2d Cir. 2002)).

Ultimately "[t]he jury verdict must be upheld if '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Guadagna*, 183 F.3d at 130 (emphasis in original) (quoting *United States v. Resto*, 824 F.2d 210, 212 (2d Cir. 1987)). "'[A] judgment of acquittal is warranted only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *United States v. Jiau*, 734 F.3d 147, 152 (2d Cir. 2013) (internal quotation marks omitted).

**B. Rule 33 Motion for a New Trial**

Pursuant to Federal Rule of Criminal Procedure 33, the Court "may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). "The defendant bears the burden of proving that he is entitled to a new trial under Rule 33." *United States v. McCourty*, 562 F.3d 458, 475 (2d Cir. 2009).

On a Rule 33 motion, "[t]he trial court must be satisfied that 'competent, satisfactory and sufficient evidence' in the record supports the jury verdict." *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001) (quoting *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992)). In so doing, "[t]he district court must examine the entire case, take into account all facts and circumstances, and make an objective evaluation." *Id.* And, as with a Rule 29 motion, "a district court faced with a Rule 33 motion must be careful to consider any reliable trial evidence as a whole, rather than on a piecemeal basis." *United States v. Archer*, 977 F.3d 181, 189 (2d Cir. 2020).

But while "'a trial court has broader discretion to grant a new trial pursuant to Rule 33 than to grant a motion for a judgment of acquittal pursuant to Fed. R. Crim. P. 29 . . . , that discretion should be exercised sparingly' and only in the most extraordinary circumstances." *Landesman*, 17 F.4th at 330 (quoting *Sanchez*, 969 F.2d at 1414). "[A] district court may not grant a Rule 33 motion based on the weight of the evidence alone unless the evidence preponderates heavily against the verdict to such an extent that it would be 'manifest injustice' to let the verdict stand." *Archer*, 977 F.3d at 188. Under this standard, "a district court may not 'reweigh the evidence and set aside the verdict simply because it feels some other result would be more reasonable.'" *Id.* (quoting *United States v. Robertson*, 110 F.3d 1113, 1118 (5th Cir. 1997)). Indeed, courts "must take

care 'not to usurp the role of the jury.'" *Landesman*, 17 F.4th at 330 (quoting *United States v. Canova*, 412 F.3d 331, 349 (2d Cir. 2005)).

Thus, "absent a situation in which the evidence was 'patently incredible or defie[d] physical realities,' or where an evidentiary or instructional error compromised the reliability of the verdict, a district court must 'defer to the jury's resolution of conflicting evidence.'" *Archer*, 977 F.3d at 188-89 (internal citations omitted). "[T]he ultimate test is whether letting a guilty verdict stand would be a manifest injustice. In other words, [t]here must be a real concern that an innocent person may have been convicted." *United States v. Snype*, 441 F.3d 119, 140 (2d Cir. 2006) (citation and quotation marks omitted).

## II. The Evidence Supports the Convictions.

### A. The Evidence Was Sufficient to Prove a Corrupt *Quid Pro Quo* as well as Official Acts Related to the Egypt Scheme; the New Jersey State Criminal Matters; and the Daibes Federal Prosecution Scheme.

Defendant contends that the government "failed to prove beyond a reasonable doubt that Senator Menendez engaged in a single official act" and failed to prove that Menendez and defendant "agreed to perform an official act *in exchange for* anything of value with corrupt intent." (ECF No. 868 at 24-25.) That is not so.

This Court has already written extensively on the definition of an official act under *McDonnell v. United States*, 579 U.S. 550 (2016) as well as the *quid pro quo* requirement in its December 13, 2024 Opinion addressing the post-trial motions of the defendant's co-defendants. *See Menendez*, 759 F. Supp. 3d at 476-79. Rather than restate that analysis here, the reader is referred to the standards set forth in that Opinion.

#### 1. *The Egypt Scheme*

Defendant urges that the government failed to prove any official act with respect to the Egypt scheme and that any agreement to perform an official act was made in exchange for anything of value. As explained below, she is incorrect.

##### a. *Official Acts*

The government presented evidence of at least two official acts in connection with the Egypt scheme. First, the government introduced evidence that Menendez promised to sign off on a foreign military sale to Egypt. Specifically, the jury saw a text message from Menendez to defendant—which defendant then immediately transmitted to Hana—in which Menendez wrote "Tell Will I am going to sign off this sale to Egypt today. Egypt: 46,000 120MM Target Practice Rounds and 10,000 Rounds Tank

Ammunition: $99 million." (GX 1352, rows 306-09, GX A101-14, GX B201-10, GX B105-15.) As this Court previously explained, this action plainly meets the definition of an official act under *McDonnell*. *See Menendez*, 759 F. Supp. 3d at 480-81. That alone is sufficient to defeat defendant's challenge with respect to official acts for these counts.[3]

*Second*, even assuming that text message did not exist, the jury could reasonably conclude that Menendez's call to Ted McKinney—at the time, the Undersecretary of Agriculture at the U.S. Department of Agriculture ("USDA")—was evidence of Menendez's promise to perform an official act, and perhaps performance of an official act as well. During the trial, the jury heard evidence that in April of 2019, Egypt rejected or decertified seven American companies that had previously been certified as halal beef exporters to Egypt. (Tr. 1036-38; GX 8B-3.) In place of those seven companies, Egypt substituted a single company, IS EG Halal Certifiers Inc. ("IS EG")—a New Jersey company owned by Hana with absolutely no prior experience in halal certification. (*See* GX 8B-3.)

Upon learning of Egypt's decision to grant a monopoly to a totally untested company, the USDA became "deeply concerned," and McKinney wrote a letter to his Egyptian counterpart—the Egyptian Deputy Minister of Agriculture—expressing the USDA's desire that the Egyptian government reverse course "[e]ffective immediately" "to prevent any disruption" in the U.S. market. (GX 1352, row 575, GX 8B-20.) In the wake of that letter, Menendez called McKinney, a call in which McKinney described Menendez to the jury as "direct" and "serious." (Tr. 1062.) During that call, Menendez twice told McKinney to "[s]top interfering with my constituent," which McKinney understood to be IS EG. (Tr. 1059-60, 1061, 1064.) McKinney testified that "it was an order." (Tr. 1060.) McKinney explained that he felt that Menendez wanted the USDA to "cease and desist all of [its] efforts" to bring back the other halal certifiers. (Tr. 1063.) McKinney also explained how unusual a call like this was (*see* Tr. 1063, 1070); afterward, he felt the need to "reassure [U.S. Embassy employees] in Egypt that we have their back" and that "[t]hey should not worry about this call from the senator." (Tr. 1068-69; *see also* GX 1352, row 666, GX 8B-12.)[4]

---

[3] Defendant protests that this message simply "reflected a communication to a concerned constituent regarding a decision on arms sales the Senator had already made, not an official act that was tied to some corrupt bargain." (ECF No. 876 at 21.) But the jury was entitled to reject that (far-fetched) competing inference, in light of the totality of the government's evidence and Menendez's choice to inform that constituent not through any official channel but though his then-girlfriend.

[4] This evidence dispels defendant's assertion that the government offered "no evidence whatsoever" that Menendez attempted to pressure McKinney on that call. (ECF No. 868 at 26.)

With this evidence, the jury was entitled to determine that Menendez was seeking to pressure McKinney concerning the position the USDA was taking on a question or matter before it—its stance on Egypt's grant of a monopoly and specifically whether the USDA would undertake efforts to oppose such a monopoly, which the jury certainly was entitled to conclude involved a "formal exercise of governmental power." *McDonnell*, 579 U.S. at 574. And while the question or matter did not come before Menendez, it did not have to. As *McDonnell* set forth, the "decision or action" prong of an official act may be satisfied by a public official "using his official position to exert pressure on another official to perform an 'official act.'" *Id.* The jury could conclude that Menendez attempted to exert pressure on McKinney to stop the USDA's efforts to get Egypt to reinstate competition in halal certification of meat exports to Egypt, which would be more than enough to establish the official act requirement of a bribery offense.

### *b. Quid Pro Quo*

The jury was similarly presented with ample evidence to conclude that Menendez promised to perform official acts to benefit Egypt and Hana in exchange for things of value, including a $23,568.54 payment towards defendant's mortgage and three $10,000 checks from IS EG to defendant for performing essentially no work for IS EG. Specifically, on July 19, 2019, Hana, with the assistance of his lawyer John Moldovan, paid the outstanding debt on defendant's mortgage to get her house out of foreclosure. And on August 30 and November 6, 2019, IS EG wrote three $10,000 checks to defendant's recently established consulting company, Strategic International Business Consultants. (GX 1352, row 919, GX 5A-1001A; GX 1352, row 989, GX 5A-1001B; GX 1352, row 997, GX 5A-1001C.)

Defendant urges that these cannot be bribe payments because they were received *after* the official acts and are thus, at most, gratuities. But bribes are payments that are either "made *or agreed to* before an official act in order to influence the official with respect to a future act." *See Snyder v. United States*, 603 U.S. 1, 5 (2024) (emphasis added). *See also* 18 U.S.C. § 201(b)(2) (criminalizing public officials for, *inter alia*, "agree[ing] to receive or accept anything of value . . . in return for . . . being influenced in the performance of any official act"). The government introduced sufficient evidence for the jury to reasonably conclude the scheme began well before defendant and Menendez received anything of value.

Indeed, months before any official acts, in February 2018, defendant asked Menendez—and Menendez agreed—to meet with her and Major General Khaled Shawky Osman, the military attaché at the Egyptian embassy in Washington (GX B105-A), at the embassy so that the pair could be introduced and, in the future, not require "an explanation to Egypt as to why [General Shawky was] meeting an official not at the embassy." (GX 1352, row 46, GX A105-A.) Approximately a week later, defendant,

Hana, and Menendez met "to discuss the points of the meeting" with General Shawky. (GX 1352, row 65, GX A101-99.) And on March 13, 2018, Menendez and defendant met with General Shawky, Andy Aslanian, and Hana, a meeting that Menendez's staff did not join and otherwise appeared to be unaware of. (GX 1352, rows 77-79, GX C102-2, GX 4I-2.) Shorty after, defendant wrote to Hana that she planned to ask Menendez "about the two deals." (GX 1352, row 85, GX B105-3.)

Just a few months after this meeting, in May 2018, defendant asked Menendez to "fix" a letter for General Shawky so that she could "prove a point to [Shawky]," noting that General Shawky and Hana had just given her "clearance for a project." (GX 1352, row 183, GX B102, GX B102-A.)

At the end of June, Hana, defendant, and Menendez met for dinner in Manhattan, during which time Hana was simultaneously communicating with General Shawky. (*See* GX 1352, rows 243-48, GX B105-10, GX 7A-2, GX 7A-3, GX 7A-4, GX 7B-1, GX C206-3, GX C206-3T.) The group again met in Washington D.C. the following month on July 25, 2018. (GX 1352, row 300, GX C410.) The very next day, Menendez told defendant to tell Hana that he will sign off on an arms sale to Egypt. (GX 1352, row 306, GX A101-14.) The defendant did immediately as Menendez instructed (GX 1352, row 308-09, GX B105-15) and then, two minutes after Hana received the text from defendant, Hana forwarded the message to General Shawky and another Egyptian official. (GX 1352, rows 310-11, GX C206-7, GX C112-2.)

This series of events provided the jury with ample evidence to conclude that long before defendant informed Hana of Menendez's promise to sign off on an arms sale—or received any payment—Menendez *agreed* to do so in exchange for things of value. In her motion, defendant faults the government for not introducing evidence of "what was actually said at these meetings." (ECF No. 868 at 33.) But a bribery agreement is, by its very nature, a "secretive operation" and thus "'it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel.'" *Santos*, 541 F.3d at 70 (quoting *Morgan*, 385 F.3d at 204) (discussing secretive nature of conspiratorial agreement). *See also Friedman*, 854 F.2d at 553 ("[T]he 'agreement or understanding' element of bribery 'is indistinguishable from a conspiratorial agreement . . . .'"). And indeed, "evidence of the timing of the payments in relation to the actions taken" by a public official may "be accepted by a rational jury in support of the conclusion that [the defendant] understood that the [] payments were made in return for official action." *United States v. Silver*, 948 F.3d 538, 567 n.18 (2d Cir. 2020) (quoting *United States v. Bruno*, 661 F.3d 733, 744 (2d Cir. 2011)). *See also id.* at 570-71 ("[T]he evidence presented at trial, including circumstantial evidence of the timing of [certain] financing approvals and [the official's] 'side letter' retainer agreement" was sufficient for a jury to conclude the official had accepted payments "with the belief that he was

expected to influence *a particular matter*"); *United States v. Reichberg*, 5 F.4th 233, 249 (2d Cir. 2021) (incriminating testimony from a coconspirator and "timing of [] circumstantial evidence provide[s] a reasonable basis for the jury to infer that particular benefits were linked to particular official actions"); *United States v. Calk*, No. 19-cr-366, 2022 WL 101908, at *2 (S.D.N.Y. Jan. 11, 2022) (concluding that "[t]he timing and circumstances of each loan was sufficient for the jury to infer [defendant's] corrupt intent"), *aff'd*, 87 F.4th 164 (2d Cir. 2023). In this case, the circumstantial evidence strongly supports the jury's conclusion that there was a corrupt *quid pro quo*.

The same is true for Menendez's call to McKinney. In January of 2019, Ali Abdi of the USDA wrote to Dr. Ahmed Abdel Karim, an Egyptian agricultural official, and approved Karim's request "to audit slaughterhouses and Islamic centers in the United States." (GX 1352, row 420, GX C107-C.) Days later, Karim forwarded this letter to Hana. (*Id.*; GX C107-1T.) Around the same time, defendant wrote to Andy Aslanian that "2019 is going to be a FANTASTIC YEAR for all of us. [Menendez] [k]eeps telling me that and I'm really starting to believe it." (GX 1352, row 402, GX B113.)

On March 26, 2019—almost exactly one year from that first meeting between defendant, Menendez, Andy Aslanian, Hana, and General Shawky—defendant wrote that "[i]t has been a year of broken promises by Will to me and I have given 1000% of my myself [sic], my time and kept every promise to Will . . . . I am willing to give 100% to make sure this goes skyhigh on condition that I start getting my $ 2500/week and health benefits and Will keeps his promises." (GX 1352, row 461, GX B221-1.) She went on to say that this week "I will once again prove my loyalty and dedication." (*Id.*) Shortly afterward, on April 8, 2019, defendant messaged Menendez that it "[s]eems like halal went through. It might be a fantastic 2019 all the way around." (GX 1352, row 523, GX A101-27.)

A few weeks later, the USDA learned that Egypt had decertified the seven U.S. companies that had been authorized by Egypt to certify meat as halal for exporting into Egypt and had instead authorized IS EG to be the sole exporter. On May 13, 2019, McKinney wrote to the Egyptian Deputy Minister of Agriculture to express his "deep[] concern[s]" and request that she "immediately . . . reinstate the seven U.S. halal certifiers" that had been suspended or terminated. (GX 1352, row 575, GX 8B-20.) Days later, Hana sent an article about the United States' response to the change to defendant (GX 1352, row 644, GX C102-6), who then immediately forwarded it to Menendez. (GX 1352, row 642, GX A404.) Within minutes, Menendez called McKinney and sent this same article to him. (GX 1352, row 647, GX 8B-16.) Five days after Menendez made that call to McKinney, Hana listed defendant as the vice president of IS EG with an annual salary of $120,000 (GX 1352, row 675, GX C104-4)—i.e., $10,000 per month or $2,500 per week, which matched the salary identified in defendant's March 2019 text message.

Following Menendez's call to McKinney, the evidence shows that defendant was paid. In July 2019, Hana, with Moldovan's assistance, paid the outstanding debt on defendant's mortgage, thus stopping the bank from foreclosing upon her house. (*See* GX 1352, row 894, GX 5C-200; Tr. 414-15.) And then in August and November 2019, defendant received three checks for $10,000 each from IS EG. (GX 1352, row 919, GX 5A-1001A; GX 1352, row 989, GX 5A-1001B; GX 1352, row 997, GX 5A-1001C.)

In sum, this circumstantial evidence provides a more than sufficient foundation for the jury to reasonably infer that Menendez agreed to take official action in exchange for items of value for defendant—including the mortgage payment and the checks from IS EG—before he took or attempted to take any official act. *See Reichberg*, 5 F.4th at 249 ("[C]ircumstantial evidence provide[s] a reasonable basis for the jury to infer that particular benefits were linked to particular official actions."); *Calk*, 2022 WL 101908, at *2 (finding that the "timing and circumstances of each loan was sufficient for the jury to infer [defendant's] corrupt intent").

Defendant contends that the mortgage payments "were always understood by Mrs. Menendez to be a loan she had every intention of paying back." (ECF No. 868 at 34.) A rational jury was certainly entitled to conclude otherwise. Moldovan testified that when he first spoke with Hana and defendant about paying off her mortgage debt, there was no mention of a promissory note. (Tr. 441-42.) Only later on, Hana instructed Moldovan to "create a loan for the purposes of providing the funds that are going to be used to pay the mortgage off." (Tr. 442.) Moldovan then drafted a loan agreement per Hana's specifications—a five-year term, no interest, and no payment schedule. (Tr. 443-44.) On June 27, 2019, Moldovan sent this draft agreement to defendant for her execution (GX 1352, row 854, GX 4C1-D), but Moldovan testified that she seemed "very angry" when she received it. (Tr. 446-47.) Moldovan explained that defendant "essentially made it clear that she was sort of offended by the fact that a note was being sent prior to the execution of the funds transferred." (Tr. 447.)

On July 16, 2019, Moldovan attempted to follow up with defendant, as he was still "awaiting [her] response on the money from [Hana]." (GX 1352, row 872, GX B222.) The next morning, defendant responded: "I have no idea what response you are waiting for." (GX 1352, row 873, GX B222.) Moldovan then reminded her of the draft loan agreement he had sent weeks ago for her review. (GX 1352, row 877, GX B222.) Moldovan testified that after he sent that message, Hana came to him and instructed him to "transfer the funds immediately" (Tr. 451), even though the draft loan agreement had not been signed. That day, Hana wired Moldovan the money to send to defendant, and on July 19, 2019, Moldovan issued a check to defendant's mortgage company in the amount outstanding. (GX D207-A at 5.) And while the memo line of the check read "Loan Auth W. Hana / ISEG to N.A" (*id.*), Moldovan testified that a promissory note

had not been executed. (Tr. 460.) Ultimately, Moldovan told the jury that defendant never told him that "she agreed the money would be a loan" and she never told him that it would be repaid. (*Id.*) This evidence provides the jury with more than sufficient support to conclude that this was not a loan.

Tellingly, defendant characterized the mortgage payment as a payment to her, along with the $10,000 monthly checks from IS EG. Specifically, in September, defendant reached out to Daibes because she had not been receiving her payments from Hana as expected. (GX 1352, row 967, GX D102-10.) Daibes asked her to send him a "rundown" of what she was owed. (GX 1352, row 969, GX D102-10.) In response, defendant wrote that the "July 19th cashier's check for the $23,568.54 to the mortgage company" covered most of the payments she was due for May, June, and partially July. (GX D102-C.)

Defendant also challenges the government's characterization of her three-month stint as a consultant for IS EG as a "sham job," contending the evidence to support this characterization was "dubious and thin." (ECF No. 868 at 33.) But there was ample evidence from which the jury could conclude that defendant's "employment" by IS EG was simply a means of funneling bribe payments to her and Menendez. As a few examples, defendant was the second highest paid individual at IS EG, despite having no prior experience in halal certification or the halal business in general; an IS EG employee testified that she was unaware of any work defendant performed for IS EG (*see, e.g.*, Tr. 1148)[5]; the jury heard a voicemail in which defendant stated that Hana told her "he doesn't need me for anything and I haven't done anything to help him, and a whole bunch of other stuff that I need to be in the office eight hours a day" (GX 1352, row 865, GX D108-A); and tellingly, defendant did not include the three $10,000 checks she received for her supposed work on her federal tax returns. (Tr. 1804-05; GX 2436.) Perhaps most incriminating, six months before any payment, defendant—referring to the possibility of IS EG being granted a monopoly by Egypt—wrote to Howard Dorian, one of Hana's associates, that she was willing to "give 100% to make sure this goes skyhigh on condition that I start getting my $ 2500/week and health benefits and Will keeps his promises." (GX 1352, row 461, GX B221-1.) All this provides ample support for the reasoned inference that defendant's purported consulting job was simply a means to receive bribe payments.

---

[5] Defendant asserts that this employee "reasonably may not have participated in any discussions around, or otherwise understood, Mrs. Menendez's work." (ECF No. 868 at 34.) That is, at best, a competing inference the jury was entitled to reject in light of the totality of the government's evidence.

### 2. *The New Jersey State Criminal Matters*

Defendant next contends that the government failed to prove that Menendez agreed to perform any official act to benefit Jose Uribe[6] in exchange for things of value. Here, again, the government has met its burden.

#### a. *Official Acts*

The government offered sufficient evidence for the jury to conclude that Menendez promised—and attempted—to take official acts to influence the outcomes of two matters handled by the New Jersey State Attorney General ("NJAG"). Specifically, Menendez agreed to pressure Gurbir Grewal, the New Jersey Attorney General at the time, to favorably influence both the prosecution of Elvis Parra, an associate and good friend of Uribe, and the investigation into Ana Peguero, a woman Uribe viewed as his daughter.

With respect to Parra, the government introduced evidence that Parra had been indicted for insurance fraud by the NJAG in connection with his trucking company and was being represented by Michael Critchley. (Tr. 1469; GX 1353, row 1, GX 4G-1, GX 10G-9; GX 1353, row 13, GX 4G-2, GX 4G-13.) As to Peguero, Uribe testified that Peguero became the agent of record and eventually the owner of Uribe's retail insurance company, Phoenix Risk Management. (Tr. 1459-60.) The NJAG issued subpoenas to Phoenix as part of its investigation into Parra. (Tr. 1469-70.) In 2018 and 2019, the investigation appeared to intensify, as Phoenix received a subpoena seeking additional documents and detectives repeatedly attempted to speak with Peguero. (Tr. 1475-77.)

The government introduced evidence of two instances in which Menendez spoke with Grewal about those matters. *First*, in early 2019, Menendez called Grewal supposedly to discuss the treatment of Hispanic vs. non-Hispanic defendants in the trucking industry (Tr. 1394-97), but in response to Grewal's questions, Menendez admitted it involved a specific criminal matter and that the defendant in question was represented by Michael Critchley. (Tr. 1397.) Grewal then told Menendez that Critchley was a good lawyer and so if he had concerns, Critchley should "raise them up the chain and address them that way." (*Id.*) Grewal testified that he was not comfortable discussing this matter with Menendez because he was afraid it could have a "chilling effect" on his line prosecutors. (*Id.*) Accordingly, Grewal decided not to tell his

---

[6] Uribe pled guilty to, among other crimes, conspiracy to bribe Menendez and defendant by purchasing a Mercedes for defendant in order to gain the help of Menendez in obtaining favorable treatment in two ongoing New Jersey state criminal investigations. (Tr. 1443-45.)

prosecutors about Menendez's call to make sure they did not feel any "undue outside influence." (Tr. 1398.)

*Second,* towards the end of 2019, Menendez called Grewal once again, this time asking Grewal to meet with him at his Senate office in New Jersey, and Grewal agreed. (Tr. 1399-1400.) The jury heard Grewal explain his impression that Menendez was not expecting Grewal to bring one of his assistant attorneys general with him to the meeting and had instead expected him to come alone. (Tr. 1404.) During the meeting, Menendez reiterated the same concerns he had shared earlier in the year, regarding the treatment of Hispanic vs. non-Hispanic defendants in the trucking industry. (Tr. 1406.) Grewal then asked Menendez if this was "the same matter you had called me about where Mike [Critchley] represents the defendants?" (*Id.*) Menendez indicated it was. (*Id.*) Grewal then told Menendez he could not talk to him further about this issue. (*Id.*) Grewal testified that while Menendez did not explicitly ask him to do anything, he understood from this meeting that Menendez "didn't like how the [matter] was being handled." (Tr. 1408.)[7]

In the first instance, there is sufficient evidence for the jury to conclude that both Menendez's call and his subsequent meeting with NJAG Grewal qualify as official acts. There is no doubt that criminal matters handled by the NJAG are properly deemed questions or matters before then-Attorney General Grewal. The decision of whether to investigate and prosecute is both a "formal exercise of governmental power" and was then clearly "pending" before the prosecuting or investigating office. *See McDonnell*, 579 U.S. at 574. Indeed, the Second Circuit has determined that "making an arrest" or "making a decision about whether to issue a desk appearance ticket to the arrestee" are the "sort of specific, formal exercises of government power that can constitute official acts." *Reichberg*, 5 F.4th at 249. *See also United States v. Lee*, 919 F.3d 340, 357-58 (6th Cir. 2019) ("A prosecutor bringing charges against a defendant is certainly within the meaning of 'official act' regarding a 'question, matter, cause, suit, proceeding, or controversy,' as defined by *McDonnell*." (citation omitted).)

From Grewal's testimony, the jury may reasonably infer that Menendez sought to "us[e] his official position to exert pressure on another official to perform an 'official act.'" *McDonnell*, 579 U.S. at 574.[8] Defendant contends that "the Senator's conduct

---

[7] Defendant emphasizes the fact that Menendez's contacts "did not spur Grewal into any action." (ECF No. 876 at 23.) That is a non sequitur. Indeed, the Supreme Court has explained that bribery does not require a public official to "actually make a decision or take an action"; rather, "it is enough that the official agree to do so." *McDonnell*, 579 U.S. at 572 (citing *Evans v. United States*, 504 U.S. 255, 268 (1992)).
[8] Defendant points out that Menendez did not "mention the case name, the criminal defendant, or any target of investigation by the Attorney General." (ECF No. 868 at 29.) True, but meritless. Menendez

[could not] be determinative of [Grewal's] prosecutorial or investigative functions because the Senator had no power over prosecutorial decisions within the purview of the [NJAG]." (ECF No. 868 at 37.) But the Second Circuit has stated that it sees "no basis for ruling that a congressman's official acts—especially those 'demonstrating Congressional interest'—may not include efforts that are directed toward local rather than federal officials." *United States v. Biaggi*, 853 F.2d 89, 99 (2d Cir. 1988). And Grewal testified that he understood Menendez to be "a close political ally of the governor"—the person who appointed Grewal to the position of New Jersey Attorney General. (Tr. 1393.) More broadly, Grewal explained that "[y]ou want to have allies" among New Jersey's federal officials (including Menendez). (Tr. 1389.)

Moreover, assuming *arguendo* that the call or meeting are not official acts themselves, they are strong evidence of *an agreement* to perform an official act. *See McDonnell*, 579 U.S. at 573 ("If an official sets up a meeting, hosts an event, or makes a phone call on a question or matter that is or could be pending before another official, that could serve as evidence of an agreement to take an official act."). Along with the record evidence discussed below, Menendez's calls and meeting with Grewal "serve as evidence of an agreement to take an official act." *See id.*[9]

### *b. Quid Pro Quo*

The government presented ample evidence for the jury to conclude that Uribe, with assistance from Hana, paid for a new Mercedes-Benz for defendant in exchange for Menendez's official acts (or promises to take official acts) to end the NJAG's prosecution of Parra and investigation into Peguero.

The evidence showed that by early 2018, Uribe had become increasingly concerned regarding Parra's case and the activity in the investigations into entities related to him and his family, including Phoenix and Peguero. (*See, e.g.*, Tr. 1475-77.) Around that time, Uribe discussed these matters with Andy Aslanian, an attorney who represented

---

stated that he was referring to (i) a pending criminal matter (ii) involving Hispanic individual(s) (iii) connected to the trucking industry (iv) represented by Michael Critchley, and (v) who were under investigation by the New Jersey Office of the Insurance Prosecutor. (Tr. 1396-97.) Grewal knew exactly which case Menendez was raising: he asked Menendez "is this the same matter that you had called me about where Mike [Critchley] represents the defendants? And [Menendez's] response was yes, to which I responded, I can't speak to you about this matter. Let Mike raise the issues with the appropriate people." (Tr. 1406.)

[9] In her reply, defendant asserts that these calls by Menendez to Grewal cannot be evidence of promises to perform official acts because Menendez first spoke with Uribe in August 2019, months after Menendez's first call to Grewal in January 2019. (ECF No. 876 at 24.) As demonstrated *infra*, the timeline of events gives the lie to that assertion.

Phoenix. (Tr. 1483-84.) Uribe testified that at that meeting, Hana—both a friend of Uribe and an officemate of Aslanian—overheard Uribe discussing his concerns, pulled Uribe into the hallway, and offered him a way to "make all of these investigations go away," mentioning both defendant and Menendez by name. (Tr. 1484.)

Soon after, Uribe organized a meeting between himself, one of his associates, Parra, and Hana. (Tr. 1487.) At that meeting, Uribe testified that Hana reiterated that he knew defendant and Menendez and he "ha[d] a way to get a better outcome for the prosecution of Elvis and to stop the investigation into [Uribe's business and associates] for a sum of 200 to $250,000." (Tr. 1489.) Uribe testified that Hana did not explain exactly what steps he was going to take to make sure all the investigations were stopped. (Tr. 1490.)

As the year progressed, the NJAG continued to investigate Phoenix and Peguero and repeatedly attempted to schedule a meeting with Peguero. In October, Uribe wrote to Hana, asking him to "be sure that your friend knows about this." (GX 1353, row 57, GX E102-1; *see also* Tr. 1503 (Uribe testifying that "your friend" referred to Menendez).) Hana responded that he would make sure. (GX 1353, row 58, GX E102-1.) In the fall, the judge presiding over Parra's case denied his motion to dismiss the indictment and set his trial date for the following April. (GX 1353, row 82, GX 4G-3; GX 1353, row 92, GX4G-4.)

On the evening of January 27, 2019, defendant, Hana, and Menendez met at the Menendez home. (GX 1353, rows 246-54, GX B105-32.) Later that night, Hana invited Parra to "have a drink tomorrow" with him and Uribe and asked Parra to call him. (GX 1353, row 255, GX C115-1.) The next day, Hana sent defendant information about Parra's lawyer, Michael Critchley. (GX 1353, rows 257, 261-64, GX B105-32, GX B105-FF, GX B105-GG.) On that same day, Hana asked Parra to send him "that date in April and the name of the judge." (GX 1353, row 268, GX C115-2.) Less than thirty minutes later, Parra sent Hana a screenshot of an online profile of the judge presiding over his case. (GX 1353, row 270, GX C115-2, GX C115-B.) Hana forwarded this screenshot to defendant within minutes. (GX 1353, row 274, GX C102-12, GX C102-F.) An hour later, defendant and Hana spoke on the phone (GX 1353, row 277, GX 6A-112), and the next morning, Menendez called defendant. (GX 1353, row 279, GX 6A-312-1.) Immediately after hanging up with Menendez, defendant called Hana, who then asked Parra for his home address, which he passed back to defendant. (GX 1353, rows 280-88, GX 6A-112, GX C115-3, GX B105-32.) Defendant responded, "Thank you now I need what the charges are." (GX 1353, row 289, GX B105-32.) Hana then immediately called her and also texted her Parra's case information. (GX 1353, rows 290-94, GX 6A-112, GX B105-32.) Defendant once again called Menendez. (GX 1353, rows 295, 298, GX 6A-206-1.) The

very next day, Menendez made his first call to Attorney General Grewal. (GX 1353, row 303, GX 6B-2401.)

During the same period of time, defendant was in need of a car, since her car had been damaged in an accident. (GX 1353, row 88, GX A109, GX A109-B.) In January, defendant wrote to a friend to ask if she knew anyone that would give her a "good price on a [Mercedes-Benz] C 300." (GX 1353, row 148, GX B110.) She explained that "Bob and I went and test drove on Saturday but the prices are too high monthly to finance." (*Id.*) By March, defendant still did not have a car. Uribe testified that he knew that Hana had promised her a car but had not followed through. (Tr. 1517-18.) As a result, Uribe began to call and text defendant directly and in March, he told her that "if her problem is a car, my problem is saving my family. And I will provide a car as long as she helps me." (Tr. 1518.) Uribe told the jury that defendant had agreed. (Tr. 1520.)

Defendant and Uribe met two weeks later for dinner and again they discussed the deal. (Tr. 1527-29.) Uribe testified that again the defendant agreed to the deal and told him that she would "be in touch with Senator Menendez" about Uribe's concerns. (Tr. 1529.) At that same meeting, defendant told Uribe she wanted a Mercedes-Benz. (*Id.*) At that point, Uribe arranged for a friend at a Mercedes-Benz dealership to help defendant get the specific Mercedes she wanted. (Tr. 1531-32; GX 1353, row 418, GX B209-13; GX 1353, row 454, GX A101-83.) In order to pay the deposit for the car, Uribe testified that he gave defendant an envelope containing $15,000 in cash. (Tr. 1532-33; GX 1353, row 486, GXE105-1, GX E105-1T; GX 1353, rows 503-05, 512-13, 519-20, GX B209-13.) He did so because "[p]roviding the $15,000 in cash is my deal with Nadine, that's my commitment to Nadine." (Tr. 1537.)

On April 5, 2019, defendant picked up the Mercedes and told Uribe, "I will never forget this." (GX 1353, row 548, GX B209-13.) Less than ten days later, defendant informed Uribe that she "spoke to him yesterday and I know everything is going to be perfect. 2019 will be fantastic for all of us. God willing." (GX 1353, row 606, GX B209-13.) By May, Uribe had begun to make monthly payments on defendant's car—paying through an associate, Fernando Barruous, in order that the payments would not be under Uribe's name. (Tr. 1559-60.) Uribe continued to make monthly payments on defendant's car for the next three years—including during the time period when Menendez met with Grewal in September 2019. (*See* Tr. 1624-25.)[10]

---

[10] In fact, the night before Menendez arranged for his meeting with Grewal, Uribe had texted the defendant, writing "[p]lease don't forget about me. I will never forget about you. I need peace." (GX 1353, row 906, GX B209-23.)

On October 29, 2019, Uribe texted defendant that he "just got a call and I am a very happy person" and "GOD bless you and him for ever." (GX 1353, rows 1005-06, GX B209-24.) Shortly after, Uribe told defendant that he would "like to set [the monthly payments on her car] in auto pay." (GX 1353, row 1016, GX E101-2.)

Given the above sequence of events coupled with Uribe's testimony, there is certainly sufficient evidence from which a jury was able to infer a "clear and unambiguous" *quid pro quo*. *See Benjamin*, 95 F.4th at 68; *Reichberg*, 5 F.4th at 249 (incriminating testimony from a coconspirator and "timing of [] circumstantial evidence provide[s] a reasonable basis for the jury to infer that particular benefits were linked to particular official actions"). The timing and circumstances of the car payments coupled with Uribe's testimony that defendant and Menendez had agreed to try to end both the criminal case against Parra and the investigation into Phoenix and Peguero were more than sufficient for the jury to infer a corrupt *quid pro quo*.

Indeed, the government introduced sufficient evidence for a reasonable jury to infer that Menendez knew that when he contacted Grewal, he was doing so in exchange for a benefit to defendant. The government introduced evidence that from as early as January 2019, Menendez participated in defendant's search for a new car, when the pair went together to test drive the Mercedes-Benz convertible she had her eye on. (GX 1353, row 148, GX B110.) Defendant also texted a friend that the monthly payments on this car were too expensive. (*Id.*) The next day, Menendez googled the price of the same model. (GX 1353, rows 171-73, GX A301-12.) Just days after those searches, Hana texted Uribe to inform him that "bob he want have dinner with us tonight." (GX 1353, row 217, GX E102-3.) And when Uribe connected defendant to his friend at the dealership, defendant told Uribe she would "go with Bob and look at the cars." (GX 1353, row 429, GX E115, GX E115-A.)

The government also presented evidence that throughout 2019, Menendez knew that defendant was meeting with Uribe. (*E.g.*, GX 1353, row 454, GX A101-83; GX 1353, row 511, GX A105-E; GX 1353, row 811, GX A101-93.) Moreover, the jury heard evidence that Uribe met with Menendez the night before Menendez's October 2019 meeting with Grewal. (Tr. 1643.) That evening, Menendez explained to Uribe that he wanted to meet "because he was having a meeting with some New Jersey officials at his New Jersey office the next day. And he wanted me to explain again what was my concerns and worries." (Tr. 1643-44.) And while Grewal testified that he told Menendez he could not talk to Menendez further about his office's pending cases, Uribe testified that Menendez nonetheless told him that his meeting with Grewal had been promising and that they were "in good status." (Tr. 1652, 1655.) Menendez's clear mischaracterization of the meeting allowed the jury to reasonably believe Menendez intended to appease Uribe in order to ensure that Uribe would continue to pay for

defendant's car.[11] Uribe further testified that he never mentioned the car payments to Menendez because he had no reason to doubt that Menendez knew about them. (Tr. 1624-25.) Finally, the jury saw evidence that months later Menendez, defendant, and Uribe had dinner together. (GX 1352, rows 1037-38, GX B227, GX B209-26.) At that dinner, Menendez texted defendant "[c]an u go to bathroom." (GX 1352, row 1039, GX A101-103.) Uribe testified that when defendant left the table, Menendez said to him, "I saved your ass twice, not once but twice." (Tr. 1664.) In sum, there is ample evidence for the jury to conclude that Menendez knew of these payments and that he was contacting Grewal to urge him to end the Parra and Peguero matters in exchange for those payments.

Defendant contends that at most "the evidence only ever plausibly supported that an agreement was struck between *Hana* and Uribe." (ECF No. 868 at 36.) Defendant is entitled to her view of the evidence, but the government introduced more than sufficient evidence that defendant was a key piece of this scheme. For one, the jury saw evidence of defendant passing information between Menendez and Hana concerning Para's case. And the jury saw many text messages from defendant to Uribe that demonstrate her involvement in this agreement. As just a few examples, the defendant texted Uribe: "You are a miracle worker who makes dreams come true I will always remember that" (GX 1353, row 499, GX B209-13); "[f]or all of us, 2019 will be a fantastic year" (on the day that defendant picked up her new car) (GX 1353, row 536, GX B209-13); "[y]ou are on my mind. It will be done. I need the info please" (GX 1353, row 712, GX B209-15); and "[y]ou will never be forgotten. That's a promise." (GX 1353, row 908, GX B209-23; Tr. 1639 (Uribe testifying that he understood the defendant meant that "she [was] going to comply with her part of the agreement")).

### *3. The Daibes Federal Prosecution Scheme*

Finally, defendant urges that the government failed to prove that Menendez agreed to perform any official act to benefit Daibes in exchange for things of value. But a review of the record yields sufficient evidence for the jury to conclude otherwise.

---

[11] Defendant contends that the "proper inference" for the jury to draw "from that conversation is that the Senator attempted to prevent Uribe from bothering Mrs. Menendez again." (ECF No. 876 at 26.) Viewing the evidence in the light most favorable to the government and drawing all permissible inferences in its favor, that is not so.

### *a. Official Act*

Menendez took an official act by recommending Philip Sellinger to the President for nomination to become the U.S. Attorney for the District of New Jersey to benefit Daibes.

The evidence allowed the jury to find an official act with respect to an ongoing federal criminal prosecution of Daibes. In October of 2018, Daibes had been indicted for fraudulent lending by the United States Attorney's Office for the District of New Jersey. (GX 4D-1.) Menendez committed an official act by using his official position as a U.S. Senator to recommend a candidate to be nominated by the President to be the U.S. Attorney for the District of New Jersey who he believed would be favorable to Daibes. Deciding who to recommend to become the U.S. Attorney is undoubtedly a question or matter that came before Menendez in his role as the senior U.S. Senator from New Jersey. Indeed, the jury heard testimony that "the White House was looking to [Menendez] and Senator [Cory] Booker for names" of individuals to nominate and that it was Menendez, as the senior senator, who would "put forth the name" and that Cory Booker, the junior senator, would "defer." (Tr. 2295, 2298, 2301; *see also id.* 2206, 2213.) Menendez then took a clear "decision or action" on that question or matter by recommending Sellinger—a person who, as explained further below, the jury could have reasonably concluded was expected to favorably resolve Daibes' criminal case—to the President to become the U.S. Attorney for the District of New Jersey.

### *b. Quid Pro Quo*

The jury heard sufficient evidence to find that Menendez took or promised to take an official act in exchange for things of value for him and defendant, including cash and gold bars.

After the 2020 presidential election, Menendez began considering who to recommend to then President-elect Biden to become the U.S. Attorney for the District of New Jersey. The jury heard credible evidence that, as of mid-December 2020, Sellinger was Menendez's top choice for the job. (Tr. 2303-05, 2334.) On December 15, 2020, Sellinger traveled to Washington D.C. to meet with Menendez to discuss the position. (GX 1354, row 14, GX 3A-17; Tr. 2214-16.) Just hours before that meeting, Menendez and Daibes spoke by phone. (GX 1354, row 13, GX 6A-615.) During his meeting with Menendez, Sellinger testified that Menendez informed him that "Daibes had a matter before the United States Attorney's office and [Menendez] believed that [Daibes] was not being treated fairly. And Senator Menendez hoped that if I became United States Attorney, I would look into it carefully." (Tr. 2217.) Two days later, on December 17, Sellinger called Menendez to inform him that he had previously represented developers in a civil case adverse to Daibes such that were he to become U.S. Attorney, he might have to be recused, but that the decision was not his to make. (Tr. 2226-27; GX 1354,

rows 16-17, GX A119-A, GX 6B-501.) Four hours later, Menendez asked Michael Soliman, his primary political advisor, to research a different candidate for the position, Esther Suarez. (Tr. 2308, 2334; GX 1354, rows 18-20, GX A113-4, GX A113-PH4.)

After Suarez's candidacy stalled, the jury learned that Menendez returned to Sellinger and recommended him to President Biden—but only after Menendez was informed by Soliman that Sellinger wanted Menendez to know that he had "checked with Main Justice and that he does not have to recuse himself" from an issue, which Soliman understood to be the then-pending criminal prosecution of Daibes. (Tr. 2351-52.) Soliman then relayed this message to Menendez, telling him that "I think if you call Sellinger, you'll be comfortable with what he says." (GX 1354, row 61, GX A113-8, GX A113-PH8.) Menendez then put forward Sellinger as his recommendation to the President for nomination to the position of U.S. Attorney for the District of New Jersey.

The government introduced evidence of various items of value received by defendant and Menendez during this period of time. As one example, Daibes arranged for his driver to pick up Menendez and defendant from JFK airport and drive them to their home in New Jersey. (GX 1354, row 83, GX A111-1, GX A111-PH1.) Moreover, the government provided ample evidence from which the jury could conclude that in October 2021, Daibes gave Menendez and defendant one or more gold bars. In particular, the government introduced cell site evidence and testimony that Menendez, defendant, and Daibes were all at the Menendez home on the morning of October 18. (GX 16C-2 at 17.) Later that morning, defendant texted Daibes to say that "[t]he sweater looks great on you" and she regretted not taking a donut in the very beginning, further indicating that she had seen Daibes that morning. (GX 1354, row 93, GX D102-1.) That very day, Menendez, for the first time, Googled "how much is one kilo of gold" and "how much is one kilo of gold worth." (GX 1354, rows 91-92, GX A125.)[12] A week later, Daibes sent Menendez a picture of a one kilo gold bar that shows a price of $59,431.20. (*See* GX 1354, row 96, GX A111-1, GX A111-PH1.)

The serial numbers of the gold bars recovered from the Menendez home match those of gold bars purchased by Daibes and listed in his inventory of gold. (*See* GX 1F-1164; GX 1F-1239; GX B201-1A; GX 3D-6.) From that point forward, Menendez continued periodically to Google the price of gold. (*See, e.g.*, GX 1354, row 102, GX A301-1 (November 20, 2021); GX 1354, row 113, GX A301-2 (December 13, 2021); GX

[12] Defendant contends that it is more likely Menendez looked up the price of gold because he "want[ed] to know the value of his wife's family gold." (ECF No. 868 at 38.) But the jury was entitled to reject that competing inference, especially in light of the fact this was the first time Menendez performed such a search.

1354, row 123, GX A301-5 (December 18, 2021); GX 1354, row 156, GX A301-10 (January 29, 2022); GX 1354, row 164, GX A301-11 (March 6, 2022); GX 1354, row 230, GX A301-18 (May 26, 2022).)

On December 16, 2021, Sellinger was sworn in as the U.S. Attorney and within the week was notified by the Department of Justice that he was recused from the Daibes prosecution. (Tr. 2251; GX 1354, row 130, GX 8M-1.) Nevertheless, in March 2022, even though Menendez knew Sellinger would not be involved in the Daibes prosecution (*see* GX 1354, rows 146-47, GX A301-6, GX A301-7), he asked Soliman to meet with Sellinger to tell him to "give the Daibes case . . . all due process," because Daibes' attorney was "not getting calls back from the U.S. Attorney's Office." (Tr. 2358.) However, at the meeting between Soliman and Sellinger, Sellinger shut down any opening for Soliman to pass along that message from Menendez, telling Soliman that he was not allowed to discuss the business of the U.S. Attorney's Office with representatives of federal elected officials and he would have to disclose any attempts at such communication. (Tr. 2359.) The jury learned that after that meeting, Menendez refused to attend and speak at Sellinger's investiture, telling Sellinger that "[t]he only thing worse than not having a relationship with the United States Attorney is people thinking you have a relationship when you don't." (Tr. 2248.) Around this time, defendant informed Daibes that Menendez was "FIXATED" on Daibes' upcoming trial. (GX 1354, row 133, GX D102-2.) Daibes responded that he "d[idn't] want [Menendez] to be upset over it" and "[t]his is not his fault he was amazing in all he did he's an amazing friend and as loyal as they come." (GX 1354, row 134, GX D102-2.)

On January 21, 2022, Menendez learned that Vikas Khanna was the First Assistant U.S. Attorney and thus would be in charge of Daibes' case in Sellinger's place. (*See* GX 1354, rows 146-47, GX A301-6, A301-7.) That same day, defendant called Daibes. (GX 1354, row 150, GX 6A-615.) The very next day, Daibes' driver, John Pilot, called defendant. (GX 1354, rows 151-53, GX 6A-615.) Less than two hours later, defendant wrote Daibes, "Thank you. Christmas in January." (GX 1354, row 154, GX D102-11.) Within hours, Menendez called Khanna. (GX 1354, row 155, GX 6A-616; *see also* GX 6B-1810.) As soon as the call with Khanna ended, Menendez called Daibes. (GX 1354, row 158, GX 6A-820-1.) Five days after calling Khanna, Menendez again Googled the price of gold. (GX 1354, row 156, GX A301-10.)

This series of events—supported by ample record evidence—supports the jury's finding of a corrupt *quid pro quo*. Indeed, the timing of and context around Menendez's flip-flop on Sellinger allows the jury to infer corrupt intent. *See Calk*, 2022 WL 101908, at *2 ("The timing and circumstances of each loan"—including quick changes of course—"was sufficient for the jury to infer [defendant's] corrupt intent").

### B. The Evidence Was Sufficient to Prove That Defendant Conspired for Menendez to Act as an Agent of a Foreign Principal.

Defendant contends the government failed to introduce sufficient evidence to sustain her conviction relating to the Foreign Agents Registration Act ("FARA"), 22 U.S.C. § 611 *et seq*. Pursuant to 18 U.S.C. § 219(a), "[w]hoever, being a public official, is or acts as an agent of a foreign principal required to register under the Foreign Agents Registration Act of 1938 . . . shall be fined under this title or imprisoned for not more than two years, or both."

As the jury heard, Congress defined an agent of a foreign principal in two ways. First, an agent of a foreign principal is anyone "who acts as an agent, representative, employee, or servant, or any person who acts in any other capacity at the order, request, or under the direction or control of a foreign principal or of a person any of whose activities are directly or indirectly supervised, directed, controlled, financed, or subsidized, in whole or in major part, by a foreign principal" and who "(i) engages within the United States in political activities for or in the interests of such foreign official; (ii) acts within the United States as a political consultant for or in the interests of such foreign principal; or (iii) within the United States represents the interests of such foreign principal before any agency or official of the Government of the United States." (Tr. 3142 (Jury Charge)); *see also* 22 U.S.C. § 611(c)(1). Second, an agent of a foreign principal is "any person who agrees, consents, assumes or purports to act as, or who is or holds himself out to be, whether or not pursuant to contractual relationship, an agent of a foreign principal." (Tr. 3142 (Jury Charge)); *see also* 22 U.S.C. § 611(c)(2).

Here, defendant was charged with—and convicted of—conspiring to have Menendez act as an agent of a foreign principle in violation of FARA. Principally, defendant asserts that this conviction must fail because there was no evidence that Menendez "acted on the request of Egypt." (ECF No. 868 at 43.) In the first instance, the record belies that statement. But even were that true, acting at the request of a foreign principal is not the only way one becomes an agent of a foreign principal. As the jury heard, someone may be an agent of a foreign principal if he acts as or holds himself out to be an agent of a foreign principal, 22 U.S.C. § 611(c)(2), a point defendant wholly fails to address in her submissions. Moreover, defendant was charged with *conspiracy*; it is thus of no matter whether or not Menendez actually completed the substantive offense. To find defendant guilty of this charge, the jury must find that (i) the charged conspiracy existed; (ii) defendant knowingly and willfully became a member of the conspiracy, with intent to further its illegal purpose; and (iii) one of the members knowingly committed an overt act. (Tr. 3140 (Jury Charge).) As explained below, there is ample evidence in the record to support the jury's conviction on this count.

*First*, the jury heard evidence that in the spring of 2019, Menendez changed his public position to become decidedly less critical of Egypt than he was previously. (Tr. 1892-95.) Sarah Arkin, the deputy staff director responsible for the Middle East and North Africa policy portfolio at the Senate Committee on Foreign Relations (Tr. 1851, 1854), testified that in the spring of 2019, Menendez informed her that he wanted to "take a different approach" to Egypt, with less public criticism of Egypt's human rights record. (Tr. 1894.) After that point, Menendez made "fewer public statements specifically critical of Egypt" (Tr. 1895) and had meetings with Egyptian officials about which he did not inform Arkin. (Tr. 1895-96.) This change in tactics overlaps with Menendez's introduction to, and meetings with, Egyptian officials through defendant and Hana. In early 2018, Menendez, at defendant's behest, was introduced to General Shawky, the defense attaché from the Egyptian government. (*See* GX 3A-4 at 2; GX C102-2; GX 4I-2; GX A101-BB.) In May of that year, defendant told Menendez that Hana and General Shawky had given her clearance for an unidentified project and asked Menendez to edit a letter that was to be sent from an Egyptian official to the United States government. (*See* GX 1352, row 183, GX B102, GX B102-A.) The jury saw evidence that communications and meetings between defendant, Hana, Menendez, and Egyptian officials increased as time went on. (*See, e.g.*, GX 1352, row 46, GX A105-A; GX 1352, rows 61-65, GX A101-99; GX 1352, row 75, GX C102-2, GX C102-A; GX 1352, rows 212-221, GX C206-2T, GX A101-10, GX A101-EX3; GX 1352, row 289, GX C206-3, GX C206-B.) While the jury did not see explicit evidence of Egyptian officials requesting or ordering this "shift," that is not surprising, considering that the government introduced evidence that the defendants were careful to not put the details of their scheme into writing or to discuss these topics in front of others. (*See* GX 1352, rows 595-96, GX A101-32 (defendant telling Menendez that an Egyptian official "is still yelling at [Hana] for talking about Halal" during a May 2019 meeting); GX 1352, rows 979-80, GX A101-55 (defendant asking Menendez if she "should text [Daibes]" and Menendez responding, "No, you should not text or email").)

*Second*, the jury saw evidence that Menendez shared sensitive, nonpublic information about the number and nationality of staff at the U.S. Embassy in Cairo and that this information was conveyed to Menendez and then, almost immediately, relayed to defendant, then to Hana, and then transmitted to an Egyptian official. Specifically, immediately after a meeting between Menendez, defendant, and Hana on May 6, 2018 (GX 1352, rows 90-97, GX B105-4), a Menendez staffer noted that Menendez was asking "how many Americans [are] posted to the embassy" in Cairo, and the staffer added, "Don't ask why I'm asking." (GX 1352, row 98, GX 8A-1.) Another staffer explained that to find out this information, he would "have to ask and then someone is going to ask why." (GX 1352, row 99, GX 8A-1.) The response was "Menendez is asking." (GX 1352, row 100, GX 8A-1.) This information was highly sensitive, nonpublic information. (Tr.

267-68.) The very next day, Menendez texted defendant, informing her that "[t]his is what's at American embassy," with detailed information on the numbers of both the Americans and Egyptians employed there, along with their roles. (GX 1352, row 104, GX A101-6.) Defendant immediately called Menendez, and as soon as they hung up, defendant texted the same information in its entirety to Hana. (GX 1352, rows 105-07, GX 6A-112, GX B105-4.) Hana confirmed receipt of the information and then immediately forwarded the information on to an Egyptian official. (GX 1352, row 108, GX B105-4; GX 1352, row 128, GX C112-1.)

The jury was entitled to conclude that this information was requested by Egyptian officials, based on the meeting between Hana, defendant, and Menendez and the immediately following flurry of activity. While defendant and Hana are not foreign principals themselves, that is not required under the law. Rather, FARA allows for an intermediary to make the request. *See* 22 U.S.C. § 611(c)(1). The evidence introduced at trial amply supports the conclusion that defendant and Hana were acting under the supervision of Egyptian officials, particularly considering the fact that this nonpublic, sensitive information immediately found its way to the Egyptian government. Both the specificity of the information and the speed of the response support an inference that this information was requested by, and then received by, an agent of Egypt. In any event, these communications certainly constitute overt acts in furtherance of the conspiracy.

*Third*, the jury heard evidence that Menendez helped Egyptian officials prepare for meetings with U.S. Senators. The jury heard evidence that Abbas Kamel, the Chief of Egypt's General Intelligence Service, met publicly with six U.S. Senators on June 22, 2021. (GX 1352, row 1071, GX 8F-13.) The night before that meeting, Menendez privately met with Kamel at his Washington D.C. hotel. (GX 1352, rows 1070, 1072-73, GX A103-16, GX B213-4, GX A103-21.) Following the meeting, Menendez sent defendant an article highlighting a line of questioning Kamel was likely to face from Senators the next day regarding the possible involvement of Egypt in the murder of noted journalist Jamal Khashoggi. (GX 1352, row 1074, GX A103-17, GX A103-A.) Defendant then immediately forwarded this article to Mai Abdelmaguid, an Egyptian intelligence official in the Egyptian embassy in Washington D.C. and friend of defendant. (GX 1352, row 1075, GX B213-4; Tr. 1928.) Immediately, Abdelmaguid responded, telling defendant that Menendez "had also raised it today" in their private meeting. (GX 1352, row 1076, GX B213-4.) Defendant wrote back to this Egyptian intelligence officer: "Wanted to give you a heads up so you can prepare your answers." (GX 1352, row 1077, GX G301-1.) This continues Menendez's pattern of taking actions that favored Egypt and constitutes yet another overt act.

*Fourth*, the jury saw evidence that Menendez edited a letter that was to be sent on behalf of an Egyptian official. In May of 2018, defendant requested that Menendez "fix this letter" so she could "prove a point to the General," presumably General Shawky, noting he and Hana had just given her "clearance for a project." (GX 1352, row 183, GX B102, GX B102-A.) Menendez then spoke with defendant on the phone (GX 1352, row 184, GX 6A-112) and sent her a version of the letter that he had revised. (GX 1352, row 185, GX A403.) While the sender and intended recipient of the letter are not identified, the letter is clearly written from the perspective of the Government of Egypt. (*See id.* (using "we" and "our" in reference to Egypt and its citizens).)[13]

*Fifth*, the jury also saw evidence that an Egyptian official requested—via Hana and defendant—that Menendez help resolve a lawsuit in Egypt's favor. In May of 2019, General Ahmed Essameldin Mohamed Helmy, an Egyptian official stationed at the embassy in Washington (GX 8A-12; GX 1352, row 1002, GX A101-58, GX A101-L), sent Hana a letter about settlement discussions in a lawsuit brought by an American citizen against the Egyptian government. (GX 1352, row 683, GX C207-7, C207-I.) In that letter, the American made clear that she was not accepting Egypt's settlement offer. (*Id.*) Shortly after sending the information, General Helmy wrote to Hana that "if the guy [i.e., Menendez] takes care of this thing through [Senator-1], he'll be settled in." (GX 1352, row 687, GX C207-7T.) Hana confirmed: "Roger that. Consider it done." (GX 1352, row 689, GX C207-7T.) A few days later, Hana sent information that he had received from General Helmy about the lawsuit to defendant. (GX 1352, row 690, GX C102-7.) That same day, defendant spoke to Menendez on the phone and, after they hung up, immediately forwarded him the same information about the lawsuit. (GX 1352, rows 700-01, GX 6A-112, GX A405.)

*Finally*, the jury heard evidence that, at a dinner with Egyptian officials, defendant asked "[w]hat else can the love of my life do for you?" (Tr. 1019.) In sum, the jury saw evidence of a multitude of acts that support the jury's conclusion that defendant participated in a conspiracy for Menendez to act as a foreign agent of Egypt and did so knowingly and willfully.

---

[13] Defendant contends that a "reasonable factfinder could not have concluded that the letter was the result of a request by Egypt, let alone support the inference that Mrs. Menendez agreed to have the Senator act on behalf of the country of Egypt." (ECF No. 868 at 44.) This Court disagrees. In any event, the jury need only conclude that this sequence of events is evidence of defendant conspiring to have Menendez act as an agent of Egypt. The evidence amply supports that conclusion.

### C. The Evidence Was Sufficient to Prove the Obstruction of Justice Charges (Counts 4, 17 & 18)

Defendant urges that the evidence was insufficient to convict her of any of the obstruction of justice counts. These counts include two counts of a conspiracy to commit obstruction of justice (Counts 4 & 17) and one substantive count of obstruction of justice (Count 18).

The Court has recently set forth the law applicable to the obstruction charges at issue in this indictment. *See Menendez*, 759 F. Supp. 3d at 504-06. The Court applies that analysis here and the reader is directed to the Court's prior opinion in this action. *See id.* Defendant principally contends that the government failed to introduce sufficient evidence of her corrupt intent. As explained below, the government has met its burden.

Beginning with the obstruction charges relating to the grand jury proceeding in this District central to both Counts 17 and 18, it is clear that each of the three elements required to prove a violation of section 1503's omnibus clause was satisfied over the course of this trial. The government presented evidence indicating that defendant learned about the federal grand jury investigation on June 16, 2022, when her cellphone was seized pursuant to a search warrant. (Tr. 1436-37.) Defendant was served with a grand jury subpoena that very same day. (*See* GX 11B-1.) Thus, as an initial matter, there can be no question that the first and second elements of a section 1503 omnibus clause conviction were satisfied—a federal grand jury proceeding was ongoing, and defendant knew of it.

Nor is there any question that the third element was satisfied. At trial, the jury heard that Uribe and defendant met approximately one month after that initial grand jury subpoena was served and specifically discussed the grand jury subpoenas they each had received. (Tr. 1673-77.) Uribe testified that defendant told him that "she get[s] scared when she look[s] at [the subpoenas]." (Tr. 1677.) Uribe further testified that at the meeting, he had devised a story in the event that law enforcement ask him about the payments he had made for defendant's Mercedes-Benz. (*Id*.) The cover story Uribe proposed was that he was "helping a friend that was in a financial problem. And when things get better, that friend was going to pay me back." (*Id.*) In response, defendant told Uribe "I like that." (*Id.*) Before that day, Uribe explained, the pair had never discussed that these payments towards the Mercedes-Benz were to be loans and repaid at a later date. (Tr. 1677-78.)

Furthermore, the jury learned that defendant worked with Menendez to substantiate that fabricated cover story that the money defendant had received from Uribe was a loan. To do so, defendant sought to return to Uribe the bribe money he had paid to her to obtain the Mercedes. Specifically, in December 2022, Menendez wrote

defendant a check for $23,000 with the contrived memo line "for car payment." (GX 3B-1 at 6.) And defendant then wrote Uribe a check for $21,000 with the false notation "personal loan." (Tr. 1680-81; GX 3B-1 at 9.)

A similar procedure was followed for the mortgage payments defendant had received from Hana in 2019. There, Menendez wrote defendant a check for $23,569 (i.e., the sum that Hana had paid to defendant's mortgage to avoid foreclosure in 2019), with the memo line "To Liquidate Loan." (GX 3B-1 at 1.) Defendant then wrote a check for $23,568.54—the amount of the mortgage payment—to Hana's lawyer in trust for Hana, with the false memo line "Full Payment of Wael Hana loan." (GX 3B-1 at 4-5.)[14]

Defendant's creation of documents that would be funneled into the response to a grand jury subpoena is a paradigmatic example of transmitting false information to the grand jury in a manner that unquestionably meets *Aguilar*'s nexus requirement of having the "natural and probable effect" of impeding a grand jury proceeding. *United States v. Aguilar*, 515 U.S. 593, 599 (1995). Given that there was an ongoing grand jury investigation of which defendant had both knowledge and notice, she had every reason to believe that payments to key players in the bribery scheme—Uribe and Hana—would be scrutinized by the government and put before the grand jury. Indeed, the Second Circuit has previously affirmed a conviction for obstruction of justice in which a defendant deleted documents *before* they were sought by any grand jury subpoena, even though "at no time did [the defendant] delete a document for which there was an outstanding subpoena." *United States v. Triumph Cap. Grp., Inc.*, 544 F.3d 149, 168-69 (2d Cir. 2008). This is because "[a]s a necessary consequence of its investigatory function, the grand jury paints with a broad brush," *id.* at 168 (quoting *United States v. R. Enters., Inc.*, 498 U.S. 292, 297 (1991)), so "the inference that the grand jury would issue a subpoena for [particularly relevant documents that the defendant deleted] was quite strong, perhaps inescapable." *Id.* at 169.

Thus, defendant's creation of false documents very likely to be sought by a grand jury subpoena is enough by itself to satisfy the third element of a conviction pursuant to section 1503's omnibus clause. But the jury was entitled to infer the even stronger fact that defendant, unlike the defendant in *Triumph*, participated in submitting false documents in direct response to an outstanding subpoena. Defendant produced these checks—each of which had a false and misleading memo line describing the

---

[14] Defendant urges that this timeline is too attenuated because she discovered the grand jury proceedings in June of 2022 but wrote these checks six months later. But a reasonable jury could conclude that it took months to put this plan into action or gather the required funds. At the end of the day, the jury was not required to accept defendant's view of the evidence.

payments—in response to a later grand jury subpoena issued in 2023. (*See* GX 2499; GX 3B-1-EM.)

Defendant's primary response is there is "nothing 'fake' or 'false'" about the checks. (ECF No. 868 at 40.) Specifically, she urges that the memo lines classifying these checks as loan repayments "simply assist[] the person writing a check in her own record-keeping and do[] not render a check 'true' or 'false.'" (*Id.*) The proper use of a memo line on a check is not an issue before this (or any) Court. Here, the jury heard voluminous evidence from which it was entitled to conclude that defendant and Menendez wrote "personal loan" and "To Liquidate Loan" in the memo lines of the December 2022 checks not for their personal records but to convince a grand jury that the prior payments they had received were loans. As discussed *supra*, there is overwhelming evidence that the payments defendant and Menendez received were actually bribe payments, not loans.

Thus, the Court finds that there was sufficient evidence for a rational trier of fact to find defendant guilty of Count 18, the substantive obstruction count, as well as Count 17, the conspiracy count.

The analysis proceeds similarly for Count 4, which charged defendant with conspiracy to commit obstruction of justice as to the criminal prosecution of Daibes in the District of New Jersey. At trial, the government introduced more than sufficient evidence to conclude that the charged conspiracy existed, that defendant knowingly and willfully joined that conspiracy, and overt acts were taken in furtherance of the conspiracy. As detailed *supra* (*see* Section II.A.3.b), the jury was presented with evidence from which it was able to conclude that Daibes paid things of value to Menendez and defendant in exchange for Menendez's promise that he would take official acts to help favorably resolve Daibes' ongoing federal criminal prosecution in New Jersey. The jury also heard extensive evidence related to Menendez's dissatisfaction with how the New Jersey U.S. Attorney's Office was handling Daibes' criminal case and the apparent emphasis Menendez placed on Daibes' criminal case when deciding who to recommend to the President to be the next U.S. Attorney for the District of New Jersey. (*See* Section II.A.3.b.)

Indeed, the jury was entitled to conclude that Menendez only recommended Sellinger because he thought—incorrectly as it turned out—that Sellinger did not have to be recused from Daibes' case and would be able to participate in a favorable resolution of it, and that Menendez's subsequent chilling reception to Sellinger's request that he attend and speak at Sellinger's investiture was a direct response to realizing that an essential reason for Menendez's recommendation of Sellinger—favorable action by Sellinger on Daibes' pending criminal prosecution—would not come to fruition due to Sellinger's recusal.

Defendant contends that "[t]here was nothing even improper, and certainly not criminal, with regard to Senator Menendez's interactions with [Philip] Sellinger." (ECF No. 868 at 41.) But the Second Circuit has explained that a defendant's endeavor to persuade a prosecutor "to be lenient" with an individual in a criminal matter "was corrupt because it was a fraud" under the rationale that "it is as 'corrupt' to persuade a public officer by lies as by bribes." *United States v. Polakoff*, 121 F.2d 333, 335 (2d Cir. 1941). Menendez's endeavor, with its impetus being bribe payments received by Daibes to favorably affect his criminal case, similarly qualifies as corrupt.

On reply, defendant attempts to extricate herself from this conspiracy, contending she played no role in it. But the jury saw evidence of defendant texting Daibes about Menendez's concern about his case, to which Daibes responded that it "was not his fault[,] he was amazing in all he did[,] he's an amazing friend and as loyal as they come." (*E.g.*, GX 1354, rows 133-34, GX D102-2.) Moreover, the jury saw evidence of defendant reaping the benefits of this scheme. Specifically, the government introduced sufficient evidence for the jury to conclude that defendant was aware of and sold some of the gold bars she and Menendez had received from Daibes. (GX 1354, row 154, GX D102-11 (defendant texting Daibes "Thank you. Christmas in January" after a delivery from Daibes' driver); GX 1354, row 184, GX D102-8 (defendant informing Daibes she was meeting with gold seller); GX 1354, row 192, GX B201-1, GX B201-1A, GX 3D-6 (photo in defendant's phone of gold bar with serial number matching Daibes' gold inventory).) The government also presented evidence that Daibes was assisting defendant and Menendez in purchasing a multimillion-dollar home. (*E.g.*, GX 1354, rows 125-27, GX D102-13; GX 1354, rows 166-68, GX D102-6; GX 1354, row 231, GX D102-16, GX D102-H).) Thus, defendant's effort to extricate herself from this scheme fails.

### D. The Evidence Was Sufficient to Prove That Venue for Each Count Was Proper in the Southern District of New York.

The jury was properly instructed on venue—with the same instruction that was given at the first trial in this action—and, like her co-defendants, defendant does not object to the charge. Specifically, the jury was instructed that if the government failed to prove venue on any count of the indictment, "you must return a verdict of not guilty on that count." (Tr. 3151 (Jury Charge).) Defendant now challenges the sufficiency of the government's venue evidence for Counts 1 to 15.[15] In doing so, defendant "bear[s] a

---

[15] Defendant was not charged in Counts 6 and 12; as such, the Court need not evaluate those counts. In addition, defendant does not raise any challenge to venue for Counts 17 and 18, which charge defendant

heavy burden," as "the reviewing court is required to draw all permissible inferences in favor of the government." *United States v. Rutigliano*, 790 F.3d 389, 396 (2d Cir. 2015) (quoting *United States v. Kozeny*, 667 F.3d 122, 139 (2d Cir. 2011)); *see also United States v. Tzolov*, 642 F.3d 314, 318 (2d Cir. 2011) ("We review the sufficiency of the evidence as to venue in the light most favorable to the government, crediting every inference that could have been drawn in its favor." (internal quotations omitted)).

This Court has already set forth the applicable law guiding the venue analysis in this case. *See Menendez*, 759 F. Supp. 3d at 509-11. The parties have not identified any intervening change in law. Accordingly, rather than restate that analysis here, the reader is referred to the standards set forth at *Menendez*, 759 F. Supp. 3d at 509-11.[16]

The Court adds, however, that for several of these counts, defendant was charged with aiding and abetting Menendez in committing certain crimes. (Tr. 3090-93 (Jury Charge) (instructing jury that defendant is charged with aiding and abetting in certain counts).) "Where guilt of a substantive offense is premised on aiding and abetting, '[v]enue is proper where the defendant's accessorial acts were committed or where the underlying crime occurred' because '18 U.S.C. § 2 alters the common law rule to provide an *additional* venue where . . . the principal[] acted.'" *United States v. Lange*, 834 F.3d 58, 69 (2d Cir. 2016) (alterations in original) (quoting *United States v. Smith*, 198 F.3d 377, 383 (2d Cir. 1999)).

### 1. *Substantive Counts Related to Egypt (Counts 5, 7 & 8)*

Defendant contends that the government failed to introduce evidence from which a reasonable juror would be able to conclude that venue was proper for Counts 5, 7, and 8—the substantive counts of bribery, honest services wire fraud, and extortion under color of official right concerning the Egypt scheme.

Specifically, Count 5 charged defendant with violating 18 U.S.C. § 201, which prohibits a public official from "directly or indirectly, corruptly demand[ing], seek[ing], receiv[ing], accept[ing], or agree[ing] to receive or accept anything of value . . . in return

---

with conspiring to obstruct justice and obstructing justice with respect to a grand jury proceeding in this District.

[16] Defendant makes a passing reference to a "substantial contacts" analysis. (*See* ECF No. 868 at 47.) Menendez similarly asked this Court to conduct this inquiry as part of its venue analysis. *Menendez*, 759 F. Supp. 3d at 511 n.20. This Court explained that such an inquiry is made "only if 'the defendant argues that his prosecution in the contested district will result in a hardship to him, prejudice him, or undermine the fairness of his trial.'" *Rutigliano*, 790 F.3d at 399 (quoting *United States v. Coplan*, 703 F.3d 46, 80 (2d Cir. 2012)). Defendant does not advance such an argument much less make that showing.

for . . . being influenced in the performance of any official act" or "being induced to do or omit to do any act in violation of the official duty of such official person." 18 U.S.C. § 201(b)(2)(A), (C). In this count, the government charged—and the jury convicted defendant of—aiding and abetting Menendez's demanding, receiving, or accepting a bribe in return for certain official actions to benefit the Government of Egypt and Wael Hana.

Bribery is a continuing offense such that venue is proper in any district in which the charged offense was begun, continued, or completed. *United States v. Stephenson*, 895 F.2d 867, 874-75 (2d Cir. 1990) (treating bribery as a continuing offense); 18 U.S.C. § 3237(a). Thus, venue is proper in any district in which Menendez began, continued, or completed demanding, seeking, receiving, accepting, or agreeing to receive or accept a thing of value in exchange for an official act, as well as in any venue where defendant's accessorial conduct occurred.

Count 7 charged defendant with committing honest services wire fraud in violation of 18 U.S.C. §§ 1343, 1346. "The honest services [wire fraud] statute prohibits the use of the mail or the wires to further 'a scheme or artifice to deprive another of the intangible right of honest services.'" *United States v. Benjamin*, 95 F.4th 60, 67 (2d Cir. 2024) (quoting 18 U.S.C. § 1346). Here, the jury convicted defendant of participating in a scheme to defraud the public by paying bribes to Menendez in exchange for Menendez taking or not taking certain actions benefiting Egypt and Hana that deprived the public of Menendez's honest services. Like bribery, wire fraud is a continuing offense. *See Rutigliano*, 790 F.3d at 396; *United States v. Kim*, 246 F.3d 186, 191-92 (2d Cir. 2001). "For a wire fraud charge, venue is established by showing that the defendant used or caused others to use a wire to communicate with others in the Southern District of New York and did so in furtherance of the scheme." *United States v. Whitehead*, No. 22-cr-692, 2024 WL 3085019, at *3 (S.D.N.Y. June 21, 2024). And again, because defendant was charged as an aider and abettor here, venue is also proper in any district where defendant's aiding and abetting took place.

Count 8 charged defendant with extortion under the Hobbs Act, 18 U.S.C. § 1951, which prohibits anyone from using one's position as a public official, or the authority of public office, to obtain money for oneself, or for another person, knowing the thing of value was made in return for official acts. In this count, the government charged defendant with aiding and abetting Menendez in obtaining things of value from Hana and Daibes in exchange for certain official acts benefiting the Government of Egypt and Hana. Hobbs Act extortion is also a continuing offense, *Smith*, 198 F.3d at 384, and "[v]enue under the Hobbs Act is proper in any district where interstate commerce is affected or where the alleged acts took place." *Stephenson*, 895 F.2d at 875. Because the

alleged acts here are a bribery scheme, the evidence that satisfies venue as to Count 5 may satisfy venue here as well.

As explained below, for each of these counts, the government introduced several pieces of evidence sufficient for a reasonable jury to conclude by a preponderance of the evidence that venue for these counts was proper in the Southern District of New York.

*First*, the government introduced evidence that on June 30, 2018, defendant, Menendez, and Hana dined at Mr. Chow's, a restaurant located in midtown Manhattan. (GX 1352, row 244, GX 7A-2, GX 7A-3, GX 7A-4, GX 7B-1; GX 1352, row 249, GX B105-10, GX B105-S.) Hana—via Andy Aslanian—paid for this dinner. (*See* GX 1352, row 251, GX 7B-2, GX 5E-101A.) While at that dinner, Hana sent a confidential WhatsApp message to General Shawky, the military attaché at the Egyptian embassy in Washington, scheduling a meeting for July 25th between Menendez and Egyptian officials. (GX 1352, rows 245-46, GX C206-3, GX C206-3T.) On July 26, the day following that meeting, Menendez sent a text message to defendant instructing her to inform Hana that Menendez was "going to sign off" on certain military aid to Egypt. (GX 1352, row 306, GX A101-14.) This evidence provided the jury with an evidentiary foundation from which to conclude that this dinner was part and parcel of Menendez seeking and agreeing to receive a bribe. Indeed, the jury was entitled to infer that this Manhattan meeting "facilitate[ed] a key event" in the bribery scheme "that was to occur only weeks later" and exhibited Menendez's "good faith efforts" to act in Egypt's favor. *See United States v. Gross*, No. 15-cr-769, 2017 WL 4685111, at *38-39 (S.D.N.Y. Oct. 18, 2017), *aff'd sub nom. United States v. Lebedev*, 932 F.3d 40 (2d Cir. 2019).

In addition, that Hana sent General Shawky a text from within the Southern District of New York satisfies the venue requirements for wire fraud. It is entirely reasonable for a jury to conclude from the timing and location of this text that defendant "used or caused others to use a wire to communicate with others in the Southern District of New York and did so in furtherance of the scheme." *Whitehead*, 2024 WL 3085019, at *3. While it is true that there is no evidence in this record of what was discussed at the restaurant, Hana's payment for the dinner, his message to General Shawky from the restaurant during his meeting with Menendez, and the ensuing timeline provide a strong foundation from which the jury was entitled to conclude that the June dinner in this District was an essential piece of the charged conduct by laying the groundwork for the July meeting and Menendez's promise to approve the military aid shortly thereafter.

*Second*, the government introduced evidence that Menendez, Daibes, and General Helmy met at the Lotte hotel in midtown Manhattan. (*See* GX 1352, rows 956-60, GX D101-1, GX B220-1.) A few months after, General Helmy informed defendant that he "ha[d] been instructed from my boss in Cairo to start talks with [Daibes] regarding what was discussed in NY about Egyptian investments in USA," stating that he wanted

to inform her because he "met [Daibes] through you and Bob." (GX 1352, rows 998-99, GX B220-2.) Defendant responded, thanking General Helmy for his "honesty and loyalty" and writing "I hope 2020 [w]ill be a fabulous year for all of us." (*Id.*)

*Third*, the government introduced evidence that defendant facilitated the sale in Manhattan of two gold bars Daibes gave her. Specifically, on March 31, 2022, defendant went to Vasken Khorozian, a jeweler in New Jersey, to sell the gold. (Tr. 2120-21, 2155; GX 1354, rows 188-89, GX B216-1.) When meeting with Khorozian, defendant falsely told him that the gold had come from her family (Tr. 2155-56)—essentially the same explanation Menendez gave to Shannon Kopplin, the Chief Counsel and Staff Director on the U.S. Senate Select Committee on Ethics (Tr. 2511), in order to explain why he was newly reporting possessing the gold bars. (*See* Tr. 2577 (Menendez referring to the gold bars as defendant's asset).) When defendant said she wanted to go forward with the sale, Khorozian informed her that he would call a buyer in Manhattan and would go to Manhattan the following week to sell it. (Tr. 2158-60.) He then proceeded to call that Manhattan buyer with defendant present and subsequently sold the gold bars in Manhattan. (Tr. 2158-60, 2164.)[17] Defendant challenges that the sales are not part of the "essential conduct" of the scheme, as her "later efforts to monetize the gold are independent of and unrelated to the alleged scheme to acquire the gold in the first place." (ECF No. 868 at 48.) But the jury was entitled to disagree given the government's evidence that defendant sold the gold as part of the scheme and in consultation with both Menendez and Daibes. (*See* GX D102-8; GX 8K-1 (discussing reporting requirements for Menendez if defendant "use[d] the proceeds of the sale of the gold bars to repay a mortgage").)

*Fourth*, the government introduced evidence that upon return from their trip to Egypt and Qatar on October 17, 2021, Menendez and defendant met Daibes' driver, John Pilot, at JFK airport (*see* GX 1352, rows 1104, 1113-18, GX 8J-1, GX 8J-2, GX A111-1, GX A111-PH1, GX 6A-615) and then were driven back to their home in Englewood Cliffs, New Jersey.[18] The jury was provided with sufficient evidence to conclude that this ride was part and parcel of the substantive offense. For one, nowhere does the statute require a high value item to be given in order to constitute bribery. *See* 18 U.S.C. § 201(2) (the provision of "anything of value" constitutes bribery). Moreover, the jury heard evidence that Pilot's fingerprints were found on an envelope bearing Daibes

---

[17] For the reasons discussed *infra*, this call also satisfies the venue requirements of wire fraud, as defendant caused Khorozian to use a wire to communicate with someone in the Southern District of New York. *See Whitehead*, 2024 WL 3085019, at *3.

[18] The jury was reasonably able to infer that a ride from JFK airport in Queens to Englewood Cliffs involved crossing through the Southern District of New York while en route.

name and containing several thousand dollars in cash discovered in the Menendez home. (*See* Tr. 184-86; GX 1334.) The jury was also entitled to infer that this car ride occurred just one day before Daibes provided defendant and Menendez with gold bars. (*See* GX 1352, row 1122, GX B208-2 (Daibes visiting the Menendez home the morning after this car ride); GX 1352, rows 1120-21, GX A125 (Menendez looking up the price of one kilogram of gold that same morning).) The government also introduced evidence that a few months later, Pilot provided gold on behalf of Daibes to defendant and Menendez—right after Menendez began researching the attorney overseeing Daibes' prosecution. (*See* GX 1354, rows 146-54, GX A301-7, GX A301-8, GX 6A-615, GX D102-11.)

In sum, the government introduced substantial evidence from which a jury was entitled to conclude that venue was satisfied by a preponderance of the evidence for Counts 5, 7, and 8.

### 2. *Substantive Counts Related to the Daibes Federal Prosecution Scheme (Counts 11, 13 & 14)*

Defendant next challenges the sufficiency of the government's venue evidence for Counts 11, 13, and 14. These counts charge defendant with bribery, honest services wire fraud, and extortion under color of right concerning acts in support of Daibes.

Much of the evidence that allowed the jury to find venue for the Egypt charges supports venue for these counts, as well. For example, the evidence of the ride from JFK airport to the Menendez home in Northern New Jersey that Daibes arranged for Menendez and defendant applies to these counts, too. The jury was entitled to infer that this conduct related to these counts, as well. The same is true for defendant's sale in New York of the gold bars that Daibes provided just two days after Menendez and defendant returned from a trip to Egypt and Qatar.

Thus, the government introduced sufficient evidence for the jury to find that venue was proper in this District for these counts.

### 3. *Substantive Counts Related to the New Jersey State Criminal Matters (Counts 9 & 10)*

Defendant next challenges the jury's finding of proper venue for Counts 9 and 10, the substantive counts of bribery and extortion under color of official right—two of the same three crimes discussed above—concerning Jose Uribe and his associates. As explained earlier, venue is proper for the honest service wire fraud count wherever Menendez began, continued, or completed the offense of demanding, seeking, receiving, accepting, or agreeing to receive or accept a thing of value in exchange for an

official act. For the extortion count, because venue is proper wherever the bribery acts took place, the same evidence may suffice. *See Stephenson*, 895 F.2d at 875. And because defendant was charged as an aider and abettor in these counts, venue is additionally proper wherever the accessorial acts occurred.

In support of venue for these counts, the government presented evidence that defendant sent texts and made telephone calls that used cell towers located in this District.[19] Among these communications were defendant's instructions to Uribe to meet with Menendez the evening prior to Menendez's meeting with then-New Jersey Attorney General Gurbir Grewal (*see* GX 1353, row 924, GX B209-23; GX 16C-2 at 13), as well as defendant's calls to Uribe and Menendez just hours after Menendez's meeting with Grewal. (*See* GX 1353, rows 931, 933-34, GX 8C-1, GX 6A-112; GX 16C-2 at 14.) Given this evidence, the jury was more than able to conclude that these communications were "crucial components" of the charged bribery scheme, in which Uribe was making payments on defendant's Mercedes in exchange for Menendez using his influence to squelch the New Jersey state case against Uribe's associates. *See Stephenson*, 895 F.2d at 874-75.

In addition, the government presented evidence that defendant deposited money she had received from Uribe into bank accounts in both New Jersey and on Long Island in the same day. (GX 1328, GX 5F-202.) Specifically, on April 6, 2019—a mere two days after Uribe gave her $15,000 in cash (Tr. 1532-33; GX 1353, row 486, GXE105-1, GX E105-1T; GX 1353, rows 512-13, 519-20, GX B209-13)—she made cash deposits in Englewood, New Jersey and Munsey Park in Long Island. (GX 1328, GX 5F-202.) The jury was entitled to infer that defendant had traveled across this District with the cash to make the deposits.

Travel through this District with a bribery payment to avoid detection is sufficient for venue. *See United States v. Shepard*, 500 F. App'x 20, 22 (2d Cir. 2012) ("[A] foray into Manhattan to avoid detection or conflict—and, thus, to continue the conspiracy—is sufficient to support venue in the Southern District."); *United States v. Boruch*, 550 F. App'x 30, 33 (2d Cir. 2013) ("Even if the theft of the money from ATMs in Manhattan was a distinct conspiracy, its transportation from that borough to Brooklyn and Queens for transfer out of the United States was a necessary step in the challenged conspiracy sufficient to confer venue in the Southern District."); *United States v. Ramirez-Amaya*, 812

---

[19] The evidence the jury heard was that when someone is located along either side of the Hudson river, the cell site used may be on either side of the river, since signals carry farther over water than land. (Tr. 2499.) It is possible that defendant was physically on the New Jersey side of the river when one or more of her calls were made, but the jury was certainly entitled to find by a preponderance of the evidence that she was located in Manhattan when the relevant call was made.

F.2d 813, 816 (2d Cir. 1987) ("[T]he course of the flight [carrying cocaine] carried the airplane over the Narrows, a body of water that lies within the joint jurisdiction of the Southern and Eastern District . . . was sufficient to make venue in the Southern District proper.").

#### 4. *The Conspiracy Charges (Counts 1, 2, 3, 4 & 15)*

For conspiracy charges, "venue is proper in any district in which 'an overt act in furtherance of the conspiracy was committed.'" *Tzolov*, 642 F.3d at 319-20 (quoting *United States v. Royer*, 549 F.3d 886, 896 (2d Cir. 2008)). "An overt act is any act performed by any conspirator for the purpose of accomplishing the objectives of the conspiracy." *Id.* "The act need not be unlawful; it can be any act, innocent or illegal, as long as it is done in furtherance of the object or purpose of the conspiracy." *Id.* "[P]roof of such activity in a district 'by any of the coconspirators' will support venue there as to all of them." *Shepard*, 500 F. App'x at 22 (quoting *Ramirez-Amaya*, 812 F.2d at 816). Ultimately, "venue for a conspiracy may be laid in a district through which conspirators passed in order to commit the underlying offense." *Tzolov*, 642 F.3d at 320 (collecting cases).

##### *a. The Bribery Conspiracy Charges (Counts 1, 2 & 3)*

Counts 1, 2, and 3 charge defendant with conspiracies to commit the underlying offenses discussed above: bribery, honest services wire fraud, and conspiracy to commit extortion under color of official right.

Defendant simply contends that because the above evidence, in her view, fails to support venue for the substantive charges, it "necessarily fail[s] to support the conspiracy charges as well." (ECF No. 868 at 49.) But as explained above, the evidence was sufficient to support venue for each of the substantive counts. And in any event, venue is more narrowly construed on the substantive counts as compared to the conspiracy counts. *See Tzolov*, 642 F.3d at 318-20. Indeed, the government introduced evidence of overt acts from either defendant or her co-conspirators in the Southern District of New York, including in-person meetings and dinners, telephone calls, and text messages. These suffice to support a finding of venue for these conspiracy charges.

##### *b. The Conspiracy to Obstruct the Prosecution of Daibes in New Jersey Charge (Count 4)*

The same is true for defendant's challenge to the jury's finding of venue with respect to Count 4, which charged her with conspiring to obstruct justice in relation to Daibes' federal criminal prosecution in the District of New Jersey. The government need only introduce evidence of "*any act*, innocent or illegal, as long as it is done in

furtherance of the object or purpose of the conspiracy." *Tzolov*, 642 F.3d at 320 (emphasis added). Defendant and Menendez's car ride from JFK airport to Englewood Cliffs, New Jersey through the Southern District of New York that Daibes provided qualifies as an act that satisfies venue. Similarly, defendant's sale of the gold bars she received from Daibes is any such act. (*See* GX 1354, row 184, GX D102-8 (defendant texting Daibes "Vasken just called me. I'm going to meet him at 2 PM.").) Thus, venue is satisfied for this count.

#### *c. The FARA Conspiracy Charge (Count 15)*

Finally, defendant challenges the sufficiency of the government's venue evidence for Count 15. Count 15 charged defendant with conspiring to have Menendez act as an agent of Egypt. Acting as an agent of a foreign principal is further defined in 22 U.S.C. § 611(c). A plain reading of statute indicates that "the conduct constituting the offense," *United States v. Ramirez*, 420 F.3d 134, 138 (2d Cir. 2005), for the purpose of venue includes: "engag[ing] within the United States in political activities for or in the interests of such foreign principal," "act[ing] . . . as a public relations counsel, publicity agent, information-service employee or political consultant for or in the interests of such foreign principal," "solicit[ing], collect[ing], disburs[ing], or dispens[ing] contributions, loans, money, or other things of value for or in the interest of such foreign principal," "represent[ing] the interests of such foreign principal before any agency or official of the Government of the United States," and "agree[ing], consent[ing], assum[ing] or purport[ing] to act as . . . an agent of a foreign principal." 22 U.S.C. § 611(c)(1), (2). For a conspiracy charge, the government need only introduce an overt act in furtherance of the conspiracy in this District. Here, the government introduced several such acts. As just one example, the government introduced evidence that while at a dinner in midtown Manhattan, Hana texted General Shawky scheduling a meeting between Menendez and Egyptian officials. Given the other evidence, the jury was more than entitled to conclude that an overt act taken in furtherance of charged conspiracy—that Menendez agree to or consent to act on behalf of Egypt—occurred in this District. This challenge plainly fails.

## III. THERE WAS NO MANIFEST INJUSTICE WARRANTING A NEW TRIAL PURSUANT TO RULE 33.

Defendant contends that she is entitled to a new trial on two bases: first, that she was denied her right to the counsel of her choice under the Sixth Amendment and second, that the government's use of summary charts was improper. The Court notes that following her conviction, she requested an extension of time to file a motion for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29 and that she did "not plan to move for a new trial [pursuant to Rule 33]." (ECF No. 840.) The Court

granted this request, extending the time in which defendant was able to file a "renewed motion pursuant to [Rule] 29." (ECF No. 842.) Her counsel specifically represented that she would not move under Rule 33. Despite that representation, the Court has considered the merits of defendant's arguments under Rule 33 and concludes that she has not identified any manifest injustice entitling her to a new trial.

**A. The Sixth Amendment Does Not Entitle Defendant to a New Trial.**

***1. Relevant Background***

In September of 2023, a grand jury indicted defendant on charges of conspiracy to commit bribery, conspiracy to commit honest services wire fraud, and conspiracy to commit extortion under color of official right. (ECF No. 1.) As the action progressed, superseding indictments were handed down and additional charges were added. (*See* ECF Nos. 65, 115, 230, 238.) On March 5, 2024, a fourth superseding indictment ("the S4 Indictment") was returned, which added charges of obstruction of justice and conspiracy to obstruct justice based on defendant's conduct relating to a grand jury proceeding in this District (Counts 17 and 18, and together "the Obstruction Charges"). (ECF No. 238.)[20]

Specifically, the Obstruction Charges of the S4 Indictment allege that in June of 2022, defendant and Menendez received grand jury subpoenas seeking documents pertaining to, *inter alia*, payments by Uribe for defendant's Mercedes-Benz convertible and Hana's payments towards defendant's mortgage. (*Id.* ¶ 68.) The government alleged that following defendant's receipt of this subpoena, she met with Uribe to discuss what he would tell law enforcement about the payments he had made for her Mercedes-Benz. (*Id.* ¶ 69.) The pair agreed that they would say those payments were a loan. (*Id.*) Defendant then put that plan into action by attempting to return the money by sending checks that purported to be loan repayments. (*Id.* ¶¶ 70-71; *see also* Section II.C. (discussing the checks).)

In addition to these checks, the S4 Indictment also referenced an August 2023 proffer between defendant's then-attorneys—David Schertler and members of his firm, Schertler Onorato Mead & Sears ("Schertler Onorato")—and the U.S. Attorney's Office for the Southern District of New York (the "August 2023 Proffer"). The S4 Indictment alleges that at this proffer, defendant caused her attorneys at Schertler Onorato to state that the payments she had received from Hana and Uribe were loans when she knew

[20] The S4 Indictment is the operative indictment and the charging instrument upon which the government proceeded to trial.

they were actually bribe payments. (ECF No. 238 ¶ 73.) Schertler also used a PowerPoint presentation at this proffer to convey his client's position (ECF No. 868 at 6), a document which the government included in its exhibit list for defendant's trial. (*Id.* at 10.)[21]

Following the proffer, in December 2023, the government issued grand jury subpoenas to Schertler and Schertler Onorato. (Decl. of David Schertler dated April 5, 2024 ¶ 3.) At that point, defendant retained independent counsel—her now-current counsel, Sarah Krissoff of the law firm Cozen O'Connor—to provide defendant with "independent legal advice on issues related to the possible conflict of interest created by the fact that her attorneys were the subjects of subpoenas in the case against her." (*Id.* ¶ 4.) After defendant's motion to quash these subpoenas was denied, Schertler and his firm complied with these subpoenas and produced responsive documents. (*Id.* ¶¶ 6-10, 12.) In addition, Schertler was ordered to provide grand jury testimony regarding (i) his communications concerning defendant's payments to Hana and Uribe; (ii) the sources of the factual representations made in the PowerPoint presentation used by Schertler at the August 2023 Proffer; (iii) the content of his communications with the sources that formed the basis of those factual representations; and (iv) whether defendant had reviewed the PowerPoint prior to its use at the August 2023 Proffer. (*Id.* ¶¶ 8, 13; Gov't Mot. to Compel Responses to Grand Jury Subpoenas dated January 23, 2024 at 8-9.)[22] Shortly thereafter, the S4 Indictment was handed down.

One week later, on March 11, 2024, the government advised the Court that "there's a potential *Curcio* issue with respect to one of the lawyers" and that discussions were underway with that attorney. (Mar. 11, 2024 Hr'g Tr. 14.) The next week, the government requested that a hearing be scheduled pursuant to *United States v. Curcio*, 680 F.2d 881 (2d Cir. 1982), because "Nadine Menendez's current counsel ha[d] personal knowledge of certain facts relevant to this matter." (ECF No. 253 at 1.) The government explained that this raised two issues: first, the government may seek to call Schertler as a witness at defendant's trial and/or it might introduce evidence or elicit testimony concerning events in which Schertler was personally involved, potentially creating an "unsworn witness" issue; and second, Schertler Onorato attorneys might be limited in their ability to make certain arguments to the Court or to the jury at trial, irrespective of whether defendant wanted them to make those arguments. (*Id.*)

[21] There were no non-attorneys present at the August 2023 Proffer. Thus, the only available witnesses to testify concerning the proffer were defense counsel or government attorneys. (ECF No. 868 at 13.)

[22] Schertler ultimately participated in an interview with the government in lieu of providing grand jury testimony. (Schertler Decl. ¶ 13.)

On March 21, 2024, this Court held a *Curcio* hearing, where defendant was represented by both her attorneys at Schertler Onorato as well as her independent counsel at Cozen O'Connor. At that hearing, the government stated that it "would intend to call Mr. Schertler as a witness absent the ability to reach an anonymized stipulation" but informed the Court that the parties were in the progress of negotiating such a stipulation. (Mar. 21, 2024 Hr'g Tr. 5.) All parties agreed that if no stipulation were reached, defendant would need to find a new attorney to represent her at trial. (*E.g.*, *id.* at 5, 8.)

Proceeding on the assumption that the parties would be able to agree on anonymized stipulation, the Court held a *Curcio* hearing on the second issue. (Mar. 21, 2024 Hr'g Tr. 6-7.) Following the *Curcio* inquiry, the Court concluded that defendant had waived her right to conflict-free representation, assuming the parties were able to arrive at a stipulation. (*Id.* at 29.) The Court gave the parties two weeks to attempt to reach such a stipulation.

Ultimately, the parties were unable to agree on a stipulation. Specifically, Schertler explained that, in consultation with independent counsel, defendant "decided that she will not agree to the Government's proposed stipulation, nor will she agree to a stipulation *in lieu* of her attorneys having the opportunity to conduct a full and unhindered cross-examination on the issues related to the testimony of her current attorneys. In so deciding, Ms. Menendez is asserting her Sixth Amendment right to conflict-free counsel." (Schertler Decl. ¶¶ 17-18.) As a result, on April 5, 2024, Schertler and his firm moved to withdraw as defendant's counsel. (ECF No. 286.) Schertler also submitted a declaration from defendant in which she stated that she had discussed the withdrawal decision with independent counsel and that she consented to Schertler's withdrawal. (Decl. of Nadine Menendez dated April 8, 2024 ¶¶ 4-5.)

Around the same time, defendant moved to adjourn her impending trial due to a serious medical condition. (ECF No. 300.) The Court granted that request, severing her trial from that of her co-defendants. (ECF No. 308.) In addition, the Court directed defendant to engage new counsel. (*Id.*) Defendant did so, and on May 29, 2024, Barry Coburn of Coburn Greenbaum & Eisenstein PLLC appeared on her behalf. (ECF No. 427.) At defendant's request, due to her ongoing medical condition, her trial was adjourned for approximately ten months. (*See* ECF Nos. 510, 633, 673, 716.) It ultimately commenced on March 18, 2025. Coburn represented defendant at her trial.

As defendant's trial date neared, the parties exchanged trial materials in compliance with this Court's scheduling orders. (*See* ECF No. 665, 673, 716.) On its pretrial exhibit list, the government included various documents related to Schertler Onorato, including an excerpt of the PowerPoint presentation Schertler used at the August 2023

Proffer. (ECF No. 868 at 10; ECF No. 875 at 77-78.) The government did not list Schertler or any member of his firm on its pretrial list of government witnesses. (ECF No. 875-1.)[23]

As trial commenced, the government continued to provide the defense with information concerning its upcoming witnesses, including by providing the defense with the names of the witnesses it would be calling in its case-in-chief at least two days in advance. (*See* ECF No. 673 at 3.) At no point did the government identify Schertler as a potential government witness, and indeed, he was not called to testify at trial.[24] The government introduced several exhibits concerning Schertler and his firm in the course of presenting its case. These exhibits included a chart listing the subpoenas issued to Schertler and his firm (GX 2499) as well as the subpoenas themselves (GX 11B-3, GX 11F-1, GX 11F-2) and the production made by Schertler Onorato containing the checks and related documentary evidence that were at the heart of the government's obstruction case. (GX 3B-1-EM.) David Schertler and Schertler Onorato were also mentioned by name at least once during the trial. (*See* Tr. 1833.) The government did not, however, introduce the PowerPoint presentation or other evidence concerning the August 2023 Proffer.

Following her conviction on all counts, defendant now contends for the first time that the government violated her Sixth Amendment right to the counsel of her choice.

### 2. *The Sixth Amendment Right to Counsel*

The Sixth Amendment to the U.S. Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. Within that right is the right of a "defendant who does not require appointed counsel to choose who will represent him." *United States v. Gonzalez-Lopez*, 548 U.S. 140, 144 (2006). The Supreme Court has explained, however, that "the essential aim of the [Sixth] Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be

[23] The government's witness list included two additional categories of witnesses: (i) "[p]ersons as to whom stipulations of testimony or fact have been proposed to you (e.g., as to accuracy of translations from Arabic or Spanish), in the event that no satisfactory stipulation is reached" and (ii) "[d]ocument/records custodians as necessary, in the event that no satisfactory stipulation is reached." (ECF No. 875-1.)

[24] In January 2025, in preparation for trial, government attorneys requested that Schertler meet with them to discuss his possible testimony. (ECF No. 876-1 ¶ 7.) Schertler declined to meet with them but verified the authenticity of certain documents. (*Id.*) On March 28, 2025, government attorneys informed Schertler in substance that it was "likely" his testimony would not be needed but that they "could not commit" that he would not be called as a witness. (*Id.* ¶ 8.)

represented by the lawyer whom he prefers." *Wheat v. United States*, 486 U.S. 153, 159 (1988). Accordingly, a defendant "does not have the absolute right to counsel of her own choosing." *United States v. Locascio*, 6 F.3d 924, 931 (2d Cir. 1993). Of course, a defendant's "[c]hoice of counsel should not be unnecessarily obstructed," *United States v. Cunningham*, 672 F.2d 1064, 1070 (2d Cir. 1982) (citation omitted), and the government may not "'manufacture' a conflict in order to prevent a defendant from having a particularly able defense counsel." *Wheat*, 486 U.S. at 163.

Also encompassed in the Sixth Amendment right to counsel is a defendant's right to conflict-free representation. *United States v. Rogers*, 209 F.3d 139, 143 (2d Cir. 2000) (citing *Wood v. Georgia*, 450 U.S. 261, 271 (1981)). In some circumstances, however, a defendant may "waive his Sixth Amendment right to a representative free from conflicts of interest in order to retain a particular attorney." *United States v. Jones*, 381 F.3d 114, 119 (2d Cir. 2004). But because "a waiver will not necessarily cure every conflict[,] the Sixth Amendment's presumption in favor of counsel of choice may not be interpreted to mean that the right to waive conflicts is absolute." *Id.*

"Rules of professional conduct and case law limit the circumstances in which an attorney acting in a representative capacity may be a witness at trial, whether sworn or unsworn." *United States v. Finkelstein*, No. 21-cr-217, 2021 WL 2555832, at *3 (S.D.N.Y. June 22, 2021). Rule 3.7 of the New York Rules of Professional Conduct provides that:

> A lawyer shall not act as advocate before a tribunal in a matter in which the lawyer is likely to be a witness on a significant issue of fact unless:
>
> (1) the testimony relates solely to an uncontested issue;
>
> (2) the testimony relates solely to the nature and value of legal services rendered in the matter;
>
> (3) disqualification of the lawyer would work substantial hardship on the client;
>
> (4) the testimony will relate solely to a matter of formality, and there is no reason to believe that substantial evidence will be offered in opposition to the testimony; or
>
> (5) the testimony is authorized by the tribunal.

N.Y. Rule of Prof. Conduct 3.7(a).

The Second Circuit has explained that "the proper recourse is to disqualify [defendant's] attorney" when the attorney is a sworn or unsworn witness. *United States v. Kliti*, 156 F.3d 150, 156 (2d Cir. 1998); *see also Locascio*, 6 F.3d at 931; *Finkelstein*, 2021 WL 2555832, at *4 (collecting cases). "An attorney acts as an unsworn witness when his

relationship to his client results in his having first-hand knowledge of the events presented at trial." *Locascio*, 6 F.3d at 933. "Where an attorney acts as an unsworn witness, 'his role as advocate may give his client an unfair advantage, because the attorney can subtly impart to the jury his first-hand knowledge of the events without having to swear an oath or be subject to cross examination." *Finkelstein*, 2021 WL 2555832, at *4 (quoting *Locascio*, 6 F.3d at 933). Thus, in this circumstance, "the detriment is to the government, since the defendant gains an unfair advantage, and to the court, since the factfinding process is impaired. Waiver by the defendant is ineffective in curing the impropriety in such situations, since he is not the party prejudiced." *Id.* (quoting *Locascio*, 6 F.3d at 934).

The Supreme Court has acknowledged the reality that a district court generally confronts conflict issues "not with the wisdom of hindsight after the trial has taken place, but in the murkier pre-trial context when relationships between parties are seen through a glass, darkly." *Wheat*, 486 U.S. at 162. As a result, a defendant's attorney may be disqualified when there is simply a risk that the attorney will become a witness or if it seems "more likely than not that a number of conflicts will materialize." *Jones*, 381 F.3d at 121.

### 3. *Defendant's Sixth Amendment Rights Were Not Violated.*

Defendant contends that the government "create[d] an attorney client conflict" by adding the Obstruction Charges in the S4 Indictment and then, once Schertler Onorato withdrew, the government "decline[d] to pursue the allegations that led to the conflict in the first place." (ECF No. 868 at 5.) Defendant asserts that once the prosecutors declined to pursue those allegations, they failed to notify her of that decision. If she had been notified, she urges, she would have re-engaged Schertler, her apparent counsel of choice. This argument fails.

*First*, at no point prior to the present motion—i.e., more than a year after Schertler's withdrawal—had defendant expressed *any* desire whatsoever to re-engage Schertler or his firm. She did not inquire why Schertler's name did not appear on the government's witness list at any point prior to or during her trial nor did she lodge any objection when the case was submitted to the jury and the government had not called Schertler or introduced any exhibits concerning the August 2023 Proffer. Following her trial—where she was ably represented by retained, conflict-free counsel—and her subsequent conviction on all counts, defendant cannot now for the first time assert that she was deprived of the counsel of her choice.

Defendant asserts that she would have had to "read the prosecutors' minds" to have realized that they were unlikely to call Schertler as a witness, contending that the government's decisions were "hidden" and "secret" in light of its representation at the

March 21, 2024 *Curcio* hearing. (ECF No. 876 at 8, 12-13; ECF No. 868 at 2.) That is simply not true. The government alerted defendant to the fact that it was unlikely to call Schertler by omitting him from its witness list.[25] That was more than sufficient to notify defendant of the role her former counsel was to play at her trial.

*Second*, defendant—incorrectly—assumes that Schertler and his firm may have properly served as her trial counsel. But the conflict of interest did not vanish because Schertler was not called as a live witness. First, Schertler likely would have been an unsworn witness to some of the obstructive conduct at issue in this case. Indeed, the jury saw subpoenas Schertler Onorato received, communications surrounding those subpoenas involving Schertler Onorato, and the responsive production which contained the checks with the false memo lines that ultimately became the centerpiece of the government's case on the Obstruction Charges. That the jury did not see all of the evidence involving Schertler or his firm does not alter Schertler's status as an unsworn witness. *See Wheat*, 486 U.S. at 162.[26] Moreover, Schertler may very well have become a sworn witness at defendant's trial. As the government points out, if defendant had chosen to testify, the government may have called Schertler as a witness in its rebuttal case.[27] Again, the fact that this did not come to pass did not remediate the conflict.

*Finally*, there is simply no evidence to support defendant's contention that this conflict was manufactured as a ploy to rid defendant of her chosen counsel. *See Wheat*, 486 U.S. at 163. The two district court cases defendant cites in support bear little, if any, resemblance to the facts of this case. *See, e.g.*, *United States v. Morrell-Corrada*, 343 F. Supp. 2d 80, 90-92 (D.P.R. 2004) (denying motion to disqualify counsel who had formerly served as counsel for a government witness in part due to the "limited nature of the former representation and the waiver of the attorney-client privilege by [the

---

[25] Defendant makes hay of the fact that the government's witness list reserved the right to call as witnesses "[p]ersons as to whom stipulations of testimony or fact have been proposed to you (e.g., as to accuracy of translations from Arabic or Spanish), in the event that no satisfactory stipulation is reached." (ECF No. 875-1.) While it is conceivable that this notation could have encompassed Schertler or other members of Schertler Onorato, it does not support defendant's assertion that she expected Schertler to testify at her trial.

[26] Defendant contends that it does not matter whether Schertler was an unsworn witness because it was the government's representation that Schertler was going to be a sworn witness. But the government did not list Schertler on its witness list; should defendant have wished to explore whether she could re-engage Schertler, she was free to do so at that—or any—time.

[27] The government was entitled to call Schertler as a rebuttal witness if it desired to do so. The government's case "should not be unfairly impaired so that an accused can continue with conflicted counsel." *Locascio*, 6 F.3d at 934.

former client]" and concluding that the motion had been made for tactical purposes); *United States v. Rosato*, No. cr-88-66E, 1989 WL 153790, at *5-6 (W.D.N.Y. Dec. 7, 1989) (denying motion to disqualify counsel when "no competent evidence ha[d] been introduced showing there was ever an attorney-client relationship between" defendant's counsel and government witness and acknowledging that the "assertion that the government has strategically sought to 'manufacture' a conflict of interest so as to avoid these attorneys' tremendous insights and abilities cannot simply be ignored").[28]

At the end of the day, "the essential aim of the [Sixth] Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers." *Wheat*, 486 U.S. at 159. The Court has no doubt that defendant was represented by an effective advocate in this case.

### B. The Use of Summary Charts and Summary Witnesses by the Government Was Proper.

Defendant contends that the government's use of several summary charts—primarily GX 1352, GX 1353, and GX 1354—to present voluminous evidence to the jury was improper. Specifically, GX 1352 is an 83-page chart that places various government exhibits concerning the Egypt scheme in chronological order; GX 1353 is a 51-page chart that similarly lists certain government exhibits concerning the New Jersey state criminal matters; and GX 1354 is a 15-page chart that organizes certain government exhibits by date relating to Daibes' federal prosecution.

These three charts are all formatted in the same manner. At the top is a row that sets forth the date range the chart covers. (GX 1352-54; *see also* Tr. 563.) Each chart is comprised of six columns, consisting of (i) a number that identifies the row, (ii) the date of the document or communication, (iii) the time of the communication in Eastern Time, (iv) who sent the communication, (v) who received the communication, and (vi) a column entitled "detail." (*See* GX 1352-54). The detail column is populated with the type of communication (e.g., "text," "email," "WhatsApp," or "call") followed by a direct quotation, photograph, or other reproduction excerpted from the underlying exhibit or

[28] The Court declines to hold an evidentiary hearing because the Court has not observed any occurrence that "potentially call[s] into question the fairness of the proceedings or the thoroughness of [the] defense." (ECF No. 876 at 5 (quoting *United States v. Awadallah*, 436 F.3d 125, 136 (2d Cir. 2006)).) *See also United States v. Menendez*, 763 F. Supp. 3d 538, 549-50 (S.D.N.Y. 2025) (declining to allow discovery into alleged government misconduct because defendant failed to provide any "evidence tending to show the existence of the essential elements of the defense" (quoting *United States v. Berrios*, 501 F.2d 1207, 1211-12 (2d Cir. 1974))).

containing the complete exhibit. (*Id.*) The chart then identifies by exhibit number the underlying exhibit from which the quoted language or reproduction came. (*Id.*) Each chart was admitted into evidence pursuant to Federal Rule of Evidence 1006, as well as the exhibits underlying each chart.

To introduce each summary chart, the government called an FBI Special Agent who was not involved in the underlying investigation of the defendant. (Tr. 556, 1186, 2395.) Each agent explained that the government prosecutors had created each chart, including by selecting what documents were listed and what information from them was set forth in the chart. (Tr. 556, 1186-88, 2395-96.) The agent's role was simply to verify that all of the information in each chart was accurate, based on the underlying exhibits. (*See* Tr. 556 (Agent Coughlin: "I went through . . . every line and every column in the summary chart and verified that those lines and the columns were accurate" by "look[ing] at the original source document that the summary chart was derived from."); Tr. 1186, 2395.) Each agent explained to the jury that the decision as to which exhibits to include in the charts had been made by the prosecutors, not the agents. (Tr. 557-58, 564-67, 1186-89, 2396-97.)

Importantly, these three summary charts and the manner in which the government presented them to the jury largely mirror the charts and testimony introduced at the 2024 trial of defendant's co-defendants. (*Compare* GX 1352-54 (summary charts introduced at defendant's March 2025 trial) *with* GX 1302-04 (summary charts introduced at co-defendants' May 2024 trial.) Indeed, the only difference is that the charts introduced at defendant's trial contain slightly fewer underlying exhibits and are therefore shorter. (*Compare, e.g.*, GX 1302 (97-page summary chart for Egypt scheme used at co-defendants' trial) *with* GX 1352 (83-page summary chart for Egypt scheme used at defendant's trial).) Indeed, the very same agents testified. (*See, e.g.*, Trial of Robert Menendez, Wael Hana, and Fred Daibes ("Menendez Tr.") 1172 (Agent Coughlin testifying about Egypt summary chart); Tr. 555 (Agent Coughlin testifying about Egypt summary chart).)

In connection with the first trial, the Court repeatedly held that the format and content of these charts was proper. (*See, e.g.*, Menendez Tr. 1012 (holding that the "format of [GX 1302] seems . . . quite appropriate, and there is nothing unusual about it. The items are certainly voluminous, and it seems to me, under [Rule] 1006, that the chart can be admitted"); *id.* 2312.) *See also Menendez*, 759 F. Supp. 3d at 518-22. In light of those rulings, defendant's trial counsel withdrew her objections to the format of the summary charts. (ECF No. 781 at 2-3 ("Given the Government's proffer that the summary charts it has compiled are materially indistinguishable from summary charts that the Court previously ruled were admissible, and upon review of the Court's prior rulings relating to the application of F.R.E. 1006 to such exhibits, we have withdrawn

such objections."); Tr. 595 (defense counsel: "the government has a right to put that chart together, and did so. And your Honor thought carefully about that and ruled on it in connection with both cases, trial number one and this case. It went in in this case; it's in evidence without objection.").) Defendant offers no reason for the Court to change course now. *See, e.g.*, *United States v. Soto*, No. 12-cr-556, 2014 WL 1694880, at *7 (S.D.N.Y. Apr. 28, 2014) ("[I]n the absence of a manifest injustice, a Rule 33 motion is an inappropriate vehicle to relitigate the trial court's earlier evidentiary decisions."), *aff'd sub nom. United States v. Ramos*, 622 F. App'x 29 (2d Cir. 2015).[29]

The Court similarly concluded that the government's method of presenting these summary charts to the jury—through FBI agents who were not involved in the underlying investigation—was proper. *See Menendez*, 759 F. Supp. 3d at 522-25. The Court will reiterate, however, that the use of such witnesses did not deprive defendant of her right under the Sixth Amendment to confront her accusers. *See id.* at 522-24 (rejecting co-defendant's Confrontation Clause challenge to similar summary witness testimony).

Defendant contends these summaries allowed the FBI agents to make "inferences . . . with no personal knowledge." (ECF No. 868 at 23.) To support her argument, defendant highlights an excerpt of the government's questioning of one of its summary witnesses. (*Id.* at 23-24.) In that excerpt, the government asked the agent to read a text message sent by defendant.

> Q: can you please just read "It has been a year of broken promises" to the end of that paragraph, just that line?
>
> A: "It has been a year of broken promises by Will to me, and I have given 1000 percent of my —— myself, my time, and kept every promise to Will."
>
> Q: Where the defendant says it's been a year of broken promises by Will to her, what's the month and year that the defendant writes this?

---

[29] Defendant takes particular issue with the fact that the charts contained line entries "from a variety of sources . . . compiled together." (ECF No. 868 at 20.) Specifically, she urges that "[b]y compiling a variety of sources of information, the summary exhibits in this trial became improperly argumentative, as they were rife with the Government's judgment determinations and conclusions about the weight of the evidence." (*Id.*) As an initial matter, defendant cites no authority to support her argument. Tellingly, courts in this District have admitted summary charts pursuant to Rule 1006 that compile information from several sources. *See, e.g.*, *United States v. Parnas*, No. 19-cr-725, 2022 WL 669869, at *7 (S.D.N.Y. Mar. 7, 2022), *aff'd sub nom. United States v. Kukushkin*, 61 F.4th 327 (2d Cir. 2023).

A: March 26, 2019.

(Tr. 677.) The government then pulled up a different (non-summary) exhibit and continued its questioning.

Q: Special Agent Coughlin, what was the month and year of this meeting that we saw the invitation for?

A. March 2018.

Q. About how long was that before the defendant texted a year of broken promises?

A. Little over a year.

(*Id.*)

Nothing about this questioning was improper. While a summary "should not draw controversial inferences or pronounced judgment," "routine computations and culling through of documents to eliminate confusing and extraneous evidence" is acceptable. *United States v. Lemire*, 720 F.2d 1327, 1350 (D.C. Cir. 1983). "[L]ining up and comparing information" does not require impermissible inferences to be drawn. *United States v. Abou-Khatwa*, 40 F.4th 666, 686 (D.C. Cir. 2022). Here, the government simply asked its witness to identify the date a message was sent and then compare that to the date of another document that was already (and properly) admitted into evidence. No interpretation or impermissible inference was called for.[30]

Defendant next contends that because the government presented the jury with a "simplified timeline of certain arguably related conduct all in one place," the jurors became less likely to "analyze evidence that was admitted but not included within the summary exhibit." (ECF No. 868 at 22.) Putting aside the fact that defendant offers absolutely no support for her theory, she was free to create and introduce her own summaries—which her co-defendants did in the 2024 trial. *See Menendez*, 759 F. Supp. 3d at 521-22.

[30] Defendant also points to an instance where the government asked Agent Coughlin to identify "the entity that is listed in the first sentence [of the exhibit] as bearing the burden of securing its western border." (Tr. 631.) But the exhibit in question—GX C301—is not a summary chart. Rather, it is an email that Hana, a co-conspirator, sent to himself. It is entirely permissible "for a summary witness to 'also read admissible non-summary evidence into the record.'" *United States v. Gentile*, No. 21-cr-54, 2024 WL 3046193, at *3 (E.D.N.Y. June 18, 2024) (quoting *Fairholme Funds, Inc. v. Fed. Hous. Fin. Agency*, 636 F. Supp. 3d 144, 161 (D.D.C. 2022)). Moreover, contrary to defendant's assertions, nothing about this piece of testimony presented a "speculative interpretation[] of the language" in this document to the jury. (ECF No. 868 at 23.)

At its core, defendant takes issue with the government's use of circumstantial evidence. She urges it was impermissible for the government to "dr[aw] connections between disparate events[] simply based on timing." (ECF No. 876 at 20.) The government, however, was well within its rights to present a circumstantial case[31] and to do so in part through the use of summary charts. *See, e.g.*, *United States v. Ho*, 984 F.3d 191, 210 (2d Cir. 2020) (affirming use of visual timeline summary chart); *Parnas*, 2022 WL 669869, at *7 (admitting similar summary chart). *See also Menendez*, 759 F. Supp. 3d at 520-24 (explaining why the format, content, and testimony concerning substantially similar summary charts were proper).

Grasping at straws, defendant asserts it was improper for the government to *not* elicit testimony concerning the "entirety or near entirety" of its summary charts. (ECF No. 868 at 21.) That is meritless. There is no requirement that a witness be examined about everything in an exhibit. Indeed, at trial, in order to expedite the presentation of evidence, the Court urged the government "not to go line by line, but to highlight what it wants to highlight." (Tr. 597.)

In sum, defendant's challenges to the government's use of summary charts and summary witnesses fail.

## IV. Counts 1 and 15 Are Multiplicitous and Judgment Shall Enter on Only One of Those Counts.

Defendant contends that Counts 1 and 15 are multiplicitous and asks this Court to impose judgment on only one of these two counts. This Court has previously concluded that these counts are multiplicitous with respect to Menendez and Hana. *See Menendez*, 759 F. Supp. 3d at 532-34 (applying *Korfant* factors and concluding that Count 15 is "merely a subset of Count 1"). The government presents no reason why the Court should reach a different conclusion here. To the contrary, the government concedes that defendant is "similarly situated to [Menendez and Hana] with respect to this claim."

---

[31] As this Court has previously explained, "evidence of a corrupt agreement in bribery cases is usually circumstantial, because bribes are seldom accompanied by written contracts, receipts or public declarations of intentions." *Menendez*, 759 F. Supp. 3d at 477 (quoting *Friedman*, 854 F.2d at 554). Thus, the Second Circuit has repeatedly emphasized the importance of timing in bribery cases. *See, e.g.*, *Bruno*, 661 F.3d at 744 ("[T]iming of the payments in relation to the actions taken by [an official] could also be accepted by a rational jury in support of the conclusion that [the official] understood that the . . . payments were made in return for official action."); *Silver*, 948 F.3d at 567 n.18 (same); *Calk*, 2022 WL 101908, at *2 ("The timing and circumstances of each loan was sufficient for the jury to infer [defendant's] corrupt intent.").

(ECF No. 875 at 99.) Accordingly, the Court will impose judgment on only one of the two multiplicitous counts.

## V. CONCLUSION

Defendant's motion for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29 is denied on the ground that the evidence at trial was more than sufficient to sustain her conviction on all counts; in addition, defendant's motion for a new trial pursuant to Federal Rule of Criminal Procedure 33 is denied on the ground that defendant has failed to identify any injustice—let alone a manifest injustice—requiring a new trial.

Dated: New York, New York
July 31, 2025

SO ORDERED:

Sidney H. Stein

Sidney H. Stein, U.S.D.J.

AO 245B (Rev. 09/19) Judgment in a Criminal Case (Form modified within District on October 3, 2024)
Sheet 1

# UNITED STATES DISTRICT COURT

Southern District of New York

UNITED STATES OF AMERICA
v.
NADINE MENENDEZ

## JUDGMENT IN A CRIMINAL CASE

Case Number: 01:(S4) 23-cr-00490 (SHS)

USM Number: 79613-510

Sarah R. Krissoff
Defendant's Attorney

## THE DEFENDANT:

☐ pleaded guilty to count(s)

☐ pleaded nolo contendere to count(s)
which was accepted by the court.

☑ was found guilty on count(s) 1, 2, 3, 4, 5, 7, 8, 9, 10, 11, 13, 14, 17, and 18 in the(S4) Superseding Indictment.
after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. § 371 | Conspiracy to Commit Bribery | 12/31/2023 | 1 |
| 18 U.S.C. § 1349, | Conspiracy to Commit Honest Services Wire Fraud | 12/31/2023 | 2 |
| [18 U.S.C. § 1343 and | | | |

The defendant is sentenced as provided in pages 2 through 8 of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s)

☑ Count(s) Open counts & underlying inds. ☐ is ☑ are dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

9/11/2025
Date of Imposition of Judgment

Sidney H. Stein
Signature of Judge

Sidney H. Stein, U.S. District Judge
Name and Title of Judge

September 11, 2025
Date

DEFENDANT: NADINE MENENDEZ
CASE NUMBER: 01:(S4) 23-cr-00490 (SHS)

## ADDITIONAL COUNTS OF CONVICTION

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 1346] | | | |
| 18 U.S.C. § 1951 | Conspiracy to Commit Extortion Under Color of Official Right | 12/31/2023 | 3 |
| 18 U.S.C. § 371 | Conspiracy to Commit Obstruction of Justice | 12/31/2023 | 4 |
| 18 U.S.C. § 201(b)(2)(A) and (C) and 2 | Bribery- Actions to Benefit Hana and Egypt | 12/31/2023 | 5 |
| 18 U.S.C. § 1343, 1346, and 2 | Honest Services Wire Fraud - Actions to Benefit Hana and Egypt | 12/31/2023 | 7 |
| 18 U.S.C. § 1951 and 2 | Extortion Under Color of Official Right - Actions to Benefit Hana and Egypt | 12/31/2023 | 8 |
| 18 U.S.C. § 1343, 1346, and 2 | Honest Services Wire Fraud - Actions to Benefit Uribe and Uribe's Associates | 12/31/2023 | 9 |
| 18 U.S.C. § 1951 and 2 | Extortion Under Color of Official Right - Actions to Benefit Uribe and Uribe's Associates | 12/31/2023 | 10 |
| 18 U.S.C. § 201(b)(2)(A) and (C) and 2 | Bribery- Actions to Benefit Daibes and Qatar | 12/31/2023 | 11 |
| 18 U.S.C. § 1343, 1346, and 2 | Honest Services Wire Fraud - Actions to Benefit Daibes and Qatar | 12/31/2023 | 13 |
| 18 U.S.C. § 1951 and 2 | Extortion Under Color of Official Right - Actions to Benefit Daibes and Qatar | 12/31/2023 | 14 |
| 18 U.S.C. § 371 | Conspiracy to Commit Obstruction of Justice | 12/31/2023 | 17 |
| 18 U.S.C. § 1503 | Obstruction of Justice | 12/31/2023 | 18 |

DEFENDANT: NADINE MENENDEZ
CASE NUMBER: 01:(S4) 23-cr-00490 (SHS)

## IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of:

54 months on Counts 1, 2, 3, 4, 5, 7, 8, 9, 10, 11, 13, 14, 17, and 18, all to run concurrently.

☑ The court makes the following recommendations to the Bureau of Prisons:

1. That defendant be housed in the tri-state area.
2. The Court has no objection to Nadine Menendez visiting her husband, Robert Menendez, at the Correctional Facility where he may be held.

☐ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

- ☐ at __________ ☐ a.m. ☐ p.m. on __________ .
- ☐ as notified by the United States Marshal.

☑ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

- ☑ before 2 p.m. on 7/10/2026 .
- ☐ as notified by the United States Marshal.
- ☐ as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on __________ to __________

at __________ , with a certified copy of this judgment.

__________
UNITED STATES MARSHAL

By __________
DEPUTY UNITED STATES MARSHAL

DEFENDANT: NADINE MENENDEZ
CASE NUMBER: 01:(S4) 23-cr-00490 (SHS)

## SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of:

Three years on each count to run concurrently.

## MANDATORY CONDITIONS

1. You must not commit another federal, state or local crime.
2. You must not unlawfully possess a controlled substance.
3. You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.
   ☑ The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. *(check if applicable)*
4. ☐ You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of restitution. *(check if applicable)*
5. ☑ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*
6. ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
7. ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

DEFENDANT: NADINE MENENDEZ
CASE NUMBER: 01:(S4) 23-cr-00490 (SHS)

## STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1. You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2. After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3. You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4. You must answer truthfully the questions asked by your probation officer.
5. You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6. You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7. You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8. You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9. If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12. You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

Defendant's Signature ____________________________________ Date ____________________

DEFENDANT: NADINE MENENDEZ
CASE NUMBER: 01:(S4) 23-cr-00490 (SHS)

## SPECIAL CONDITIONS OF SUPERVISION

You must not incur new credit charges or open additional lines of credit without the approval of the probation officer. You must provide the probation officer with access to any requested financial information.

You will be supervised by your district of residence.

DEFENDANT: NADINE MENENDEZ
CASE NUMBER: 01:(S4) 23-cr-00490 (SHS)

# CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | Assessment | Restitution | Fine | AVAA Assessment* | JVTA Assessment** |
|---|---|---|---|---|---|
| **TOTALS** | $ 1,400.00 | $ 0 | $ 0.00 | $ 0.00 | $ 0.00 |

☐ The determination of restitution is deferred until __________ . An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss*** | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| **TOTALS** | $ 0.00 | $ 0.00 | |

☐ Restitution amount ordered pursuant to plea agreement $ __________

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

☐ the interest requirement is waived for the ☐ fine ☐ restitution.

☐ the interest requirement for the ☐ fine ☐ restitution is modified as follows:

* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
** Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
*** Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

DEFENDANT: NADINE MENENDEZ
CASE NUMBER: 01:(S4) 23-cr-00490 (SHS)

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

**A** ☑ Lump sum payment of $ 1,400.00 due immediately, balance due

☐ not later than ______________ , or
☐ in accordance with ☐ C, ☐ D, ☐ E, or ☐ F below; or

**B** ☐ Payment to begin immediately (may be combined with ☐ C, ☐ D, or ☐ F below); or

**C** ☐ Payment in equal ________ *(e.g., weekly, monthly, quarterly)* installments of $ ________ over a period of ________ *(e.g., months or years)*, to commence ________ *(e.g., 30 or 60 days)* after the date of this judgment; or

**D** ☐ Payment in equal ________ *(e.g., weekly, monthly, quarterly)* installments of $ ________ over a period of ________ *(e.g., months or years)*, to commence ________ *(e.g., 30 or 60 days)* after release from imprisonment to a term of supervision; or

**E** ☐ Payment during the term of supervised release will commence within ________ *(e.g., 30 or 60 days)* after release from imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

**F** ☐ Special instructions regarding the payment of criminal monetary penalties:

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐ Joint and Several

| Case Number<br>Defendant and Co-Defendant Names<br>*(including defendant number)* | Total Amount | Joint and Several Amount | Corresponding Payee, if appropriate |
|---|---|---|---|

☐ The defendant shall pay the cost of prosecution.

☐ The defendant shall pay the following court cost(s):

☑ The defendant shall forfeit the defendant's interest in the following property to the United States:
$922,188.10 in U.S. currency. See the Preliminary Order of Forfeiture As To Specific Property/Money Judgment dated 9/11/2025.

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.